UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IAN J. BROWN, JAMES BROWN and | ) | |
| BARBARA BROWN, | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| vs. | ) | No. 04-11924-RGS |
| UNITED STATES OF AMERICA, | ) | |
| VERIZON NEW ENGLAND, INC., and | ) | |
| BOSTON EDISON COMPANY d/b/a | ) | |
| NSTAR ELECTRIC, | ) | |
| Defendants. | ) | |
| _____ | ) | |

Deposition of

MAJOR BRIAN PETERS

Thursday, April 21, 2005

Reported by:  SHERYL DIRKS, CSR #3513

1  best of your ability just mark with a "W" the general area
2  where you believe your office is located?
3  A.     Okay. It is marked.
4  Q.     Can you generally describe for me what your
5  assignment as a major at Hanscom Air Force Base entailed?
6  A.     I was a captain at Hanscom Air Force Base. I have
7  since been promoted. We were members of the acquisition
8  community at Hanscom. It's in acquisitions it's primarily
9  office work where you worry about the cost schedule and
10 performance of various efforts that the Air Force
11 undertakes. It's not what people typically associate with
12 being in the Air Force with launching and recovering
13 aircraft, those types of things. It's mostly office work.
14       Hanscom Air Force Base doesn't even have an active
15 runway anymore. It's basically an office park.
16 Q.     Okay. And in your position as a captain, did you
17 oversee civilians?
18 A.     Yes. I had several civilians under -- that I
19 supervised. These civilians were actually contractors, not
20 government civilians, though.
21 Q.     They were military contractors?
22 A.     They were contractors under contract with the
23 government. They were not what people would refer to as a
24 government civilian or a --
25 Q.     Okay. In any event they weren't active duty

1  military personnel?
2  A.    No.
3  Q.    Did you also oversee or supervise military
4  personnel?
5  A.    Yes, I did.
6  Q.    And approximately how many?
7  A.    Depending on what time frame but between three and
8  five other lieutenants.
9  Q.    And was Lieutenant Ian Brown one of those?
10 A.    Yes.  Lieutenant Brown was one of my subordinates.
11 Q.    You indicated that there were approximately three to
12 five lieutenants?
13 A.    Yes.
14 Q.    And were there any military personnel subordinates
15 to those three to five lieutenants?
16 A.    Not to my knowledge.
17 Q.    Did this unit have any name?
18 A.    I don't understand your question.
19 Q.    Okay.  You indicated that you supervised three to
20 five lieutenants.  Did that group have a set of specific
21 responsibilities assigned to it?
22 A.    Yes.  We all had responsibilities towards the Global
23 Combat Support System Air Force Program.
24 Q.    Did that group of three to five lieutenants that you
25 oversaw have a specific unit name or designation?

1  A.      I don't think so.  They were part of the Program
2  Office.  I guess I don't understand.  You know, there was
3  nothing like A team or B team or anything like that if
4  that's what you're after.
5  Q.      Okay.  What were your specific duties in relation to
6  your supervision of those three to five lieutenants?
7  A.      What do you mean?
8  Q.      What did you do?  What were your daily duties as a
9  captain at Hanscom Air Force Base?
10 A.      With respect to the lieutenants?
11 Q.      Let's just start with respect to your general work
12 at Hanscom?
13 A.      Okay.  Primarily I did all of the budgetary and
14 contracting items for the programs that we ran.  Several of
15 the lieutenants worked with me on those items.  Several.
16 Ian I recall was an engineer and he worked additionally on a
17 program called Air Force Portal.
18 Q.      Sorry.  What was that "Air Force"?
19 A.      Air Force Portal.  It's a web-based computer system.
20 Q.      As of January 4th, 2002 do you know Lieutenant
21 Brown's rank at that time?
22 A.      I believe he was a first lieutenant.  But we could
23 check the personnel records and find out.
24 Q.      But your belief is that he was a first lieutenant?
25 A.      Yes.

1  January 4th, 2002?
2  A.    I believe that he was sharing a trailer with his
3  girlfriend at the time in the Hanscom Air Force Base Mobile
4  Home Park, but I had never, I have never been there.
5  Q.    You've never been to the mobile home park where he
6  lived?
7  A.    I have never been to Ian Brown's mobile home in the
8  mobile home park.
9  Q.    Have you ever been to the mobile home park?
10 A.    Yes.
11 Q.    If we could go back to Exhibit No. 2?
12 A.    I have Exhibit No. 2.
13 Q.    Okay.
14       Can you identify on Exhibit No. 2 the approximate
15 location of the mobile home park?
16 A.    I believe it's the area labeled "mobile home park"
17 to the left of "Site 1" and above "Site 5."
18 Q.    Okay. And according to this map that mobile home
19 park is located on or near Hartwell Road; is that correct?
20 A.    That's what the map shows me, yes.
21 Q.    Do you recall whether the mobile home park when you
22 went there was located on Hartwell Road?
23 A.    Yes, I believe it was. I'm not aware of it moving.
24 Q.    If you could look at Exhibit No. 1 which is the
25 affidavit of Brian Carl Peters, Major United States Air

