# Exhibit D

Deposition of Major Brian Carl Peters

(Pages:  10, 14, 18-21, 23-25, 29-36, 42-46

(Exhibit:  2)

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| IAN J. BROWN, JAMES BROWN and | ) | |
| BARBARA BROWN, | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| VS. | ) | No. 04-11924-RGS |
| UNITED STATES OF AMERICA, | ) | |
| VERIZON NEW ENGLAND, INC., and | ) | |
| BOSTON EDISON COMPANY d/b/a | ) | |
| NSTAR ELECTRIC, | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

Deposition of

MAJOR BRIAN PETERS

Thursday, April 21, 2005



Reported by:  SHERYL DIRKS, CSR #3513

Major Brian Peters

1    best of your ability just mark with a "W" the general area

2    where you believe your office is located?

3    A.      Okay.  It is marked.

4    Q.      Can you generally describe for me what your

5    assignment as a major at Hanscom Air Force Base entailed?

6    A.      I was a captain at Hanscom Air Force Base.  I have

7    since been promoted.  We were members of the acquisition

8    community at Hanscom.  It's in acquisitions it's primarily

9    office work where you worry about the cost schedule and

10   performance of various efforts that the Air Force

11   undertakes.  It's not what people typically associate with

12   being in the Air Force with launching and recovering

13   aircraft, those types of things.  It's mostly office work.

14        Hanscom Air Force Base doesn't even have an active

15   runway anymore.  It's basically an office park.

16   Q.      Okay.  And in your position as a captain, did you

17   oversee civilians?

18   A.      Yes.  I had several civilians under -- that I

19   supervised.  These civilians were actually contractors, not

20   government civilians, though.

21   Q.      They were military contractors?

22   A.      They were contractors under contract with the

23   government.  They were not what people would refer to as a

24   government civilian or a --

25   Q.      Okay.  In any event they weren't active duty

14

1    January 4th, 2002?

2    A.       I believe that he was sharing a trailer with his

3    girlfriend at the time in the Hanscom Air Force Base Mobile

4    Home Park, but I had never, I have never been there.

5    Q.       You've never been to the mobile home park where he

6    lived?

7    A.       I have never been to Ian Brown's mobile home in the

8    mobile home park.

9    Q.       Have you ever been to the mobile home park?

10   A.       Yes.

11   Q.       If we could go back to Exhibit No. 2?

12   A.       I have Exhibit No. 2.

13   Q.       Okay.

14           Can you identify on Exhibit No. 2 the approximate

15   location of the mobile home park?

16   A.       I believe it's the area labeled "mobile home park"

17   to the left of "Site 1" and above "Site 5."

18   Q.       Okay.  And according to this map that mobile home

19   park is located on or near Hartwell Road; is that correct?

20   A.       That's what the map shows me, yes.

21   Q.       Do you recall whether the mobile home park when you

22   went there was located on Hartwell Road?

23   A.       Yes, I believe it was.  I'm not aware of it moving.

24   Q.       If you could look at Exhibit No. 1 which is the

25   affidavit of Brian Carl Peters, Major United States Air

1   Hanscom Air Force Base and he had the right skill-set to

2   assist our program, and to my knowledge Ian worked with him

3   on occasion.

4   Q.      Do you know what he worked with him on?

5   A.      Not specifically at this point.  I'd have to go back

6   into files and look it up.

7   Q.      And then you also mentioned software engineering.

8   Did I understand that correctly?

9   A.      To understand how the hardware and software works

10  together on these programs you have to have a foundation in

11  -- well, you should have some understanding of software.

12  Q.      And did Lieutenant Brown work on the hardware or

13  software for this program?

14  A.      Not directly.  He did not write code.  However,

15  understanding the concepts of how the different systems work

16  would have been something that Ian would have needed to

17  learn for this program.

18  Q.      So you've indicated that less than 50 percent of

19  Lieutenant Brown's time was devoted to the Air Force Portal,

20  and that he also spent some time working with the individual

21  mobilization augmentee.  What else did Lieutenant Brown do

22  at Hanscom?

23  A.      He also worked on the Global Combat Support System

24  programs.  They're all related computer software and

25  hardware setups.

