UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
No. 04-11924-RGS

IAN J. BROWN, JAMES BROWN and )
BARBARA BROWN, )
                Plaintiffs )
)
v. )
)
UNITED STATES OF AMERICA, )
VERIZON NEW ENGLAND, INC. and )
BOSTON EDISON COMPANY d/b/a NSTAR )
ELECTRIC )
)
                Defendants )
)

## BOSTON EDISON COMPANY'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION TO DISMISS

Now comes the defendant and cross-claim plaintiff, Boston Edison Company ("Boston Edison"), and submits the within Supplemental Memorandum in support of its Opposition to the Motion to Dismiss filed by the United States of America. The limited discovery permitted by the Court demonstrates that the cross-claim asserted by Boston Edison is not barred by either *Feres v. United States*, 340 U.S. 135, 71 S. Ct. 153 (1950) or *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S. Ct. 2054 (1977).

In *Stencel*, a National Guard officer sought to recover for injuries sustained by an alleged malfunction of his ejection system in his fighter jet. 431 U.S. at 667. The *Stencel* court ruled that the cross-claim asserted by a military vendor for indemnity was barred by reason of the

*Feres* doctrine.    431 U.S. at 673-674.    However, under the circumstances and facts of this case as evidenced by the limited discovery taken to date, the rationale in *Feres* and *Stencel* have no application and do not bar the plaintiff's claims or the cross-claims asserted by Boston Edison.

Major Brian Peters testified at his deposition that he oversaw military personnel as well as civilian employees at Hanscom Air Force Base ("Hanscom"). (Major Peters Transcript, pp. 10-11; attached hereto as Exhibit "A")   Mr. Brown worked in an office building at Hanscom where his responsibilities included working on software programs and hardware setups for an Air Force computer program called "Air Force Portal".   (Peters Transcript at pp. 16-19) Mr. Brown's schedule essentially consisted of a typical work week Monday through Friday, 8 am to 4 pm.   (Peters Transcript at pp. 21).    There was "no hard and fast policy" as to lunch.   Mr. Brown was generally allowed an hour for lunch and was not required to inform Major Peters when he was leaving or seek permission to leave.   (Peters Transcript at pp. 29-30)   Nor was Brown required to stay on base during his lunch hour.   (Peters Transcript at pp. 31).   Finally, Major Peters testified that Brown was not performing any military duties related to his position at the time of the accident.    (Peters Transcript at pp. 45)

In addition, the depositions revealed that Brown's residence was located at a trailer park off Hartwell Road on land leased by the Air Force. (Peters Transcript at p. 14; See also Deposition Transcript of Dennis P. Cronin[1], attached hereto as Exhibit "B" at pp. 15-18.) Hartwell Road provides access to civilian residential homes and various civilian businesses. There is no direct access from Hartwell Road to Hanscom. (See Deposition of Adrienne St.

---

[1] Mr. Cronin testified as the Rule 30(b)(6) deponent for the United States Air Force.

2

John, attached hereto as Exhibit "C" at pp. 68-69)   There are no restrictions as to civilian vehicular traffic along Hartwell Road and it is plowed, sanded, swept and otherwise maintained by the Town of Bedford. (St. John Transcript at pp. 34-35, 58-59, 69) (See also Deposition Transcript of Arthur Hayes, III[2], attached hereto as Exhibit "D" at pp. 38-39).   In fact, the Air Force considers Hartwell Road to be "off base". (Cronin Transcript at p. 21)

### Supplemental Legal Argument

The allowance of cross-claims by Boston Edison will not implicate any of the concerns raised in *Stencel* concerning the relationship between the Government and members of its Armed Forces. *Stencel* involved a relationship between the Government and a supplier of military equipment. In this case, the relationship between the United States and Boston Edison is not "distinctively federal in character". In *Stencel*, the ejection system had been manufactured "pursuant to the specifications of, and by use of certain components provided by, the United States". *Stencel* at 667.   Unlike *Stencel*, a trial of this action, a motorcycle accident, does not involve "second-guessing military orders" or require "members of the Armed Forces to testify as to each other's decisions and actions" *Stencel* at 673.   Similarly, Boston Edison's cross-claim against the United States is not based upon a "commercial contract" such that any "risk" could have been taken into account at the time of negotiation between the United States and its vendor. (See *Stencel* at 674, n. 8).

