UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                          )
IAN J. BROWN, JAMES BROWN and          )
BARBARA BROWN                                     )
                    Plaintiffs                             )
                                                          )
v.                                                        )
                                                          )        CIVIL ACTION
                                                          )        NO. 04-11924-RGS
UNITED STATES OF AMERICA,               )
VERIZON NEW ENGLAND INC. and         )
BOSTON EDISON COMPANY d/b/a         )
NSTAR ELECTRIC                                  )
                    Defendants                           )
_____)

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY VERIZON NEW ENGLAND INC.

### Introduction

In 1916, Verizon New England Inc. ("Verizon") and co-defendant, Boston Edison Company[1], designed, engineered and installed a utility pole ("Pole 16/37") on Hartwell Road in Bedford.  Pole 16/37 and its replacements stood uneventfully and in good repair for eighty-six years.  On January 4, 2002, Plaintiff lost control of his Kawasaki Ninja sport motorbike and crashed into a guardrail which had been installed near Pole 16/37 without Verizon's knowledge. Plaintiff's collision with the guardrail prevented him from traveling off the side of Hartwell Road and, instead, redirected him into Pole 16/37. Plaintiff claims that Verizon was negligent in locating Pole 16/37 and in failing to

---

[1] Through their predecessors, The Edison Electric Company of Boston and The New England Tel. & Tel. Co. of Massachusetts.

discover and remedy the allegedly unsafe condition created by the guardrail's proximity to the Pole.

Verizon is entitled to judgment as a matter of law because the Massachusetts Statute of Repose, G. L. c. 260 § 2B, precludes all claims for negligence in the design, planning, engineering and construction of improvements to real property more than six years after the completion of the improvement. Here, Verizon completed the design, engineering and installation of Pole 16/37 in 1916—more than eighty-six years before the accident. Further, Verizon cannot be held responsible for failing to discover and remedy the allegedly dangerous condition created by the guardrail's proximity to Pole 16/37 because NStar was exclusively responsible for inspecting jointly owned utility poles within the Town of Bedford and maintaining them in a safe condition. Indeed, Verizon never received notice that the guardrail had been installed and had no notice of the guardrail's existence at any time before Plaintiff's accident.

Absent notice or knowledge of the guardrail, Verizon cannot be held liable for Plaintiff's injuries because it was not reasonably foreseeable at the time Verizon participated in the design, engineering and installation of Pole 16/37 that, at least seventy-five years later, someone would install a guardrail behind Pole 16/37 and that a motorcyclist would thereafter lose control of his motorcycle and ricochet off the guardrail into Pole 16/37. Finally, Plaintiff has produced no admissible evidence that the original placement of Pole 16/37 was negligent, because his sole evidence in that regard is the opinion of a singularly unqualified "expert" who, by his own admission, conducted no research, analysis or testing with respect to placement of the pole.

The consortium claims of Plaintiff's parents, James and Barbara Brown ("the Browns") must be dismissed pursuant to M.G.L. G. L. c. 231, § 85X, because they cannot prove that Ian Brown was financially dependent on them, either prior to or after the accident.

## FACTS[2]

**The Placement of Pole 16/37 in 1916 and Subsequent Maintenance**

In early 1916, predecessors of Verizon and Boston Edison Company, d/b/a NStar Electric (hereinafter "NStar") (collectively, "the Utilities") designed a line of jointly owned utility poles to be installed along Hartwell Rd. in Bedford. VSUMF, ¶4. On February 16, 1916, the Town of Bedford, through its Board of Selectmen (the "Town"), granted the Utilities the authority to erect and maintain the line of poles. Id., ¶5. The Town ordered that the line of poles meet specific engineering specifications and be placed in specific locations alongside Hartwell Rd. Id. Pole 16/37 was installed in 1916 pursuant to this order and was replaced in 1929, 1954 and 1962.[3] Id., ¶¶6-7. The location of Pole 16/37 pole has not changed since 1916. See id. Verizon jointly designed and engineered the original Pole 16/37 and its subsequent replacements. Id., ¶8. At the time of the accident, Pole 16/37 stood 13 inches from the edge of the road's pavement in compliance with 220 C.M.R. § 125.23, which requires only six inches between utility poles and the edge of the pavement. Id., ¶10.

