IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN J. BROWN, JAMES BROWN and BARBARA BROWN, )<br>Plaintiffs )<br> )<br>v. )<br> )<br>UNITED STATES OF AMERICA, )<br>VERIZON NEW ENGLAND, INC. and )<br>BOSTON EDISON COMPANY d/b/a NSTAR )<br>ELECTRIC )<br> )<br>Defendants ) | NO. 04-11924-RGS |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
BOSTON EDISON COMPANY'S
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM

INTRODUCTION

Plaintiff Ian Brown ("Brown") has brought this action alleging that on January 4,

2002, he lost control of his motorcycle as he rode along Hartwell Road, Bedford,

Massachusetts and then struck a guardrail and then a utility pole.   (Complaint, ¶¶ 8,9, Ex.

A)  The utility pole that Brown alleges was involved in his accident was jointly owned by

Boston Edison Company ("Boston Edison") and Verizon New England, Inc. ("Verizon").

(Roche Affidavit ¶8, Ex. B; Defendant Boston Edison Company's Answers to Plaintiffs'

Interrogatories, Response No. 2, Ex. C)[1] Brown alleges that he suffered serious personal

injuries as a result of the accident. (Complaint, ¶¶ 10, Ex. A)   Brown's parents, James

---

[1] For the purposes of this summary judgment only, Boston Edison will assume that the
following facts are undisputed.  If the motion is denied, Boston Edison reserves the right
to contest any of the facts alleged by Plaintiffs.

and Barbara Brown, have each asserted claims for loss of consortium under M.G.L. c.

231, §85X. (Complaint ¶44)

### FACTS

**The Accident**

      The accident which is the subject matter of this case occurred on January 4, 2002

on Hartwell Road, Bedford, Massachusetts. (Brown Transcript, p. 152, Ex. D)

Previously, in the summer of 2001, Brown, a Second Lieutenant in the Air Force,

transferred to Hanscom Air Force Base ("Hanscom"), in Bedford, Massachusetts.

(Brown Transcript, p. 19, Ex. D)   In January 2002, Brown resided at Independence

Court, Bedford, Massachusetts which is located a few minutes drive from Hanscom

where Brown worked. (Brown Transcript, p. 22, 155-157, Ex. D)

      On the morning of January 4, 2002, Brown drove his truck to work at Hanscom.

(Brown Transcript, p. 156, Ex. D)  On January 4, 2002, Brown returned home for lunch

and decided to ride his motorcycle back to work after lunch. (Brown Transcript, p. 159,

Ex. D)  At the time of the accident, Brown was operating a new Kawasaki Ninja ZX-12R

sport motorcycle. (Brown Transcript, p. 188, Ex. D)   Brown lost control of his

motorcycle when he drove over a sewer manhole located in the travel lane of Hartwell

Road. (Brown Transcript, p. 167, Ex. D)   The sewer manhole was located toward the

center line of Hartwell Road approximately 102 feet from the utility pole that Brown

alleges was involved in his accident. (Brown Transcript, p. 323, Ex. D; Burnstine

Transcript p. 248, Ex. E)    Brown testified that he observed the sewer manhole and

attempted to slow down. (Brown Transcript, p. 167, Ex. D)   After hitting the sewer

manhole, his motorcycle began to topple to the right. (Brown Transcript, p. 177, Ex. D)

As the motorcycle began to fall to the right, Brown jumped off the motorcycle and propelled his body toward the guardrail. (Brown Transcript p. 179-180, Ex. D)    Brown testified that he recalls turning his back to the guardrail while in the air and that he consciously chose the guardrail as an "aim point" for his body. (Brown Transcript, p. 179, 334, Ex. D)   Brown also chose not to go down with the motorcycle and slide along the roadway. (Brown Transcript, p. 334, Ex. D)   In any event, Brown testified that he would have hit the guardrail whether or not he jumped off his motorcycle. (Brown Transcript, p. 572, Ex. D)    According to Brown, the first part of Brown's body to hit the guardrail was his back. (Brown Transcript, p. 180, Ex. D)