19

1  Q.      So all of Lieutenant Brown's job duties at Hanscom
2  revolved around computer hardware and software; is that
3  correct?
4  A.      It all revolved around the things that were
5  necessary for the Global Combat Support System Office, yes.
6  Q.      Could you describe for me a typical workday at
7  Hanscom for Lieutenant Brown?
8  A.      A typical workday would have been coming to work,
9  working on his normal programs, attending meetings or
10 setting up meetings as necessary to get his things done.  He
11 would routinely go home for lunch.
12         We allowed a fairly liberal amount of physical
13 training time for all the lieutenants in the office.
14 Occasionally they would go work out together at the gym or
15 they would work out by themselves at the gym, usually on
16 base.  And afternoon would be more of the same.  Working on
17 the -- your various projects.  This time of the year,
18 January is normally very focused on contractual issues and
19 financial issues.  The way the contracts, the recurring
20 contracts with our supporting contractors were set up most
21 of them were expired in December and would then, therefore,
22 be renewed, you know, beginning of January.
23         Additionally we'd have quite a few discussions about
24 financial issues since the president's budget normally would
25 be approved sometime in the fall and the money distribution

1  A.     Yes. All of the military people on the program
2  worked in the same office area.
3  Q.     And is that -- is the building where you worked an
4  office building?
5  A.     Yes, it is.
6  Q.     It's not a hangar?
7  A.     It is not a hangar.
8  Q.     Did Lieutenant Brown have his own office in the
9  building?
10 A.     Lieutenant Brown had a cubicle with his own
11 computer, telephone, an office area. But it was not
12 separate from the rest of the office. It was just a
13 cubicle.
14 Q.     Were there set hours of work for Lieutenant Brown?
15 A.     Yes. We worked a normal workday.
16 Q.     What was the normal workday?
17 A.     It was expected -- we had some flexibility in the
18 workday; however, it was expected that you were at work
19 between 8:00 and 4:00 o'clock. 8:00 in the morning and 4:00
20 in the afternoon.
21        Any other arrangements where if you needed to take
22 care of some business off base outside of those times, then
23 it would have to be specifically arranged.
24 Q.     How many days a week was -- did Lieutenant Brown
25 work?

1  A.    Five duties days per week, Monday through Friday.
2  Q.    Monday through Friday?
3  A.    Yes.
4  Q.    Was Lieutenant Brown ever called to work on an
5  emergency basis during that period of time?
6        I don't recall any, anything that would have called
7  him in on an emergency basis.
8  Q.    Was Lieutenant Brown on call when he was not at
9  work?
10 A.    When you're on active duty and you're not on leave
11 you are subject to recall at any time.
12 Q.    Do you know if he had a pager?
13 A.    I know he had a cell phone. He may have had a
14 pager.
15 Q.    Do you recall at any time recalling Lieutenant Brown
16 to work during his non-normal working hours?
17 A.    No. Not for anything that wouldn't have been an
18 ordinary test of the recall system. Occasionally the base
19 would run a recall which would be, you know, I would get a
20 phone call from my superior with, you know, an indication
21 for what we needed to do. Simply call down the chain and
22 notify everyone or if we needed to come into work or
23 something. But I'm not aware that we had been called in
24 after duty or on the weekends for any particular purpose in
25 that time frame.

29

1  Q.     I'd like to ask you some questions about the lunch
2  policy if any. Was there a specific set lunch time in the
3  office?
4  A.     No. Often -- based on meetings and other things it
5  was not uncommon for people to have to shift their lunch
6  hours slightly, you know, between, you know, 10:00 o'clock
7  in the morning and maybe 2:00 o'clock in the afternoon.
8  Additionally some of the lieutenants or some of the people
9  in the office they would combine physical fitness activities
10 with their lunch hour and take a slightly extended lunch
11 hour several days a week but there was no hard and fast
12 policy that lunch was, you know, between 11:15 and 12:15
13 every day.
14 Q.     You mentioned a few times the word "lunch hour."
15 I'm sorry. I'll reask the question. You mentioned the word
16 "lunch hour" a few times. Was the lunch break a one-hour
17 lunch break?
18 A.     Generally we were allowed about an hour to have, to
19 go have lunch. If you had lunch on base, obviously, it
20 would take a lot less than an hour to get all that done. If
21 you were going off base to one of the local civilian
22 establishments, it could take an hour by the time you could
23 get to and from and get your food and have a nice lunch.
24 Q.     Would they have to clock in or out for lunch?
25 A.     No. We did not have any sort of time card system to