Major Brian Peters

04/21/2005

19

1    Q.    So all of Lieutenant Brown's job duties at Hanscom

2    revolved around computer hardware and software; is that

3    correct?

4    A.    It all revolved around the things that were

5    necessary for the Global Combat Support System Office, yes.

6    Q.    Could you describe for me a typical workday at

7    Hanscom for Lieutenant Brown?

8    A.    A typical workday would have been coming to work,

9    working on his normal programs, attending meetings or

10   setting up meetings as necessary to get his things done.  He

11   would routinely go home for lunch.

12        We allowed a fairly liberal amount of physical

13   training time for all the lieutenants in the office.

14   Occasionally they would go work out together at the gym or

15   they would work out by themselves at the gym, usually on

16   base.  And afternoon would be more of the same.  Working on

17   the -- your various projects.  This time of the year,

18   January is normally very focused on contractual issues and

19   financial issues.  The way the contracts, the recurring

20   contracts with our supporting contractors were set up most

21   of them were expired in December and would then, therefore,

22   be renewed, you know, beginning of January.

23        Additionally we'd have quite a few discussions about

24   financial issues since the president's budget normally would

25   be approved sometime in the fall and the money distribution

20

1    would start to come down in January-February.  It was always

2    an interesting time.

3    Q.      Was major -- Lieutenant Brown required to wear a

4    uniform while he was at work?

5    A.      Yes, he was.

6    Q.      What's the uniform?

7    A.      If we had meetings, you know, specifically with

8    superiors outside of the office, we would usually wear

9    blues.  Most of the rest of the time we would wear the BDU,

10   battle dress uniform.

11   Q.      I'm sorry.  What?

12   A.      The green fatigues.  The camouflage uniform.

13   Q.      So when you would just be working at the office it

14   was typical to wear the fatigues?

15   A.      Yes.

16   Q.      And then if you were meeting with superiors, you

17   would wear your blues?

18   A.      That's correct.

19   Q.      By "blues" can you -- what are the "blues"?

20   A.      Short sleeve light blue shirt with the blue pants.

21   Q.      By the way, you all worked in the same building,

22   correct?

23   A.      I'm sorry?

24   Q.      Lieutenant Brown worked in the same building as you,

25   correct?

Major Brian Peters
04/21/2005

21

1   A.     Yes. All of the military people on the program

2 worked in the same office area.

3   Q.     And is that -- is the building where you worked an

4 office building?

5   A.     Yes, it is.

6   Q.     It's not a hangar?

7   A.     It is not a hangar.

8   Q.     Did Lieutenant Brown have his own office in the

9 building?

10   A.     Lieutenant Brown had a cubicle with his own

11 computer, telephone, an office area. But it was not

12 separate from the rest of the office. It was just a

13 cubicle.

14   Q.     Were there set hours of work for Lieutenant Brown?

15   A.     Yes. We worked a normal workday.

16   Q.     What was the normal workday?

17   A.     It was expected -- we had some flexibility in the

18 workday; however, it was expected that you were at work

19 between 8:00 and 4:00 o'clock. 8:00 in the morning and 4:00

20 in the afternoon.

21       Any other arrangements where if you needed to take

22 care of some business off base outside of those times, then

23 it would have to be specifically arranged.

24   Q.     How many days a week was -- did Lieutenant Brown

25 work?

Major Brian Peters
04/21/2005

23

1   Q.      Can you briefly describe for me the extent of your

2   supervision of Lieutenant Brown during the workday?

3   A.      I did not work directly with him on all of his

4   tasks.  We would -- there would be meetings during the week

5   where we would check status on how people were progressing

6   on the various things that they were working on, and we

7   would make course corrections.  I primarily did contracts

8   and finances.

9   Q.      You mention there would periodically be meetings

10  where you would check up on his status.  How often would

11  those meetings occur?

12  A.      Several times a week.  We'd have a scheduled staff

13  meeting where issues would be presented to Colonel Bremer,

14  our SPO director.  System Program Office Director.  There we

15  are also lots of opportunities for informal meetings.  The

16  work proximity was such that we saw our leadership several

17  times a day if not more; and, you know, if something hot

18  came up, we would adjust as necessary.

19  Q.      Okay.  You didn't review his work on a daily basis,

20  did you?