---

[2] Mr. Hayes testified as the Rule 30(b)(6) deponent for the United Sates Navy.

## Conclusion

For the reasons stated above, Boston Edison respectfully requests that this Court deny the Government's Motion to Dismiss its cross-claims.

Respectfully submitted,
BOSTON EDISON COMPANY,
By its attorney,

Michael K. Callahan
BBO #546660
NSTAR Electric & Gas Corporation
800 Boylston Street, 17th Floor
Boston, MA 02199
617-424-2102

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

**EXHIBIT "A"**

IAN J. BROWN, JAMES BROWN and  )
BARBARA BROWN,                 )
           Plaintiffs,         )   CIVIL ACTION
vs.                            )   No. 04-11924-RGS
UNITED STATES OF AMERICA,      )
VERIZON NEW ENGLAND, INC., and )
BOSTON EDISON COMPANY d/b/a    )
NSTAR ELECTRIC,                )
           Defendants.         )
_____)

Deposition of

MAJOR BRIAN PETERS

Thursday, April 21, 2005

Reported by:  SHERYL DIRKS, CSR #3513

1  best of your ability just mark with a "W" the general area
2  where you believe your office is located?
3  A.     Okay. It is marked.
4  Q.     Can you generally describe for me what your
5  assignment as a major at Hanscom Air Force Base entailed?
6  A.     I was a captain at Hanscom Air Force Base. I have
7  since been promoted. We were members of the acquisition
8  community at Hanscom. It's in acquisitions it's primarily
9  office work where you worry about the cost schedule and
10 performance of various efforts that the Air Force
11 undertakes. It's not what people typically associate with
12 being in the Air Force with launching and recovering
13 aircraft, those types of things. It's mostly office work.
14        Hanscom Air Force Base doesn't even have an active
15 runway anymore. It's basically an office park.
16 Q.     Okay. And in your position as a captain, did you
17 oversee civilians?
18 A.     Yes. I had several civilians under -- that I
19 supervised. These civilians were actually contractors, not
20 government civilians, though.
21 Q.     They were military contractors?
22 A.     They were contractors under contract with the
23 government. They were not what people would refer to as a
24 government civilian or a --
25 Q.     Okay. In any event they weren't active duty

Major Brian Peters                                              04/21/2005

                                                                        11

1   military personnel?
2   A.   No.
3   Q.   Did you also oversee or supervise military
4   personnel?
5   A.   Yes, I did.
6   Q.   And approximately how many?
7   A.   Depending on what time frame but between three and
8   five other lieutenants.
9   Q.   And was Lieutenant Ian Brown one of those?
10  A.   Yes.  Lieutenant Brown was one of my subordinates.
11  Q.   You indicated that there were approximately three to
12  five lieutenants?
13  A.   Yes.
14  Q.   And were there any military personnel subordinates
15  to those three to five lieutenants?
16  A.   Not to my knowledge.
17  Q.   Did this unit have any name?
18  A.   I don't understand your question.
19  Q.   Okay.  You indicated that you supervised three to
20  five lieutenants.  Did that group have a set of specific
21  responsibilities assigned to it?
22  A.   Yes.  We all had responsibilities towards the Global
23  Combat Support System Air Force Program.
24  Q.   Did that group of three to five lieutenants that you
25  oversaw have a specific unit name or designation?