Under the Joint Pole Agreement between the Utilities, NStar was solely responsible for inspecting and maintaining all jointly owned poles in Bedford, including

---

[2] All citations are made to the <u>Concise Statement of Undisputed Material Facts in Support of Motion for Summary Judgment by Verizon New England, Inc.</u> which has been filed simultaneously herewith and will be cited as "VSUMF, ¶__".

[3] Verizon's records indicate that the pole was last replaced in 1962 while NStar's records indicate that the replacement occurred in 1964. This discrepancy is not material for purposes of summary judgment.

Pole 16/37.  Id., ¶11.  NStar conducted pole inspections in Bedford pursuant to that

agreement.  Id.

**The Scene of the Accident**

Hartwell Road is a rural two-lane roadway with a speed limit of twenty five miles

per hour.  Id., ¶1.  Plaintiff lost control of his motorcycle at a location where Hartwell Rd.

curves to the left and where there is a guardrail along the right edge of the roadway.  Id.,

¶3.  Pole 16/37 is located on the right side of the road approximately 102 feet beyond the

location where Plaintiff lost control.  Id., ¶9.  The guardrail was installed behind Pole

16/37 in approximately 1990 to protect a fence located on the side of the roadway.  Id.,

¶13.  Verizon had no knowledge of the existence of the guardrail prior to Plaintiff's

accident.  Id., ¶14.

**The Accident**

After a lunch break at his home on January 4, 2002, Plaintiff was riding his

Kawasaki Ninja ZX-12R sport motorbike on Hartwell Road to his office at Hanscom Air

Force Base.  Id., ¶15.  As Plaintiff came around the curve, he lost control of his

motorcycle and headed towards the right side of the road.  Id., ¶16-17.  Instead of

continuing off the side of the road, however, the Plaintiff hit the guardrail which

redirected him towards Pole 16/37.  Id.  Plaintiff then slid along the guardrail and

collided with Pole 16/37.  Id., ¶17.  Plaintiff would not have hit Pole 16/37 had the

guardrail not been present; he would have traveled off the right side of Hartwell Rd.  Id.,

¶18. Pole 16/37 had never before been struck by a motorist.  Id., ¶12.

**Plaintiff's Liability Expert, Murray Burnstine**

In his Complaint, Plaintiff claims that negligent placement of Pole 16/37 caused his injuries.  In support of this allegation, Plaintiff has designated Murray Burnstine, a mechanical engineer, as his liability expert.  Id., ¶19.  Burnstine contends that Pole 16/37 is negligently located.  Id., ¶20.  Burnstine admits, however, that he conducted no analysis whatsoever with respect to the placement of the pole and that his opinions are based merely on "common sense" and "common knowledge." Id., ¶23-25.

**The Consortium Claims of Barbara and James Brown**

At the time of his accident, Plaintiff was a Lieutenant in the United States Air Force stationed at Hanscom Air Force base in Bedford.  The Browns lived in New Jersey and provided him with no financial support.  Id., ¶27.  As a result of his disability, Plaintiff receives a monthly tax-free stipend from the United States government of more than $5,000, which covers all of his current and prospective expenses.  Id., ¶¶29, 32-35.  After completing inpatient rehabilitation, Plaintiff moved home with the Browns. Id., ¶31.  Plaintiff pays their utility bills and purchases the food for the household.  Id., ¶33.  He is saving his money to purchase a residence of his own.  Id., ¶35.  Plaintiff is not financially dependent on the Browns for his medical care, as it is provided by the government.  Id., ¶28-30.  The Browns admitted at deposition that Plaintiff is completely financially independent of them.  Id., ¶36.

## Argument

**A.    The Statute of Repose Bars Plaintiffs' Claims Against Verizon For Negligently Engineering and Installing Pole 16/37.**

The Statute of Repose, G. L. c. 260 § 2B, was enacted to protect those who design, plan, or construct improvements to real property from "defending claims brought against them long after evidence has dissipated…" Kozikowski v. Toll Bros., 354 F.3d 16, 21 (1st Cir. 2003) (quoting Klein v. Catalano, 437 N.E.2d 514 (Mass. 1982)); Milligan v. Tibbetts Eng'g Corp., 461 N.E.2d 808, 811(Mass. 1984). The Statute of Repose imposes an absolute bar on claims for negligent design or construction of an improvement to real property brought more than six years after the improvement has been completed regardless of when such claims accrued or were discovered. G. L. c. 260, § 2B; Conley v. Scott Products, Inc., 518 N.E.2d 849, 850 (Mass. 1988).