It is undisputed that Brown had passed over this section of Hartwell Road on many occasions prior to January 4, 2002. (Brown Transcript, p. 193, Ex. D)   In fact, Brown testified that he usually attempted to avoid the sewer manhole cover when driving either his motorcycle or his truck along this section of Hartwell Road prior to January 4, 2002. (Brown Transcript, p. 194-195, Ex. D)   The reason Brown gave for this was that, prior to January 4, 2002, he was concerned that riding over the sewer manhole would cause an accident. (Brown Transcript, p. 320, Ex. D)   In fact, it is Brown's understanding of the accident that the sewer manhole on Hartwell Road caused him to lose control of his motorcycle. (Brown Transcript, p. 390, Ex. D)    Brown testified that while he had observed utility pole 16/37 prior to January 4, 2002, he did not see the pole when he picked the guardrail as his "aim point". (Brown Transcript, p. 320, 336, Ex. D)

**The Utility Pole**

The utility pole at issue is jointly owned by Boston Edison and Verizon pursuant to a Joint Ownership Agreement between them and is known as Pole 16/37.  Pursuant to

this Agreement, Boston Edison is responsible for the maintenance of the pole.  Each of
the attaching parties is responsible for the maintenance of their own attachments.  (Roche
Affidavit, ¶ 8, Ex. B)  Pole 16/37 is one of many poles located along Hartwell Road,
Bedford, Massachusetts. (Certified Copy of Town of Bedford's, Ex. J)    In 1916, the
Town of Bedford, Massachusetts granted Boston Edison's predecessor and the telephone
company's predecessor the right to install a pole line along Hartwell Road.  (Certified
Copy of Town of Bedford's records, Ex. J)   In accordance with the Grant of Location
issued by the Town of Bedford, Boston Edison installed pole 16/37 in 1916 and replaced
it in 1929, 1954 and 1964 in the ordinary course of its business.  (Dion Transcript, p.33-
35, Ex. F; Roche Affidavit, ¶¶ 3,4, Ex. B; Certified Copy of Town of Bedford's records,
Ex. J)  In fact, the same pole 16/37 which is the subject matter of this lawsuit has been
located at the spot where plaintiff's accident occurred since 1964.  (Roche Affidavit, ¶ 4,
Ex. B; Boston Edison's Responses to Plaintiff's Request for Admissions, No. 3, Ex. G)
The pole is located approximately 102 feet from the sewer manhole that Brown testified
caused him to lose control of his motorcycle and 13 inches from the end of the pavement
of Hartwell Road.  (Burnstine Transcript, p. 165-166, 248, Ex. E)   Boston Edison has no
information and no record of utility pole 16/37 ever having been involved in an accident
or having been damaged either before or after Brown's accident on January 4, 2002.
(Roche Affidavit, ¶ 6, Ex. B; Boston Edison' Answers to Plaintiff's Interrogatories, No.
20, Ex. C)     Boston Edison does not know who installed the guardrail where Brown's
accident occurred or when it was installed. (Boston Edison' Answers to Plaintiff's
Interrogatories, No.4, Ex. C)   Finally, there are in excess of 409,000 overhead electric

poles either jointly or solely owned in the electric service territory. (Roche Affidavit, ¶ 7, Ex. B)

**James and Barbara Brown's Claim for Loss of Consortium**

At the time of his accident on January 4, 2002, Brown's parents lived in New Jersey and provided Brown with no financial support.  (James Brown Transcript, p. 83, Ex. H; Barbara Brown Transcript, p. 53, Ex. I)   Since the accident, almost all of Brown's medical care and medical supplies have been paid for by the United States of America because of his status as a military veteran. (Brown Transcript, p 251, Ex. D)   To the extent Brown has incurred expenses beyond that paid by the United States, Brown has met those expenses on his own. (Brown Transcript, p. 252-255, Ex. D)   Browns' parents have not paid for any of Brown's medical treatment since the accident and Brown is not financially dependent on them for his medical care.  (James Brown Transcript, p.106-107, 109, Ex. H; Barbara Brown Transcript, p. 61-63, Ex. I; Brown Transcript, p. 252-255, Ex. D).   Upon termination of inpatient treatment after the accident, Brown moved home with his parents.  Brown receives a monthly tax-free stipend from the United States government of approximately $5,000.  Brown's parents' monthly mortgage payment is $1,000 per month.  While the Browns do not charge Mr. Brown rent, Mr. Brown pays the gas and electric bills and purchases the food for the household.   (James Brown Transcript, p.105 -106, Ex. H; Barbara Brown Transcript, p. 61-63, 114, Ex. I; Brown Transcript, p. 264, Ex. D).   With the exception of occasional gifts from his parents, Brown purchases all of his own clothing and supplies and pays for his continuing education courses.   (Brown Transcript, p. 264, Ex. D).