1  clock in and out.
2  Q.    Did anyone keep track of how long the lieutenants
3  were taking for lunch?
4  A.    Not specifically with a stop watch or something. If
5  it seemed like a lieutenant was taking too long or abusing
6  the flexibility that we had in the workday, we would address
7  it.
8  Q.    Would all the members in your office take lunch at
9  the same time?
10 A.    Rarely all of us took lunch at the same time.
11 Q.    Was it on an individual basis?
12 A.    Yes.
13 Q.    Did anyone have to seek permission to take his lunch
14 break?
15 A.    No.
16 Q.    And he did not, Lieutenant Brown did not have to
17 sign out for lunch?
18 A.    No, Lieutenant Brown did not have to sign out for
19 lunch.
20 Q.    Was he required to let you know that he was leaving
21 for lunch?
22 A.    No.
23 Q.    You mention that Lieutenant Brown or the other
24 lieutenants would on occasion work out during their lunch?
25 A.    Yes.

1  Q.    Were there any restrictions on what Lieutenant Brown
2  could do during his lunch break?
3  A.    I don't understand that question.
4  Q.    Okay. Let me ask you this. Was he required to
5  remain in his uniform during lunch?
6  A.    Was he required to remain in his uniform during
7  lunch? There wouldn't be a policy that says that during
8  your lunch hour you had to remain in your uniform. However,
9  you know, if he were going to go work out, it would be
10 expected that he would change into gym clothes. If he were
11 going to, you know, it becomes a convenience thing. He was
12 expected to have his uniform on when he left work and he
13 will be expected to have his uniform on when he returns from
14 his lunch hour. So I suppose if it suited Lieutenant Brown
15 to change out of his uniform for his lunch hour and then
16 return to work and put his uniform back on, that would be
17 fine.
18 Q.    He was not required to stay on the base during
19 lunch; is that correct?
20 A.    No. Within -- if he could get on and off base
21 within the guidelines of approximately an hour for lunch,
22 then he could go off base for lunch.
23 Q.    And he could eat his lunch at home if he wanted to?
24 A.    He often did.
25 Q.    And that was allowed?

1    A.    Absolutely.
2    Q.    And how about going to an off-base restaurant for
3    lunch?
4    A.    Again, that would be allowed. Depending on where it
5    was and, you know, the amount of time that would be required
6    to go to lunch.
7    Q.    And if he did leave the base, was he required to use
8    a military vehicle?
9    A.    He almost certainly would be driving his civilian,
10   his own personal vehicle. Our office did not have any
11   government-use vehicles at all nor were there any available
12   for Lieutenant Brown to use.
13   Q.    Was Lieutenant Brown -- if Lieutenant Brown did eat
14   his lunch at home, was he required to check in at any time
15   during that lunch hour with you?
16   A.    No.
17   Q.    If we could turn back to your affidavit?
18   A.    Okay.
19   Q.    If I can direct your attention. This is Exhibit No.
20   1. If I could direct your attention to paragraph 11.
21   A.    Okay.
22   Q.    Paragraph 11 states, "At the time of his accident
23   Lieutenant Brown was subject to military control." Do you
24   see that?
25   A.    Yes.

34

1  basically pardons you from the responsibilities of being on
2  active duty. You then can travel to wherever it is that you
3  want, do the things that you need to do or you would like to
4  do. Leave is basically the military equivalent of vacation.
5  And to my knowledge Lieutenant Brown did not have any
6  approved leave paperwork for this period of time and also to
7  my knowledge he was not given any sort of verbal permission
8  to not be at work. I certainly did not do it. The other
9  person in the office who could have done such a thing would
10 have been Colonel Bremer, and you would have to speak with
11 him.
12 Q.    All right. What is "liberty status"?
13 A.    "Liberty" in my -- the way I used it in my affidavit
14 the Navy usually refers to "liberty." "Leave" is the term
15 used for the Air Force.
16 Q.    So "liberty status" is the Navy version of the Air
17 Force's "leave status"?
18 A.    To my knowledge. I don't know. I'm not in the
19 Navy.
20 Q.    But you use it in the same way that you use the word
21 "leave"?
22 A.    In that statement I am referring to that he had, as
23 far as to my knowledge, he had no permission from a -- on
24 leave paperwork that says he was not subject to active duty
25 rules and he had also not been given any verbal