21  A.      No.

22  Q.      And you weren't required to sign off on his work on

23  a daily basis?

24  A.      No.

25  Q.      Okay.  I'd like to direct your attention back to

Major Brian Peters
04/21/2005

24

1  Exhibit No. 1 which is your affidavit?

2  A.      Okay.

3          MR. WILMOT:  This is Damian Wilmot.  I just want to

4  take a quick break to speak with Major Peters on the phone.

5          (recess)

6          BY MR. LEWIN:  Q.  Major Peters, if we could turn

7  back to your Exhibit No. 1 which is your affidavit.

8  A.      Yes.

9  Q.      And if I could direct you to paragraph number 7

10 again?

11 A.      Okay.

12 Q.      Paragraph number 7 you indicate that Hanscom Air

13 Force Base is located on Hartwell Road.  Is that correct?

14 A.      Well, from the map that you've provided it looks

15 like Hanscom Air Force Base is actually located on Hartwell

16 Avenue, and I must have just been mistaken putting "Hartwell

17 Road" on my affidavit for Hartwell Avenue.  I have not been

18 there in several years and I must have just made an error.

19 Q.      Understandable.  So it's your understanding now that

20 Hanscom Air Force Base is actually located on Hartwell

21 Avenue?

22 A.      Yes.

23 Q.      And that's a different road than the Hartwell Road

24 you identified earlier as being close to Major Peters' --

25 I'm sorry -- Lieutenant Brown's home?

Major Brian Peters
04/21/2005

25

1    A.      Right.

2            MR. WILMOT:  Objection.

3            BY MR. LEWIN:  Q.  I'll reask the question.  So,

4    Major Peters, your understanding now is that Hanscom Air

5    Force Base is actually located on Hartwell Avenue?

6    A.      Yes.

7    Q.      And that's a different road from the Hartwell Road

8    which you identified earlier in this deposition as passing

9    by Lieutenant Brown's home?

10   A.      That's correct.

11   Q.      Are you aware, Major Peters, of what town Lieutenant

12   Brown's home was located in?

13   A.      From the map here it looks like it's in Bedford.

14   Q.      And the Hartwell Avenue that you've identified as

15   accessing Hanscom Air Force Base, do you know what town that

16   road is located in?

17   A.      Again, from the map it looks like it's primarily in

18   Lexington.

19   Q.      So you've indicated that your affidavit paragraph

20   number 7 you now believe to be in error; is that correct?

21   A.      That's correct.

22           MR. WILMOT:  Objection.

23           BY MR. LEWIN:  Q.  That was just an innocent

24   mistake?

25   A.      I believe that I probably transposed -- I just

Major Brian Peters
04/21/2005

29

1    Q.      I'd like to ask you some questions about the lunch

2    policy if any.  Was there a specific set lunch time in the

3    office?

4    A.      No.  Often -- based on meetings and other things it

5    was not uncommon for people to have to shift their lunch

6    hours slightly, you know, between, you know, 10:00 o'clock

7    in the morning and maybe 2:00 o'clock in the afternoon.

8    Additionally some of the lieutenants or some of the people

9    in the office they would combine physical fitness activities

10   with their lunch hour and take a slightly extended lunch

11   hour several days a week but there was no hard and fast

12   policy that lunch was, you know, between 11:15 and 12:15

13   every day.

14   Q.      You mentioned a few times the word "lunch hour."

15   I'm sorry.  I'll reask the question.  You mentioned the word

16   "lunch hour" a few times.  Was the lunch break a one-hour

17   lunch break?

18   A.      Generally we were allowed about an hour to have, to

19   go have lunch.  If you had lunch on base, obviously, it

20   would take a lot less than an hour to get all that done.  If

21   you were going off base to one of the local civilian

22   establishments, it could take an hour by the time you could

23   get to and from and get your food and have a nice lunch.

24   Q.      Would they have to clock in or out for lunch?

25   A.      No.  We did not have any sort of time card system to

Major Brian Peters
04/21/2005

30

1    clock in and out.

2    Q.      Did anyone keep track of how long the lieutenants

3    were taking for lunch?

4    A.      Not specifically with a stop watch or something.  If

5    it seemed like a lieutenant was taking too long or abusing

6    the flexibility that we had in the workday, we would address

7    it.