Major Brian Peters                                              04/21/2005

14

1  January 4th, 2002?
2  A.      I believe that he was sharing a trailer with his
3  girlfriend at the time in the Hanscom Air Force Base Mobile
4  Home Park, but I had never, I have never been there.
5  Q.      You've never been to the mobile home park where he
6  lived?
7  A.      I have never been to Ian Brown's mobile home in the
8  mobile home park.
9  Q.      Have you ever been to the mobile home park?
10 A.      Yes.
11 Q.      If we could go back to Exhibit No. 2?
12 A.      I have Exhibit No. 2.
13 Q.      Okay.
14         Can you identify on Exhibit No. 2 the approximate
15 location of the mobile home park?
16 A.      I believe it's the area labeled "mobile home park"
17 to the left of "Site 1" and above "Site 5."
18 Q.      Okay. And according to this map that mobile home
19 park is located on or near Hartwell Road; is that correct?
20 A.      That's what the map shows me, yes.
21 Q.      Do you recall whether the mobile home park when you
22 went there was located on Hartwell Road?
23 A.      Yes, I believe it was. I'm not aware of it moving.
24 Q.      If you could look at Exhibit No. 1 which is the
25 affidavit of Brian Carl Peters, Major United States Air

Major Brian Peters                                          04/21/2005

16

1        Lieutenant Brown worked on, like I said, Air Force
2  Portal that several of the lieutenants in the office were
3  put on that task, and Lieutenant Brown also worked with one
4  of the individual mobilization augmentees that we had in the
5  office who was also a computer engineer, software engineer.
6  Q.     Do you know -- you said for most of Lieutenant
7  Brown's first year he was training. Do you know when that
8  first year began approximately?
9  A.     I don't recall the day that he PCS'd into Hanscom.
10 Sorry.
11 Q.     How about as of January 4th, 2002; was he still in
12 training at that point?
13 A.     He was not currently in a class, in a TDY class
14 because he was at Hanscom. The training courses that he
15 went to many of them we are off base. Several of them he
16 could complete online. But I think he was -- I'm pretty
17 sure he was finished with his online training by that point.
18 Q.     You said part of his work consisted of Air Force
19 Portal which was basically web design. Do I understand that
20 correctly?
21 A.     There is a program called Air Force Portal which we
22 use, which the Air Force is migrating all of its information
23 systems to. So that through the Internet you can have
24 access to your personnel data, to pay data. It's basically
25 one-stop shopping. It's all consolidated. The program

Major Brian Peters                                              04/21/2005

17

1  actually was designed -- I don't know how it's currently set
2  up but at the time Air Force Portal was being run out of
3  Gunter Air Force Base or Gunter Annex of Maxwell Air Force
4  base actually down south, and Ian was learning the ins and
5  outs of that program.
6          In that time frame there were several major
7  decisions made with regard to the types of hardware and
8  software that would support the Air Force Portal. Obviously
9  setting something up for the entire Air Force to use
10 requires quite a bit of thought.
11 Q.     Do you know specifically what Lieutenant Brown's job
12 duties were with respect to the Air Force Portal, what he
13 was doing?
14 A.     I don't know specifically at this time.
15 Q.     Can you tell me as of approximately January 4th,
16 2002 what percentage of Lieutenant Brown's workday would
17 consist of working on the Air Force Portal?
18 A.     I could only guess. No, I wouldn't know.
19 Q.     Would you say it was more than half of his day?
20 A.     I don't think it would have been that much. I'd say
21 less than 50 percent.
22 Q.     You also indicated he was working with -- I think
23 you said individual mobile augmenteer?
24 A.     Individual mobilization augmentee is a reservist.
25 There was a young man who wanted to do his reserve time at