Section 2B provides:

> Actions of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property . . . shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.

Section 2B precludes Plaintiff's claims against Verizon because (1) the installation of a utility pole constitutes "an improvement to real property" and (2) Verizon engaged in the designing, planning and general administration of Pole 16/37 in 1916 and 1962. Afarian v. New England Tel. & Tel., Civil No. 99-1852, pp. 10-12 (Suffolk Sup. Ct. Jan. 3, 2003) (Haggerty, J.) (and cases cited) (copy attached hereto as Exhibit A ) (appeal pending) (granting summary judgment to the telephone company on

the Statute of Repose in a wrongful death case involving an accident with a utility pole placed in 1969).  The policy of section 2B—protecting engineering professionals from claims for which reliable evidence is no longer available—is particularly salient in this case where Plaintiff seeks to hold Verizon liable for engineering services it performed nearly a century earlier.[5]  Id.

1.  The Statute of Repose Bars All Claims Relating to the Design and Erection of Pole 16/37.

Section 2B extends to "architects, *engineers*, contractors, and others *involved in the design, planning*, construction, or general administration of improvements to real property."  Klein, 437 N.E.2d at 516 (emphasis added).  Since § 2B protects entities that provide engineering and design services, the Statute of Repose bars Plaintiff's pole placement claim against Verizon because Verizon participated in the design, engineering and installation of Pole 16/37 more than six years before Plaintiff's accident.

Where a party fulfills two roles with regard to a particular improvement to real property, even where one role normally would not be protected the Statute of Repose, the party is immune from liability for all claims arising out of its activities in designing, engineering or constructing the improvement.  Sonin v. Mass. Tpk. Auth., 809 N.E.2d 1075, 1078 (Mass. App. Ct. 2004) ("By its clear and express terms, § 2B limits the period for bringing any claim arising from negligent design without regard to whether the owner or another party has committed the alleged negligence. Put another way, an owner that participates in the design of improvements to real property is as entitled to the protection of § 2B as any other actor involved in such design or construction -- but only with respect

---

[5] The date of installation and design of Pole 16/37—not the date of replacement—is the operative date because pole replacement is merely "routine maintenance" rather than a separate "improvement to real property" within the meaning of section 2B.  Sonin v. Mass. Tpk. Auth., 61 Mass. App. Ct. 287, 291 (Mass. App. Ct. 2004) (repaving of highway not a separate "improvement to real property").

to a claim for negligence in the design"); Cournoyer v. Mass. Bay Trans. Auth., 744 F.2d 208, 210-211 (1st Cir. 1984) (where defendant acted in a "dual role" "as both supplier and designer of the building" plaintiff could not "escape the guillotine of ch. 260, § 2B" because complaint alleged that the defendant was negligent in his role as designer).

In the instant matter, the Statute of Repose protects Verizon because Plaintiff's claims arise from Verizon's engineering efforts with respect to the placement of Pole 16/37 notwithstanding its concurrent status as co-owner. Id. To the extent plaintiffs allege that Verizon is liable as a joint owner for failure to properly inspect and maintain Pole 16/37, such an argument is unavailing because Verizon delegated those duties to NStar in the Joint Pole Agreement, (See infra, §A.3 ).

> 2. The Design and Installation of Pole 16/37 Constitutes an Improvement to Real Property for Purposes of the Statute of Repose.

Consistent with the legislature's intention of protecting design and construction professionals from claims for which access to reliable evidence is wanting, the Massachusetts courts have given an expansive interpretation to improvements covered by § 2B, defining as an improvement any "permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." E.g. Parent v. Stone & Webster Eng'g Corp., 56 N.E.2d 1009, 1011 (Mass. 1990) (citation omitted); Dighton v. Fed. Pac. Elec. Co., 506 N.E.2d 509 (Mass. 1987); Milligan, 461 N.E.2d at 811 (holding that construction of roadway constitutes an improvement to real property and recognizing that the legislature intended broad protection for design and construction professionals: "whether the 'improvement' involves a road or a building, long lapses in time between the date of completion, the date

of injury and, finally, litigation will lead to the same problems of proof, i.e., incomplete or lost records, unavailable witnesses, and defective memories.").