## ARGUMENT

### A.    The Standard for Granting Summary Judgment.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the onus is on the nonmoving party to present facts that show a genuine issue for trial. See Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 25 (1st Cir.1997); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841-42 (1st Cir.1993), cert. denied, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(citing Fed.R.Civ.P. 56(e)). "[P]laintiff ... [must] offer[ ] ... 'significant probative evidence tending to support the complaint.' " Id. at 256, 106 S.Ct. 2505 (quoting from First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B.    Boston Edison Is Entitled To Summary Judgment Because Plaintiffs Cannot Prove Negligence As A Matter Of Law.

In order to succeed on their claims against Boston Edison, each of which is based on negligence, Plaintiffs bear the burden of proving that Boston Edison owed Brown a duty of care, that Boston Edison breached that duty of care, that Boston Edison's breach caused Brown's injuriesand that damages resulted from the injuries. Beausoleil v.

<u>Massachusetts Bay Transp. Authority</u>, 138 F.Supp.2d 189, 197 (D.Mass.2001) citing

<u>Glidden v. Maglio</u>, 430 Mass. 694, 696 (2000); <u>Ulwick v. DeChristopher</u>, 411 Mass. 401,

408 (1998). Whether a duty of care exists is a question of law. <u>Vaughn v. Eastern</u>

<u>Edison Co.</u>, 48 Mass. App. Ct. 225, 226 (1999) (whether utility company had a legal duty

to pedestrian plaintiff is question of law). <u>See also</u> <u>Yakubowicz v. Paramount Pictures</u>,

404 Mass. 624, 629 (1989); <u>Monadnock Display Fireworks, Inc. v. Andover</u>, 388 Mass.

153, 156 (1983).

The existence of duty of care is a question of law. When defining duty of care the

court must also determine foreseeability. <u>Whitaker v. Saraceno</u>, 418 Mass. 196, 199

(1994). Questions of reasonable foreseeability may properly be decided by the judge as

questions of law. <u>Westerback v. Harold F. LeClair Co., Inc.</u>, 25 Mass App. Ct. 144, 146

(2000); <u>Glick v. Prince Italian Foods of Saugus, Inc.</u>, 25 Mass. App. Ct. 901, 902 (1987).

Numerous courts have held that a utility company has no liability in negligence

when a vehicle collides with a utility pole located off the roadway. Those courts have so

held based on the lack of a duty of care owed by the utility company, using a

foreseeability analysis. Following this same foreseeability analysis, the facts, taken in a

light most favorable to Plaintiffs, show that Boston Edison has no liability in negligence

in the instant matter.

### Boston Edison Is Not Liable Because, As a Matter of Law, It Was Not Foreseeable Brown Would Deviate From the Roadway and Strike the Utility Pole

The determinative question for this Court to decide is whether Boson Edison

should have foreseen that Brown would veer off the roadway, hit a guardrail, slide along

the guardrail, and ultimately strike Pole 16/37. Restatement 2d of Torts, §368 offers

insight into the analysis of Boston Edison's duty and the foreseeability of Brown hitting

Pole 16/37. This section provides as follows:

Conditions Dangerous to Travelers on Adjacent Highway

> A possessor of land who creates or permits to remain
> thereon an excavation or other artificial condition so near
> an existing highway that he realizes or should realize that it
> involves an unreasonable risk to others accidentally
> brought into contact with such condition while traveling
> with reasonable care upon the highway, is subject to
> liability for physical harm thereby caused to persons who

    (a)    Are traveling on the highway, or

    (b)    Foreseeable deviate from it in the ordinary course of travel.

Section 368 is routinely extended to utility pole owners whose pole is set on land owned

by a town or municipality. Coates v. Southern Maryland Electric cooperative, Inc., 731

A.2d 931, 944 (Md. 1999); Gouge v. Central Illinois Public Service Company, 582

N.E.2d 108, 113-114 (Ill. 1991); Boylan v. Martindale, 431 N.E. 2d 62, 71 (Ill. App.

1982); Gorrell v. Texas Utilities Electric Company, 915 S.W.2d 55, 59-60 (Tex. App.

1996).