1  "furlough"?
2  A.    "Furlough"?
3  Q.    Yes.
4  A.    With respect to what, sir?
5  Q.    The Air Force?
6  A.    No, sir. I'm not aware of "furlough." Is it
7  commonly referred to in -- by other terms?
8  Q.    Well, I guess that's what I'm asking you. You're
9  not familiar with the term?
10 A.    I'm not familiar with the term "furlough" with
11 regard to Air Force and the leave program.
12 Q.    Major, on Saturdays and Sundays when Ian Brown --
13 strike that.
14       In December of 2001 on Saturdays and Sundays was Ian
15 Brown on active duty?
16 A.    To my knowledge he was on active duty, yes.
17 Q.    Is it fair to say that on Saturdays and Sundays in
18 December of 2001 Ian Brown was subject to military
19 discipline 24 hours a day?
20 A.    Yes.
21 Q.    Is it fair to say that on Saturdays and Sundays in
22 December of 2001 Ian Brown was subject to the Uniform Code
23 of Military Justice?
24 A.    I believe that is fair to say, yes.
25 Q.    Is it fair to say on Saturdays and Sundays in

43

1  December of 2001 Lieutenant Brown was subject to military
2  control?
3  A.     Yes.
4  Q.     Now in January of 2002, Major, if someone in the Air
5  Force was on leave, is it your understanding that they're no
6  longer on active duty status?
7  A.     No.  It's my understanding that they're no longer
8  required to be present at work.
9  Q.     But they're still on active duty status; isn't that
10 correct?
11 A.     Yes.
12 Q.     When someone is on leave from the Air Force
13 including in January 2002 they're still subject to military
14 control.  Are they not?
15 A.     Yes.
16 Q.     When someone is on leave from the Air Force
17 including in January, 2002 they're all still subject to
18 military discipline 24 hours a day, correct?
19 A.     Yes, I believe that's true.
20 Q.     Bear with me one moment, Major.  I'm almost
21 finished.  I'm just checking my notes.
22 A.     Take all the time you want.
23 Q.     Thank you.  Now, Major, are you familiar with the
24 criterion that was applied to Lieutenant Brown for receipt
25 of medical treatment benefits arising out of his accident

1   which is the subject of this case?
2   A.   I'm generally familiar. However, the specific
3   determinations that were made were made by other military
4   professionals who have specific responsibilities with regard
5   to medical treatment, line of duty determinations, those
6   types of things.
7   Q.   Would you be kind enough, Major, to turn to
8   paragraph 13 of Exhibit 1 your affidavit. Tell me when
9   you've done so.
10  A.   Yes.
11  Q.   Would you read number 13 to yourself, please.
12  A.   Okay. I've done so.
13  Q.   Do you see the end of the paragraph you say,
14  "Because they occurred while Lieutenant Brown was performing
15  his military duties." Do you see that there?
16  A.   Yes.
17  Q.   What was the basis of your affidavit or that
18  statement in your affidavit that his benefits were given to
19  him or awarded to him because they occurred while he was
20  performing his military duties as opposed to some other
21  criteria? For example, that he was on active duty at the
22  time of his incident?
23  A.   No. I see your point. I think what I meant was
24  that he was on active duty; and, therefore, was eligible for
25  military medical benefits and those types of things. He

45

1  certainly was not injured because his duty was to drive his
2  motorcycle. I can see where that can cause some confusion.
3        MR. CHARNAS: Thank you, Major. Those are all the
4  questions I have.
5                    EXAMINATION BY MR. STEVENS
6  Q.    Major Peters, my name is Jeffrey Stevens. I
7  represent the Defendant Boston Edison Company. I believe
8  it's still morning just about there. Good morning.
9        One question for you and I want to direct your
10 attention to what's been marked as Exhibit 1 which is your
11 affidavit, and specifically I'd like to draw your attention
12 to paragraph 8 of your affidavit. If you could just take a
13 moment to read that paragraph.
14 A.    Okay.
15 Q.    And in paragraph 8 you state based upon your
16 information and belief on January 4th of 2002 at
17 approximately 1419 hours Lieutenant Brown lost control of
18 his motorcycle?
19 A.    Yes. I see that paragraph.
20 Q.    Can you tell me what military duties Lieutenant
21 Brown was performing at that time?
22 A.    Again, I believe he was just returning from lunch
23 going -- coming back to work. He was not specifically
24 executing a military duty. I mean, he didn't have a duty to
25 be on Hartwell Road at that time.