8    Q.      Would all the members in your office take lunch at

9    the same time?

10   A.      Rarely all of us took lunch at the same time.

11   Q.      Was it on an individual basis?

12   A.      Yes.

13   Q.      Did anyone have to seek permission to take his lunch

14   break?

15   A.      No.

16   Q.      And he did not, Lieutenant Brown did not have to

17   sign out for lunch?

18   A.      No, Lieutenant Brown did not have to sign out for

19   lunch.

20   Q.      Was he required to let you know that he was leaving

21   for lunch?

22   A.      No.

23   Q.      You mention that Lieutenant Brown or the other

24   lieutenants would on occasion work out during their lunch?

25   A.      Yes.

Major Brian Peters
04/21/2005

31

1   Q.      Were there any restrictions on what Lieutenant Brown
2   could do during his lunch break?
3   A.      I don't understand that question.
4   Q.      Okay.  Let me ask you this.  Was he required to
5   remain in his uniform during lunch?
6   A.      Was he required to remain in his uniform during
7   lunch?  There wouldn't be a policy that says that during
8   your lunch hour you had to remain in your uniform.  However,
9   you know, if he were going to go work out, it would be
10  expected that he would change into gym clothes.  If he were
11  going to, you know, it becomes a convenience thing.  He was
12  expected to have his uniform on when he left work and he
13  will be expected to have his uniform on when he returns from
14  his lunch hour.  So I suppose if it suited Lieutenant Brown
15  to change out of his uniform for his lunch hour and then
16  return to work and put his uniform back on, that would be
17  fine.
18  Q.      He was not required to stay on the base during
19  lunch; is that correct?
20  A.      No.  Within -- if he could get on and off base
21  within the guidelines of approximately an hour for lunch,
22  then he could go off base for lunch.
23  Q.      And he could eat his lunch at home if he wanted to?
24  A.      He often did.
25  Q.      And that was allowed?

Major Brian Peters
04/21/2005

32

1    A.      Absolutely.

2    Q.      And how about going to an off-base restaurant for

3    lunch?

4    A.      Again, that would be allowed.  Depending on where it

5    was and, you know, the amount of time that would be required

6    to go to lunch.

7    Q.      And if he did leave the base, was he required to use

8    a military vehicle?

9    A.      He almost certainly would be driving his civilian,

10   his own personal vehicle.  Our office did not have any

11   government-use vehicles at all nor were there any available

12   for Lieutenant Brown to use.

13   Q.      Was Lieutenant Brown -- if Lieutenant Brown did eat

14   his lunch at home, was he required to check in at any time

15   during that lunch hour with you?

16   A.      No.

17   Q.      If we could turn back to your affidavit?

18   A.      Okay.

19   Q.      If I can direct your attention.  This is Exhibit No.

20   1.  If I could direct your attention to paragraph 11.

21   A.      Okay.

22   Q.      Paragraph 11 states, "At the time of his accident

23   Lieutenant Brown was subject to military control."  Do you

24   see that?

25   A.      Yes.

Major Brian Peters                                          04/21/2005

33

1   Q.      What did you mean by that statement or let me ask

2   you this.  What do you mean "subject to military control"?

3   A.      Lieutenant Brown was on active duty so he had all of

4   the responsibilities that are inherent with being on active

5   duty.

6   Q.      And that's what you meant by "subject to military

7   control"?

8   A.      Right.  It was a military duty day.  He was subject

9   to -- to the military control piece referred to -- in my

10  mind referred to a line of duty determination.

11  Q.      But the military did not tell him where he could eat

12  during his lunch break, did it?

13  A.      No, absolutely not.

14  Q.      And it didn't tell him what he could eat, did it?

15  A.      It did not tell him what he could eat for lunch.

16  Q.      And it didn't tell him if he was going to leave the

17  base, what road to take to his destination, did it?

18  A.      No, it did not.

19  Q.      Or which road to take to return to the base,

20  correct?

21  A.      That's correct.

22  Q.      And if I could direct your attention to paragraph 9,

23  was Lieutenant Brown required to be on leave or on liberty

24  status to go to his house for lunch?