1  Hanscom Air Force Base and he had the right skill-set to
2  assist our program, and to my knowledge Ian worked with him
3  on occasion.
4  Q.     Do you know what he worked with him on?
5  A.     Not specifically at this point. I'd have to go back
6  into files and look it up.
7  Q.     And then you also mentioned software engineering.
8  Did I understand that correctly?
9  A.     To understand how the hardware and software works
10 together on these programs you have to have a foundation in
11 -- well, you should have some understanding of software.
12 Q.     And did Lieutenant Brown work on the hardware or
13 software for this program?
14 A.     Not directly. He did not write code. However,
15 understanding the concepts of how the different systems work
16 would have been something that Ian would have needed to
17 learn for this program.
18 Q.     So you've indicated that less than 50 percent of
19 Lieutenant Brown's time was devoted to the Air Force Portal,
20 and that he also spent some time working with the individual
21 mobilization augmentee. What else did Lieutenant Brown do
22 at Hanscom?
23 A.     He also worked on the Global Combat Support System
24 programs. They're all related computer software and
25 hardware setups.

Major Brian Peters                                              04/21/2005

                                                                      19

1  Q.    So all of Lieutenant Brown's job duties at Hanscom
2  revolved around computer hardware and software; is that
3  correct?
4  A.    It all revolved around the things that were
5  necessary for the Global Combat Support System Office, yes.
6  Q.    Could you describe for me a typical workday at
7  Hanscom for Lieutenant Brown?
8  A.    A typical workday would have been coming to work,
9  working on his normal programs, attending meetings or
10 setting up meetings as necessary to get his things done.  He
11 would routinely go home for lunch.
12       We allowed a fairly liberal amount of physical
13 training time for all the lieutenants in the office.
14 Occasionally they would go work out together at the gym or
15 they would work out by themselves at the gym, usually on
16 base.  And afternoon would be more of the same.  Working on
17 the -- your various projects.  This time of the year,
18 January is normally very focused on contractual issues and
19 financial issues.  The way the contracts, the recurring
20 contracts with our supporting contractors were set up most
21 of them were expired in December and would then, therefore,
22 be renewed, you know, beginning of January.
23       Additionally we'd have quite a few discussions about
24 financial issues since the president's budget normally would
25 be approved sometime in the fall and the money distribution

Major Brian Peters                                                  04/21/2005

21

1   A.      Yes.  All of the military people on the program
2   worked in the same office area.
3   Q.      And is that -- is the building where you worked an
4   office building?
5   A.      Yes, it is.
6   Q.      It's not a hangar?
7   A.      It is not a hangar.
8   Q.      Did Lieutenant Brown have his own office in the
9   building?
10  A.      Lieutenant Brown had a cubicle with his own
11  computer, telephone, an office area.  But it was not
12  separate from the rest of the office.  It was just a
13  cubicle.
14  Q.      Were there set hours of work for Lieutenant Brown?
15  A.      Yes.  We worked a normal workday.
16  Q.      What was the normal workday?
17  A.      It was expected -- we had some flexibility in the
18  workday; however, it was expected that you were at work
19  between 8:00 and 4:00 o'clock.  8:00 in the morning and 4:00
20  in the afternoon.
21          Any other arrangements where if you needed to take
22  care of some business off base outside of those times, then
23  it would have to be specifically arranged.
24  Q.      How many days a week was -- did Lieutenant Brown
25  work?

Major Brian Peters								04/21/2005

29

1  Q.    I'd like to ask you some questions about the lunch
2  policy if any. Was there a specific set lunch time in the
3  office?
4  A.    No. Often -- based on meetings and other things it
5  was not uncommon for people to have to shift their lunch
6  hours slightly, you know, between, you know, 10:00 o'clock
7  in the morning and maybe 2:00 o'clock in the afternoon.
8  Additionally some of the lieutenants or some of the people
9  in the office they would combine physical fitness activities
10 with their lunch hour and take a slightly extended lunch
11 hour several days a week but there was no hard and fast
12 policy that lunch was, you know, between 11:15 and 12:15
13 every day.
14 Q.    You mentioned a few times the word "lunch hour."
15 I'm sorry. I'll reask the question. You mentioned the word
16 "lunch hour" a few times. Was the lunch break a one-hour
17 lunch break?
18 A.    Generally we were allowed about an hour to have, to
19 go have lunch. If you had lunch on base, obviously, it
20 would take a lot less than an hour to get all that done. If
21 you were going off base to one of the local civilian
22 establishments, it could take an hour by the time you could
23 get to and from and get your food and have a nice lunch.
24 Q.    Would they have to clock in or out for lunch?
25 A.    No. We did not have any sort of time card system to