Under Massachusetts law, the erection of a utility pole constitutes an improvement to real property for purposes of the Statute of Repose.  Afarian, *supra*, at pp. 10-12; Afarian, Civil. No. 99-1852 (Suffolk Sup. Ct. April 22, 2003) (Sikora, J.) (copy attached hereto as Exhibit B) (opining that it was "extremely improbable" this ruling would be overturned on appeal).  These rulings are consistent with the nationwide general trend of courts ruling that the installation of utility services constitute "improvements to real property." see, e.g., Pippin v. Reilly Industries, Inc., 64 Fed. Appx. 382, 2003 WL 21235464, 2003 U.S. U.S. App. Lexis 10673 (4th Cir. 2003) (utility pole is an "improvement to real property" under Maryland's statute of repose); Montaup Elec. Co. v. Ohio Brass Corp., 561 F. Supp. 740 (D.R.I. 1983) (erection of electrical transmission lines is an improvement to real property under section 2B); Phipps v. Irby Const. Co., 636 So. 2d 353 (Miss. 1993) (installation of power lines constitutes an improvement to real property); Mora-San Miguel Elec. Co-op., Inc. v. Hicks & Ragland Consult'g & Eng'g Co., 598 P.2d 218 (N.M. Ct. App. 1979) (same); Washington Natural Gas Co. v. Tyee Const. Co., 611 P.2d 1378 (Wash. App. Div. 1 1980) (same).[6]

---

[6] Massachusetts' courts have applied section 2B to myriad types of improvements to real property, including the installation of utilities.  See, e.g., Cournoyer, 744 F.2d 208 (1st Cir. 1984) (an ungrounded, pre-fabricated steel building); Snow v. Harnischfeger Corp., 12 F.3d 1154 (1st Cir. 1993) (a crane built for use inside a trash-to-energy conversion plant); McDonough v. Marr Scaffolding Co., 591 N.E.2d 1079 (Mass. 1992) (installation of bleachers at a skating rink); Parent, 556 N.E.2d 1009 (installation of an electrical distribution panel); Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 489 N.E.2d 172 (Mass. 1986)  (construction of a ship's mooring system); Milligan, 461 N.E.2d 808 (Mass. 1984) (construction of a roadway); Sonin, 809 N.E.2d at 1076-1079 (construction of a highway); Casco v. Warley Elec. Comp. Inc., 643 N.E.2d 466 (Mass. App. Ct. 1994) (installation of an electrical junction box); Salinsky v. Perma-Home Corp., 443 N.E.2d 1362 (Mass. App. Ct. 1983) (installation of aluminum siding on a home).

The design and construction of utility poles on Hartwell Rd, including Pole 16/37, constituted an "improvement to real property" under § 2B because it was "a permanent fixture designed to enhance the value of the surrounding neighborhood by providing utility services." Afarian, *supra* at p. 12; Montaup Elec. Co., 561 F. Supp. 740; see also, e.g., Parent, 556 N.E.2d at 1011; Dighton, 506 N.E.2d at 515-516; Milligan, 461 N.E.2d at 811. Indeed, since Pole 16/37 was installed and the Utilities brought telephone and electric service to the surrounding area, Hartwell Rd. has seen the addition of numerous residences, a naval weapons laboratory (which receives utility service directly from Pole 16/37), a large Raytheon facility and airplane hangars. VSUMF, ¶2. Because the Plaintiff filed this case more than eighty-six years after Verizon engineered and constructed the original pole and twenty years after it was last replaced—it must be dismissed.

   3.   Verizon Cannot be Held Liable for Failing to Discover and Remedy the Allegedly Dangerous Condition Created by the Placement of the Guardrail Behind Pole 16/37 Because Inspection and Maintenance Responsibilities For the Pole Were Delegated Solely to NStar.