Clause (a) of § 368 of the Restatement is inapplicable to this matter, as it concerns

accidents that happen "on the highway" itself. Clause (b) concerns the traveler who

deviates from the highway and focuses on foreseeability. Comment h to §368 explains

that "the essential question is whether [the pole] is so placed that travelers may be

expected to come in contact with it in the course of a deviation *reasonably to be*

*anticipated in the ordinary course of travel*." (emphasis supplied). The comment notes

the relevance of distance between the condition and the roadway, but states that distance

is important "only as it affects the recognizable risk; and other factors, such as the nature

of the condition itself, its accessibility, and the extent and character of the use of the

highway must be taken into account." Id.

### As a Matter of Law It Was Not Legally Foreseeable That Pole 16/37 Would Be Struck.

Courts have recognized that while it is generally foreseeable that motor vehicles

will leave the traveled portion of the roadway and hit a pole, it is not *legally* foreseeable

that a vehicle will hit a particular pole, unless the particular circumstances concerning the

exact pole in question render the collision something more than random. See, e.g.,

Coates, 731 A.2d at 944; Gouge, 582 N.E. 2d at 113 (plaintiffs have alleged no facts in

their complaint, nor are any facts apparent, which would indicate that it was reasonably

foreseeable that plaintiff would deviate from roadway and strike this utility pole);

Boylan, 431 N.E.2d at 71 (must be reasonable anticipation of specific deviation as a

normal incident of travel").

In Coates, the driver of a motor vehicle lost control of the vehicle, spinning out of

control, and striking a utility pole. Plaintiff, a passenger in the vehicle, brought suit

against the defendant Southern Maryland Electric Cooperative, Inc. ("SMECO") alleging

that it was negligent in placing the pole that was struck. The court found in favor of

SMECO holding that it had no duty to anticipate that a motor vehicle would go so out of

control so as to strike the utility pole. Coates, 731 A.2d at 945. The court explained that,

although off-road collisions with utility poles are "generally foreseeable," that was not

determinative:

> The fact that these kinds of deviations occur with some
> frequency and are therefore generally to be anticipated does
> not mean that a collision with any particular pole is
> foreseeable, and, in judging liability, that is the requisite
> consideration. Liability must be based on the negligent

placement or maintenance of the pole that was struck, not in the placement or maintenance of other poles that were not struck. Most poles, we expect, exist for years or even decades, without incident. Most roads, we expect, are relatively safe, and most people are able to navigate them throughout their driving careers without running into a pole.

*We conclude from this that, while off-road collisions may be generally foreseeable, a collision with any particular pole is not legally foreseeable merely by virtue of its proximity of the pole to the traveled portion of a road.*

Coates, 731 A.2d at 943-44 (emphasis added).

The court in Coates provided several factors to be considered in determining whether a collision was legally foreseeable: (1) the condition and topography of the road; (2) the proximity of the pole to the traveled portion of the road; (3) other site conditions; and (4) experience. Id. at 944. The court noted that, in the absence of significant changes to the road, "experience may be the best guide . . . . If a pole has existed at a relatively unchanged site for any significant length of time without serious problem, there may be little reason to anticipate a future collision, for it suggests that motorists are able to navigate that part of the road without incident." Id.

Applying the factors set forth in Coates, the undisputed facts show that, as a matter of law, it was not legally foreseeable that Pole 16/37 would be struck. First, there is simply no evidence that the condition or topography of Hartwell Road was unusual or defective in any way. Hartwell Road curves to the left and the guardrail is located on the outside of the curve. Pole 16/37 is located approximately 102 feet from where Brown claims he lost control of his motorcycle. (Burnstine Transcript, p. 165-166, 248, Ex. E). Pole 16/37 is set thirteen inches from the edge of the pavement of the Road and is in front of the guardrail. Id. Had Brown remained on the road, he would not have struck the

guardrail. The mere placement of a utility pole on the outside of a guardrail, does not, in and of itself, create a defect in Hartwell Road. The evidence is not contradicted that Pole 16/37 "has existed at a relatively unchanged site" for a significant length of time without any problems let alone any serious problems. See Coates, 731 A.2d at 943-44.

The record is also completely devoid of any evidence of prior accidents involving Pole 16/37. Indeed, prior to this incident, Pole 16/37 had been in its present location for since 1916 without incident or any report of incident involving personal injury. (Roche Affidavit, ¶ 6, Ex. B; Boston Edison' Answers to Plaintiff's Interrogatories, No. 20, Ex. C) See Schrader v. Great Plains Electric Cooperative, Inc., 868 P.2d 536 (Kan. App. 1994) (court refuses to hold utility company liable where guy wire had been in place for nearly 40 without incident). Whether or not there have been other accidents along other sections of Hartwell Road is immaterial. Liability must be based on the negligent placement of the pole that was struck and not on accidents that did not involve Pole 16/37. See Coates, 731 A.2d at 943-44. Since Pole 16/37 had been in place prior to the accident for 91 years without incident, it is not foreseeable that Brown would veer off the road striking the pole.