25  A.      No.  Leave status is specifically applied for which

Major Brian Peters                                                      04/21/2005

34

1   basically pardons you from the responsibilities of being on

2   active duty.  You then can travel to wherever it is that you

3   want, do the things that you need to do or you would like to

4   do.  Leave is basically the military equivalent of vacation.

5   And to my knowledge Lieutenant Brown did not have any

6   approved leave paperwork for this period of time and also to

7   my knowledge he was not given any sort of verbal permission

8   to not be at work.  I certainly did not do it.  The other

9   person in the office who could have done such a thing would

10  have been Colonel Bremer, and you would have to speak with

11  him.

12  Q.      All right.  What is "liberty status"?

13  A.      "Liberty" in my -- the way I used it in my affidavit

14  the Navy usually refers to "liberty."  "Leave" is the term

15  used for the Air Force.

16  Q.      So "liberty status" is the Navy version of the Air

17  Force's "leave status"?

18  A.      To my knowledge.  I don't know.  I'm not in the

19  Navy.

20  Q.      But you use it in the same way that you use the word

21  "leave"?

22  A.      In that statement I am referring to that he had, as

23  far as to my knowledge, he had no permission from a -- on

24  leave paperwork that says he was not subject to active duty

25  rules and he had also not been given any verbal

Major Brian Peters
04/21/2005

35

1    authorization to not be complying with active duty rules.

2    Q.      But he was not in violation of any rules by eating

3    his lunch at home; is that correct?

4    A.      Oh, absolutely not.  He was not in violation of any

5    Air Force rules for eating lunch at home.

6    Q.      Can I direct your attention to paragraph 12.

7    A.      Okay.

8    Q.      I think you've partially defined it for me but what

9    does the term "active duty" refer to in paragraph 12?

10   A.      "Active duty" is -- I mean we could look it up as

11   far as the personnel definition for the Air Force.

12   Q.      Why don't you give me your understanding as you used

13   it in paragraph 12?

14   A.      Well, okay.  Being on "active duty" means he was

15   present for work.  He was not on leave status.  He was not

16   being -- he was not given permission to not be at work.  He

17   was active duty and active duty members of the United States

18   are subject to military discipline.  The Uniform Code of

19   Military Justice 24 hours a day.  So the fact that the duty

20   day was over does not mean that the Uniform Code of Military

21   Justice now no longer applies.  We carry that with us.  We

22   carry those responsibilities with us 24 hours a day.

23   Q.      So the second part of paragraph 12 which says,

24   "Subject to military discipline 24 hours a day," that refers

25   to the Uniform Code of Military Justice applying to all

Major Brian Peters
04/21/2005

36

1   active duty members?

2   A.      We as -- yes.  I guess I don't understand your

3   question.

4   Q.      Okay.  My question to you is what you meant by

5   "subject to military discipline," and you started to

6   indicate that --

7   A.      Yeah.  He was subject to all of the rules of a

8   military member on active duty at the time of his accident.

9   Q.      Okay.  Just so I understand because you have a

10  better understanding of this than I do, certainly, this

11  means that Lieutenant Brown is subject to the Uniform Code

12  of Military Justice 24 hours a day whether or not he's

13  performing military duties; is that correct?

14  A.      That is my understanding of how that works, yes.  If

15  we violate any of the rules for us off duty, you know, after

16  duty hours we are subject to the same punishments that are

17  available as if we are on, currently at work in on duty

18  hours.

19  Q.      Is your understanding that that applies to all

20  active duty members of the Air Force?

21  A.      That's my understanding.

22          MR. LEWIN:  Okay.  I have not more questions, Major

23  Peters.  I appreciate your time and welcome back.

24                  EXAMINATION BY MR. CHARNAS

25  Q.      This is attorney Scott Charnas representing the

Major Brian Peters                                          04/21/2005

42

1    "furlough"?

2    A.      "Furlough"?

3    Q.      Yes.

4    A.      With respect to what, sir?

5    Q.      The Air Force?

6    A.      No, sir.  I'm not aware of "furlough."  Is it

7    commonly referred to in -- by other terms?

8    Q.      Well, I guess that's what I'm asking you.  You're

9    not familiar with the term?

10   A.      I'm not familiar with the term "furlough" with

11   regard to Air Force and the leave program.

12   Q.      Major, on Saturdays and Sundays when Ian Brown --

13   strike that.