1  clock in and out.
2  Q.    Did anyone keep track of how long the lieutenants
3  were taking for lunch?
4  A.    Not specifically with a stop watch or something. If
5  it seemed like a lieutenant was taking too long or abusing
6  the flexibility that we had in the workday, we would address
7  it.
8  Q.    Would all the members in your office take lunch at
9  the same time?
10 A.    Rarely all of us took lunch at the same time.
11 Q.    Was it on an individual basis?
12 A.    Yes.
13 Q.    Did anyone have to seek permission to take his lunch
14 break?
15 A.    No.
16 Q.    And he did not, Lieutenant Brown did not have to
17 sign out for lunch?
18 A.    No, Lieutenant Brown did not have to sign out for
19 lunch.
20 Q.    Was he required to let you know that he was leaving
21 for lunch?
22 A.    No.
23 Q.    You mention that Lieutenant Brown or the other
24 lieutenants would on occasion work out during their lunch?
25 A.    Yes.

Major Brian Peters                                              04/21/2005

31

1   Q.      Were there any restrictions on what Lieutenant Brown
2   could do during his lunch break?
3   A.      I don't understand that question.
4   Q.      Okay. Let me ask you this. Was he required to
5   remain in his uniform during lunch?
6   A.      Was he required to remain in his uniform during
7   lunch? There wouldn't be a policy that says that during
8   your lunch hour you had to remain in your uniform. However,
9   you know, if he were going to go work out, it would be
10  expected that he would change into gym clothes. If he were
11  going to, you know, it becomes a convenience thing. He was
12  expected to have his uniform on when he left work and he
13  will be expected to have his uniform on when he returns from
14  his lunch hour. So I suppose if it suited Lieutenant Brown
15  to change out of his uniform for his lunch hour and then
16  return to work and put his uniform back on, that would be
17  fine.
18  Q.      He was not required to stay on the base during
19  lunch; is that correct?
20  A.      No. Within -- if he could get on and off base
21  within the guidelines of approximately an hour for lunch,
22  then he could go off base for lunch.
23  Q.      And he could eat his lunch at home if he wanted to?
24  A.      He often did.
25  Q.      And that was allowed?

1  certainly was not injured because his duty was to drive his
2  motorcycle. I can see where that can cause some confusion.
3          MR. CHARNAS: Thank you, Major. Those are all the
4  questions I have.
5                    EXAMINATION BY MR. STEVENS
6  Q.      Major Peters, my name is Jeffrey Stevens. I
7  represent the Defendant Boston Edison Company. I believe
8  it's still morning just about there. Good morning.
9          One question for you and I want to direct your
10 attention to what's been marked as Exhibit 1 which is your
11 affidavit, and specifically I'd like to draw your attention
12 to paragraph 8 of your affidavit. If you could just take a
13 moment to read that paragraph.
14 A.      Okay.
15 Q.      And in paragraph 8 you state based upon your
16 information and belief on January 4th of 2002 at
17 approximately 1419 hours Lieutenant Brown lost control of
18 his motorcycle?
19 A.      Yes. I see that paragraph.
20 Q.      Can you tell me what military duties Lieutenant
21 Brown was performing at that time?
22 A.      Again, I believe he was just returning from lunch
23 going -- coming back to work. He was not specifically
24 executing a military duty. I mean, he didn't have a duty to
25 be on Hartwell Road at that time.