There is no basis for Plaintiff's claim that Verizon was negligent in failing to discover and remedy the allegedly dangerous conditions created by the placement of the guardrail behind Pole 16/37 because Verizon had no knowledge of the guardrail prior to Plaintiff's accident. Verizon owed Plaintiff no duty to inspect or maintain Pole 16/37 because those duties were delegated exclusively to NStar under the Joint Pole Agreement executed by the Utilities. See,e.g., Lyon v. Morphew, 678 N.E.2d 1306, 1310 (Mass. 1997) (property owner not liable to injured party for the negligence of a third-party who by contract was responsible for maintaining premises in safe condition); St. Germaine v. Prendergast, 584 N.E.2d 611, 616 (Mass. 1992) (employer of independent contractor not

responsible for negligence of independent contractor where the employer does not retain control over work).  C.f. Hopkins v. F. W. Woolworth Co., 419 N.E.2d 302, 303-304 (Mass. App. Ct. 1981) (where lease delegated maintenance and inspection responsibilities to landlord, tenant may not be held liable unless that tenant is aware of the unsafe condition).

**B.      Verizon Cannot Be Held Liable For Ian Brown's Injuries Because His Accident Was Not Forseeable When Pole 16/37 Was Engineered and Erected.**

Verizon cannot be held liable for failing to protect against unforeseeable risks or for injuries that were not the reasonably foreseeable consequence of its actions.  While the parties vigorously disagree about the precise manner in which Plaintiff's accident occurred, there is one critical fact not in dispute: ***Plaintiff would not have hit Pole 16/37 had the guardrail not redirected him into the pole.***  Verizon cannot be held liable for the Plaintiffs injuries because they were not caused by the placement of Pole 16/37, but rather by the placement of a guardrail behind Pole 16/37.  Verizon had neither notice nor knowledge of the guardrail placement, an event which could not reasonably anticipated.

1.    Verizon Owed No Duty to Protect Plaintiff From Crashing Into A Guardrail The Construction of Which It Could Not Have Anticipated.

It is well-settled that "one is bound to anticipate and provide against what usually happens and what is likely to happen, but is not bound in like manner to guard against what is . . . only remotely and slightly probable."  Hebert v. Enos, 806 N.E.2d 452, 456 (Mass. App. Ct. 2004) (citing Falk v. Finkelman, 168 N.E. 89, 90 (Mass. 1929)); Bergendahl v. Massachusetts Elec. Co., 701 N.E.2d 656, 663 (Mass. App. Ct. 1998) (court should allow summary judgment "in the absence of evidence that the risk which

resulted in the plaintiff's injury should reasonably have been anticipated by the defendant").

Massachusetts courts have specifically held that in order for liability to be imposed on a utility company, such as Verizon, "the evidence must show that [the utility] was chargeable with such knowledge that it should reasonably have foreseen or anticipated the type of injurious risk that eventuated." Bergendahl, 701 N.E.2d 656, 663 (Mass. App. Ct. 1998) (citing, *inter alia*, Clough v. New England Tel. & Tel. Co., 172 N.E.2d 113 (Mass. 1961)). "[I]nsofar as foreseeability bears on the existence of a duty, it is not appropriate to leave such an issue for the jury." Jupin, 849 N.E.2d at 836, n.7; Bergendahl, 701 N.E.2d at 663.

Verizon owed no duty to protect the Plaintiff from his accident because, at the time it engineered and installed Pole 16/37 in 1916 and replaced it in 1962, Verizon could not reasonably have anticipated the alleged danger which resulted from the placement of the guardrail behind the pole in 1990. Plaintiff has adduced no evidence that Verizon knew or should have known that a guardrail would be placed behind Pole 16/37 such that it would cause an out-of-control motorcyclist to be deflected into the pole instead of continuing off the side of the road. As a matter of law, Verizon should not be charged with failing to anticipate and protect against this remote possibility. See Galbraith v. Levin, 81 N.E.2d 560, 564 (Mass. 1948) (defendant should not be not liable for an accident caused by an intervening cause which [it] was not bound to anticipate and guard against"). The circumstances that led to Plaintiff's injuries were simply beyond the realm of "what usually happens and what is likely to happen." See Hebert, 806 N.E.2d at 455.