As to the final factor, proximity of the pole to the traveled portion of the roadway, although distance of the pole from the roadway is a factor, it, alone, is not determinative. In Boylan, 431 N.E.2d at 64, the plaintiff's car was struck in an intersection collision and hit a pole located six to twelve inches from the traveled portion of the roadway. There was no evidence to suggest that the intersection was such that a traveler, in the ordinary course of travel, might deviate from it and strike the utility pole. Nor was there any evidence that the pole had ever been struck before. Thus, the court found no liability on

the part of the utility, holding that the mere placement of the pole six to twelve inches from the roadway "does not, in and of itself, create an unreasonable risk to others traveling with reasonable care." Id. at 345. Accord, Coates, 731 A.2d at 944.

Pole 16/37 is thirteen inches from the edge of the road's pavement. (Burnstine Transcript, p. 165-166, 248, Ex. E). There is no evidence that Pole 16/37 was in violation of any code, standard, regulation, or local ordinance. Under M.G.L.c. 166 § 22, the utility must receive permission from the board of aldermen of the city or the selectmen to erect a pole. Pole 16/37 was placed in a location pursuant to a license issued by the Town of Bedford and in accordance with the location and design authorized by the Town of Bedford. (Certified Copy of Town of Bedford's records, Ex. J). Plaintiffs have produced no evidence that Boston Edison has not complied with the Town of Bedford's regulations, the National Electric Safety Code or any of its internal policies with respect to Pole 16/37. Moreover, there is no evidence that the Town of Bedford ever requested Boston Edison to relocate Pole 16/37.

As in Boylan and Coates, there is no other evidence to suggest that Boston Edison should have foreseen that Brown would veer off the Hartwell Road, hit a guardrail, slide along the guardrail, and ultimately strike a pole located 102 feet beyond where Brown originally lost control of his motorcycle. It is undisputed that Pole 16/37 is legally placed. The mere fact that Pole 16/37 is located in front of a guardrail is insufficient to impose liability on Boston Edison. In fact, Plaintiffs' argument seeks to impose a double layer of foreseeability upon Boston Edison. Not only do Plaintiffs argue that it was foreseeable that a motorcycle would veer off the road and strike Pole 16/37, their argument requires a finding of a second layer of foreseeability that a motorcycle would

strike a another object and be re-directed into Pole 16/37.   As the cases cited by Boston

Edison make clear under the facts of this case, it is not only not foreseeable that a

motorcycle would veer off the road and strike Pole 16/37, it is wholly beyond the bounds

of reasonableness to impose a double layer of foreseeability and impose a duty in this

case.

Plaintiffs have come forth with no facts to suggest that Boston Edison should

reasonably have foreseen that a motorcyclist traveling in the ordinary course of travel

would strike Pole 16/37.  Boston Edison is entitled to summary judgment.

### Public Policy Considerations Argue Against Imposing Liability Upon Boston Edison In This Matter.

When determining whether a duty of care exists, the Courts look to existing social

values and customs as well as appropriate public policies.  Davis v. Westwood Group,

420 Mass. 739, 743 (1995).  Several courts that have refused to impose liability on utility

companies because of collisions with poles have considered the public policy

implications.  In Coates, 731 A.2d at 944, the court stated as follows:

> Nor, however, are we willing to create the prospect of a
> damage award against a utility every time someone runs off
> the road and strikes a pole.  We are not competent to
> decide, as a matter of common law, how far a pole must be
> removed from the traveled portion of a road in order to be
> safe; that is the function of highway and safety engineers.
> To make liability in every accident a jury question would,
> we expect (1) quickly remove the availability of affordable
> liability insurance for utilities, and (2) effectively force
> them to move hundreds, if not thousands, of poles, at
> enormous cost and inconvenience to them and to their
> customers and, even then, without absolute assurance of
> safety.