14           In December of 2001 on Saturdays and Sundays was Ian

15   Brown on active duty?

16   A.      To my knowledge he was on active duty, yes.

17   Q.      Is it fair to say that on Saturdays and Sundays in

18   December of 2001 Ian Brown was subject to military

19   discipline 24 hours a day?

20   A.      Yes.

21   Q.      Is it fair to say that on Saturdays and Sundays in

22   December of 2001 Ian Brown was subject to the Uniform Code

23   of Military Justice?

24   A.      I believe that is fair to say, yes.

25   Q.      Is it fair to say on Saturdays and Sundays in

Major Brian Peters
04/21/2005

43

1    December of 2001 Lieutenant Brown was subject to military

2    control?

3    A.    Yes.

4    Q.    Now in January of 2002, Major, if someone in the Air

5    Force was on leave, is it your understanding that they're no

6    longer on active duty status?

7    A.    No.  It's my understanding that they're no longer

8    required to be present at work.

9    Q.    But they're still on active duty status; isn't that

10   correct?

11   A.    Yes.

12   Q.    When someone is on leave from the Air Force

13   including in January 2002 they're still subject to military

14   control.  Are they not?

15   A.    Yes.

16   Q.    When someone is on leave from the Air Force

17   including in January, 2002 they're all still subject to

18   military discipline 24 hours a day, correct?

19   A.    Yes, I believe that's true.

20   Q.    Bear with me one moment, Major.  I'm almost

21   finished.  I'm just checking my notes.

22   A.    Take all the time you want.

23   Q.    Thank you.  Now, Major, are you familiar with the

24   criterion that was applied to Lieutenant Brown for receipt

25   of medical treatment benefits arising out of his accident

44

1    which is the subject of this case?

2    A.      I'm generally familiar.  However, the specific

3    determinations that were made were made by other military

4    professionals who have specific responsibilities with regard

5    to medical treatment, line of duty determinations, those

6    types of things.

7    Q.      Would you be kind enough, Major, to turn to

8    paragraph 13 of Exhibit 1 your affidavit.  Tell me when

9    you've done so.

10   A.      Yes.

11   Q.      Would you read number 13 to yourself, please.

12   A.      Okay.  I've done so.

13   Q.      Do you see the end of the paragraph you say,

14   "Because they occurred while Lieutenant Brown was performing

15   his military duties."  Do you see that there?

16   A.      Yes.

17   Q.      What was the basis of your affidavit or that

18   statement in your affidavit that his benefits were given to

19   him or awarded to him because they occurred while he was

20   performing his military duties as opposed to some other

21   criteria?  For example, that he was on active duty at the

22   time of his incident?

23   A.      No.  I see your point.  I think what I meant was

24   that he was on active duty; and, therefore, was eligible for

25   military medical benefits and those types of things.  He

45

1    certainly was not injured because his duty was to drive his

2    motorcycle.  I can see where that can cause some confusion.

3              MR. CHARNAS:  Thank you, Major.  Those are all the

4    questions I have.

5                    EXAMINATION BY MR. STEVENS

6    Q.      Major Peters, my name is Jeffrey Stevens.  I

7    represent the Defendant Boston Edison Company.  I believe

8    it's still morning just about there.  Good morning.

9              One question for you and I want to direct your

10   attention to what's been marked as Exhibit 1 which is your

11   affidavit, and specifically I'd like to draw your attention

12   to paragraph 8 of your affidavit.  If you could just take a

13   moment to read that paragraph.

14   A.      Okay.

15   Q.      And in paragraph 8 you state based upon your

16   information and belief on January 4th of 2002 at

17   approximately 1419 hours Lieutenant Brown lost control of

18   his motorcycle?

19   A.      Yes.  I see that paragraph.

20   Q.      Can you tell me what military duties Lieutenant

21   Brown was performing at that time?

22   A.      Again, I believe he was just returning from lunch

23   going -- coming back to work.  He was not specifically

24   executing a military duty.  I mean, he didn't have a duty to

25   be on Hartwell Road at that time.

Major Brian Peters                                        04/21/2005

46

1          MR. STEVENS:  Thank you.  I have no further

2    questions.

3          MR. WILMOT:  I have no questions.

4          (deposition concluded at 11:57 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25