2.  The Placement of Pole 16/37 was Not the Proximate Cause of Plaintiff's Injuries.

"Whether negligent conduct is the proximate cause of an injury depends . . . on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." Kent v. Commonwealth, 771 N.E.2d 770, 777 (Mass. 2002). The Plaintiff cannot dodge the foreseeability issue by arguing that his injuries fall generally within the foreseeable risk created by the placement of Pole 16/37 in close proximity to the edge of the curve. While there may be cases where the placement of a pole in close proximity to the edge of a roadway on a curve may amount to the proximate cause of a motorist's injuries, see Riley v. New England Tel. & Tel., 234 N.E.2d 746, 748-749 (Mass. 1968), the juxtaposition of the guardrail to Pole 16/37—not the placement of Pole 16/37—was the cause of Plaintiff's injuries in this case. Because the Plaintiff "has no reasonable expectation of proving that [his injury] was a foreseeable result of" the placement of Pole 16/37, the Court should award summary judgment to Verizon. Hebert, at 455.[7]

C.    **Plaintiff Has Failed to Adduce Admissible Evidence That Pole 16/37 Was Negligently Placed By Verizon.**

Plaintiff's failure to prove foreseeability, a requisite aspect of duty and causation, is not the only fatal deficiency in Plaintiff's case: Plaintiff cannot prove breach of any duty owed to him by Verizon. Plaintiff's sole evidence in that regard, the opinion of Murray Burnstine, is inadmissible because Mr. Burnstine is a mechanical engineer

---

[7] see also Caldwell v. Commonwealth, Penn. DOT, 548 A.2d 1284 (Pa. Commlth. Ct. 1988); Mattucci v. Ohio Edison Co., 73 N.E.2d 809 (Ohio Ct. App. 1946); Hemphill v. Mississippi Power Co., 84 F.2d 971, 972 (5th Cir., 1936); Oram v. New Jersey Bell Tel. Co., 334 A.2d 343 (N.J. 1975); Parsons v. Chesapeake and Potomac Tel. Co., 30 A.2d 788 (Md. 1943); Hayes v. Malkan, 258 N.E.2d 695 (N.Y. 1970); Zibbon v. Cayuga County, 198 N.E.2d 47 (N.Y. 1964); Boylan v. Martindale, 431 N.E.2d 62, 71-72 (Ill. App. Ct. 1982); Mancaniello v. Guille, 306 A.2d 444 (Conn. Super. Ct. 1964).

without any qualification to render an opinion concerning roadside utility pole placement; and, because Mr. Burnstine, by his own admission, rendered his opinion without conducting any analysis whatsoever with respect to placement of the pole. Even were this Court to accept, at this stage, Mr. Burnstine's unsupported opinions, standing alone they do not, as a matter of law, constitute sufficient evidence of negligence to support a jury finding that Verizon breached a duty to Plaintiff.

1. The Court Should Grant Summary Judgment Where Plaintiff's Only Evidence of Negligence Is Inadmissible Expert Testimony.

The Court should grant summary judgment to Verizon because Plaintiff's only evidence of alleged negligent pole placement is testimony from his designated expert, Murray Burnstine, a mechanical engineer who testified that he reached his opinion through the application of "common sense" rather than the application of any reliable methodology whatsoever.  See Schubert v. Nissan Motor Corp., 148 F.3d 25, 32 (1st Cir. 1998) (affirming summary judgment which was granted on the grounds that the opinion of plaintiff's expert, Murray Burnstine, lacked an adequate foundation) (a copy is attached hereto as Exhibit C).   Plaintiff cannot escape summary judgment by relying on a report submitted by an expert who is unqualified and whose opinion is unreliable and will not be admissible at trial.  Id.  "'The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Id. (quoting DeNovellis v. Shalala, 124 F.3d 298, 305-06 (1st Cir. 1997) (quoting Fed. R. Civ. P. 56 Advisory Committee's notes, 1963 Amendment)).  Thus, at summary judgment, the Court should disregard an expert's opinion that fails to meet the tests of admissibility under Fed. R. Civ. P. 702 and as set forth in the Daubert trilogy.  Id.

An expert's opinion will be excluded if the expert is not sufficiently qualified by training or experience to render an opinion on the particular subject at hand. Polaino v. Corporation, 122 F. Supp.2d 63, 65 (D. Mass. 2000) (Stearns, J.). Likewise, the opinion will be excluded if the reasoning or methodology underlying the opinion is not scientifically valid or reliable. Id.; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-149 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). The Court may not simply "tak[e] the expert's word for it." Brown v. Wal-Mart Stores, Inc., 402 F.Supp. 2d 303, 307-308 (D. Me. 2005); General Electric Co. v. Joiner, 522 U.S. 136, 146 ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"). Rather, the trial judge must ensure that the expert's opinion is supported by appropriate validation"—i.e, "a reliable basis in the knowledge and experience of [the relevant] discipline." Polaino, 122 F. Supp.2d at 65; Kumho Tire, 526 U.S. at 149.