Accord, Gouge, 582 NE.2d at 114 ("the imposition of a general duty to anticipate and

guard against the negligence of others would place an intolerable burden on society")

(citations and quotations omitted).  Factors to be considered include the convenience of administration, the extent of the burden on the utility and its capacity to bear that burden, the benefit, or detriment to the community, the desire to prevent future injuries, and any moral blame associated with the placement of the pole.  Coates, 731 A.2d at 944.  For the same public policy reasons articulated in Coates and Gouge, Boston Edison should incur no liability for its placement of Pole 16/37.  Given the particular randomness of this collision, to impose liability in this case, would impose on Boston Edison an "intolerable burden" to guard against the unforeseeable negligence of others.  Because of the necessity and proliferation of utility poles in our society, Boston Edison's liability would be boundless.

C.    **The Massachusetts Statute of Repose, M.G.L. c. 260, §2B, Bars Plaintiffs' Claim That Boston Edison Negligently Installed Pole 16/37.**

Plaintiffs have alleged that Boston Edison was negligent in its placement of Pole number 16/37.  This allegation is barred by G.L. c. 260, §2B, the Massachusetts Statute of Repose.

G.L. c. 260, §2B provides, in relevant part, that:

> [a]ctions of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property . . . shall be commenced within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.

The second clause of §2B "is a repose provision imposing an absolute limit on the time within which actions to which it refers may be brought, irrespective of when the plaintiff

was injured or discovered the wrong." Conley v. Scott Products, Inc., 401 Mass. 645,

646 (1988).  Chapter 260, § 2B applies to all tort actions, including wrongful death

claims.  McDonough v. Marr Scaffolding Co., 412 Mass. 636, 643 (1992).  Moreover, the

District Court of Rhode Island applying Massachusetts law has squarely held that a

defendant's installation or construction of electrical distribution equipment is an

"improvement to real property" within the meaning of G.L. c. 260, §2B.  Montaup

Electric Co. v. Ohio Brass Corp., 561 F. Supp. 740, 748 (D. R.I.  1983) (applying

Massachusetts law and holding that erection of electrical transmission line constitutes an

"improvement to real property" within the meaning of G.L. c. 260, §2B).

    The subject utility pole was last replaced in 1964.  (Dion Transcript, p.33-35, Ex.

F; Roche Affidavit, ¶¶ 3,4, Ex. B).  In its usual course of business, representatives from

Boston Edison would have visited the site prior to installing this pole to determine the

location where it was to be set and to provide the necessary engineering.  In installing

Pole 16/37, Boston Edison followed the standards set forth by the National Safety

Electric Code.  (Roche Affidavit, ¶ 5, Ex. B).  The engineering and the installation of

Pole 16/37 are acts of planning and construction and qualify as a protected activity under

the statute.  See Conley, 401 Mass. at 647.

    The installation of pole 16/37 is an improvement to real property within the

meaning of G.L. c. 260, § 2B.  In Montaup, the United States District Court for the

District of Rhode Island, applying Massachusetts law, held that the installation of ground

wire brackets and the construction of electrical transmission lines constituted an

improvement to real property under G.L. c. 260, §2B.  561 F.Supp. at 743, 747.  Montaup

Electric Company had sought damages from Ohio Brass Corporation for the failure of

ground wire brackets used in the construction of an electrical transmission line. Id. at

743. Ohio Brass, in turn, filed a third-party Complaint against Stone & Webster

Engineering Corporation based on the alleged negligence of Stone & Webster in the

design and construction of the electrical transmission lines and the ground wire brackets.

Id. In response, Stone & Webster brought a motion for summary judgment, claiming that

the third-party Complaint of Ohio Brass was barred by G.L. c. 260, §2B because the

construction of the electrical transmission lines was an improvement to real property. Id.

at 748. The court granted Stone & Webster's motion for summary judgment, holding that

the ground wire brackets and electrical transmission lines fell within Webster's definition

of an improvement:

> It cannot be gainsaid that the erection of electrical transmission lines
> comprises a permanent addition to real property; that such a project
> involves the expenditure of labor and of money; and that completion
> thereof makes the property more useful or valuable.

Id. at 748.

Based upon courts' interpretation of the term "improvement," the installation of

utility poles along a public way comes within the definition of improvement. Necessary

to the construction of electrical transmission lines are utility poles from which those lines

run. Thus, just as electrical transmission lines have been recognized as an improvement

to real property, so too should utility poles. Utility poles are permanent additions to the

street, the installation of which require the expenditure of time and money and the

existence of which enhance the value and usefulness of both the street and surrounding

neighbourhood through the provision of electrical service.