> a. Mr. Burnstine is Unqualified to Render an Opinion About Utility Pole Placement and Roadside Design.

Roadside design, including the placement and location of utility poles, falls within the expertise of civil engineers. See Affidavit of Malcolm Ray, attached hereto as Exhibit D. Mr. Burnstine, however, is a *mechanical engineer* whose professional career since 1964 has been limited to providing testimony and litigation consulting services "in the field of accident reconstruction [and] automotive design." VSUMF, ¶21. He has no education, training or experience that would qualify him to render an opinion in the field of civil engineering, which involves completely different educational training and professional experience than that of Mr. Burnstine. Id., ¶¶21-22; Levin v. Dalva Bros., 459 F.3d 68, 78 (1st Cir. 2006) (expert must be "qualified to testify by knowledge, skill,

experience, training or education" and "should have achieved a meaningful threshold of expertise" in the given area").  Mr. Burnstine's qualifications as a mechanical engineer do not qualify him to render an opinion regarding roadside design.  Id. ("That 'a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields'").

> b. Mr. Burnstine's Reliance on His "Common Sense" and "Common Knowledge" Is Not an Acceptable Methodology For Reaching a Reliable Opinion on Complex Technical Civil Engineering Topics.

Mr. Burnstine's expert report reveals nothing about the basis for his conclusory opinions that "the pole is on the wrong side of the road", "the guardrail is on the wrong side of the pole" and that "Pole [16/37] is too close to the pavement."  His report is, in all respects "a 'black-box opinion, that is, an opinion stated without any reasoned explanation."  Simmons v. Shalala, 1994 U.S. Dist. LEXIS 10910 (D. Mass. 1994).  At his deposition, Mr. Burnstine explained that his opinions were based entirely upon his "common sense" and upon "common knowledge".[8]  Reliance on Mr. Burnstine's common sense and common knowledge is not a recognized methodology and is not "a reliable basis in the knowledge and experience of [roadside design] experts."  Kumho Tire, 526 U.S. at 149; see Ray Aff., p. 11-14.

---

[8] Mr. Burnstine testified that he went online and found an article to support his opinion and to cite at the end of his report because "lawyers like to see something in writing to back you up."  That article does not, in fact, support Mr. Burnstine's opinion but rather further exposes his failure to conduct any analysis whatsoever.  VSUMF, ¶¶24-25.

2.   <u>Plaintiff Has Failed to Adduce Sufficient Evidence That Pole 16/37 Was Placed Negligently.</u>

The owner of a utility pole cannot be found negligent for placing a pole that has been hit by an automobile unless there are facts in the record establishing that the pole at issue posed a heightened and unreasonable risk of being hit.  <u>Afarian</u>, *supra*, at 7. "Public policy favoring placement of utility poles along highway rights-of-way and the state practice of regulating such placement are such that the occasional random accident is reviewed as just that:  an occasional random accident, for which the utility should not be held accountable." <u>Marino v. Nynex</u>, 1995 Mass. Super. Lexis 503, *7-*8 (Super. Ct. 1995).  Thus, under Massachusetts law,  Plaintiff must prove an unreasonably heightened risk that Pole 16/37 would be struck in light of (1) condition and topography of the road; (2) the proximity of the pole to the traveled portion of the road; and (3) the experience and accident history of the pole.  <u>Afarian</u>, *supra*, at 7 (and cases cited).  Verizon is entitled to summary judgment on Plaintiff's claim of negligent pole placement because Plaintiff has failed to adduce sufficient evidence of "unique circumstances attendant to the placement of the pole which render the collision in question something more than random." <u>Marino</u>, 1995 Mass. Super. Lexis 503, at *8.

a.     <u>Condition and Topography of Hartwell Rd.</u>

The mere "fact that a pole is located on a curve . . . is not enough for the Telephone Company to incur liability." <u>Afarian</u>, *supra* at 7.  There must be additional evidence such as unique topographical features that push vehicles into the pole or numerous accidents on the particular curve.  <u>Id.</u> (and cases cited).  Here, Pole 16/37 is located at the straight end of a curve on Hartwell Rd. where the speed limit is 25 m.p.h.