In sum, Boston Edison is protected by G.L. c. 260, § 2B. Pole 16/37 was last

reset in 1964. (Roche Affidavit, ¶¶ 3,4, Ex. B). Any negligence claims filed after 1970

are time-barred.  Because Brown's accident did not occur until 2002 and the Complaint

was not filed until 2004, the Plaintiffs' claims are time-barred and fail as a matter of law.

**D.     Boston Edison Company Is Entitled to Summary Judgment on James and Barbara's Claim for Loss of Consortium**

James and Barbara Brown have each asserted claims for loss of consortium as a

result of the injuries sustained by their son.  The Massachusetts Supreme Judicial Court

has held that in order for a parent to prevail on a claim for loss of consortium under

M.G.L. c. 231, §85X for an adult child, "that child must be, at the very least, *financially*

dependent on his parents, either prior to or after the accident, or both".  Monahan v.

Town of Methuen, 408 Mass. 381, 390, 558 N.E. 2d 951 (1990)(emphasis in original).

The Monahan Court strictly interpreted the language in section 85X which provides that

"[T]he parents of a minor child or an adult child who is dependent on his parents for

support shall have a cause of action for loss of consortium of the child who has been

seriously injured against any person who is legally responsible for causing the injury".

M.G.L. c. 231, § 85X.

As set forth in the Statement of Material Facts, Ian Brown was not financially dependent

on his parents prior to the accident and is not financially dependent on his parents since

the accident.  (Statement of Material Facts, ¶¶ 38-43).  At the time of his accident on

January 4, 2002, Brown's parents lived in New Jersey and provided Brown with no

financial support.  (James Brown Transcript, p. 83, Ex. H; Barbara Brown Transcript, p.

53, Ex. I).  Almost all of Brown's medical care and medical supplies have been paid for

by the United States of America because of his status as a military veteran.  (Brown

Transcript, p 251, Ex. D).  To the extent Brown has incurred expenses beyond that paid

by the United States, Brown has met those expenses on his own.  (Brown Transcript, pp.

252-255, Ex. D).  Browns' parents have not paid for any of Brown's medical treatment

since the accident and Brown is not financially dependent on them for his medical care.

(James Brown Transcript, p.106-107, 109, Ex. H; Barbara Brown Transcript, p. 61-63,

Ex. I; Brown Transcript, pp. 252-255, Ex. D).  Upon termination of inpatient treatment

after the accident, Brown moved home with his parents.  Brown receives a monthly tax-

free stipend from the United States government of approximately $5,000.  Brown's

parents' monthly mortgage payment is $1,000 per month.  While the Browns do not

charge Mr. Brown rent, Mr. Brown pays the gas and electric bills and purchases the food

for the household.  (James Brown Transcript, p.105 -106, Ex. H; Barbara Brown

Transcript, p. 61-63, 114, Ex. I; Brown Transcript, p. 264, Ex. D).  With the exception of

occasional gifts from his parents, Brown purchases all of his own clothing and supplies

and pays for his continuing education courses.  (Brown Transcript, p. 264, Ex. D).

     Accordingly, under the analysis set forth by the Supreme Judicial Court in

Monahan, James and Barbara Brown cannot prevail on their loss of consortium claims

and Boston Edison is entitled to summary judgment.


     Finally, in the event that the Court determines that summary judgment may not be

appropriate at this time, Boston Edison brings to the Court's attention a Massachusetts

Superior Court decision in the case of Afarian et al. v. Massachusetts Electric Company

et al., Suffolk Superior Court Docket No.  99-1852, a copy of which is attached hereto as

Exhibit A.  The Afarian Decision is currently on appeal and is pending before the

Supreme Judicial Court.  Accordingly, in the event, the Court determines that summary

judgment may not be appropriate; Boston Edison suggests that a decision by the Supreme

Judicial Court may assist this Court.

## CONCLUSION

For all of the foregoing reasons, Defendant Boston Edison Company d/b/a

NSTAR Electric requests that this Court enter summary judgment in its favor.


Respectfully submitted,
BOSTON EDISON COMPANY,
By its attorneys,


____/s/ Marissa A. Goldberg_____
Michael K. Callahan
BBO #546660
Marissa A. Goldberg
BBO #654506
NSTAR Electric & Gas Corporation
800 Boylston Street, 17th Floor
Boston, MA 02199
617-424-2102
617-424-2114