There is no evidence of unique topographical features and the speed limit is only 25 m.p.h.  See id. Contrast Marino, 1995 Mass. Super. Lexis 503, at *1 (holding that the topography (negative superelevation) of the roadway forced cars off a highway around curve).

b.    The Pole Was Not Unreasonably Close to the Road.

Massachusetts regulation requires that utility poles must be at least six inches from the edge of the pavement.  220 CMR § 125.23.  Pole 16/37, situated 13 inches from the traveled section of the road, complied with Massachusetts law and Plaintiff has adduced no evidence that the placement of the pole violated *any* standard other than the common sense of an automotive engineer with no education, training or experience in roadside design.  Accordingly, Verizon cannot be held liable.  See Afarian, *supra* at 8, (summary judgment granted where pole placed six inches from roadway).

c.    There is No Evidence Pole 16/37 Has Ever Been Struck

The most important factor to consider when determining whether a utility pole was negligently placed is whether there is a history of accidents involving the pole. Afarian, *supra* at 8-10 (and cases cited).  There is no evidence in the record that Pole 16/37 had *ever* been involved in an accident at any time during the eighty six years it has been standing on the side of this curve.  Because Pole 16/37 had stood without incident for nearly a century, no reasonable jury could conclude that the Pole was situated negligently.  Contrast Afarian, *supra* at 8-10 (no liability where no history of accidents) with Marino, *supra* at *3 (liability imposed where the pole had been hit at least six collisions in seven years).

**D.    James and Barbara Brown's Consortium Claims Must Be Dismissed Pursuant To M.G.L. c. 231, § 85X, Because Ian Brown Was Not and Is Not Financially Dependent Upon His Parents.**

In order for parents to recover for loss of consortium of an adult child under G. L. c. 231, § 85X, they must prove that the adult child was, "at the very least, financially dependent on [them], either prior to or after the accident, or both."  Monahan v. Town of Methuen, 558 N.E.2d 951, 957 (Mass. 1990).  In enacting section 85X, the legislature adopted the dissent in Norman v. Mass. Bay Trans. Auth., 403 Mass. 303 (1988), which argued that parental consortium claims should lie if " '*the severity of the injuries has resulted in the child's continued dependence on his parents and the parents' continued subordination to the needs of the child.*'"  Monahan, 558 N.E.2d at 956  (quoting Norman) (emphasis in original in Monahan).  Thus, a consortium claim will not exist where parents merely provide temporary support or, alternatively, ongoing care which does not necessitate subordination of their own needs to the needs of the child.

Summary judgment should enter with respect to the Browns' claims because it is undisputed that Plaintiff was not financially dependent on them either before or after the accident, a fact admitted by the Browns at their depositions. Prior to the accident, Brown was living independently of his parents and received no financial support from them. According to Mrs. Brown, Ian is "completely financially independent" from his parents. and Mr. Brown testified that the Browns have not provided Ian with any financial support since the accident.

While Brown lives at home with his parents rent-free, he pays the utility bills, buys food for the household and pays all of his own expenses.  While the Browns do not charge their son rent and occasionally purchase food and supplies for him, Ian does not

*depend* on them in these respects—the Browns, as caring parents, provide them gratuitously. Indeed, all of Brown's medical care, medical supplies and equipment have been provided to him as a veteran.

In this case, there is no question that the Browns have provided all of the parental support that could be expected under the circumstances. Nonetheless, Brown's disability has not necessitated that they subordinate their own lives to his care in an ongoing or permanent way. Indeed, the Browns have remained gainfully employed in exactly the same capacities as prior to the accident. Accordingly, the Browns' consortium claim must be dismissed because Plainitt's injuries have not rendered him financially dependent upon on his parents, as required by Massachusetts law to sustain a parental consortium claim.

**Conclusion**

For the reasons stated herein, Verizon New England Inc. is entitled to summary judgment on plaintiffs' claims against it.

Respectfully submitted,

VERIZON NEW ENGLAND INC.

By its attorneys,

*/s/ William A. Worth*
*/s/ Joshua A. Lewin*
William A. Worth, BBO #544086
Joshua A. Lewin, BBO# 658299
PRINCE, LOBEL, GLOVSKY & TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000

Date: March 14, 2007

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 14, 2007.

          _/s/ Joshua A. Lewin_