# Condensed Transcript

DEFENDANT'S
EXHIBIT
D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IAN J. BROWN, JAMES BROWN
AND BARBARA BROWN,

Plaintiffs,

VS CIVIL ACTION NUMBER 04-11924-RGS

UNITED STATES OF AMERICA,
VERIZON NEW ENGLAND, INC. AND
BOSTON EDISON COMPANY
D/B/A NSTAR ELECTRIC,

Defendants.

**DEPOSITION OF**

**IAN JAMES BROWN**

July 7, 2006
9:40 a.m.

Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street, Suite 2200
Boston, Massachusetts

Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime Professional Reporter and Certified Realtime Reporter, within and for the Commonwealth of Massachusetts.

Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

Ian James Brown July 7, 2006

17

A. -- and my job there was to await training for the upcoming undergraduate pilot training class.
Q. Okay. And did you participate in the pilot training class?
A. Yes, sir.
Q. Okay. And how long -- did you complete it?
A. No, sir.
Q. Okay. Why not?
A. Sir, I changed careers.
Q. Okay. From -- from flight training to what kind of training?
A. Sir, I went into next developmental engineering.
Q. Okay. What does that mean, "developmental engineering;" what does it entail?
A. Sir, it is a broad job in the Air Force. They can utilize you as best they see fit for your talents versus the programs they're running. In a general sense, it is electrical engineering or computer engineering for the government --

18

Q. Okay.
A. -- for my tract.
Q. Why did you make the career change that you made?
A. Sir, I realized that flying was not my calling in life --
Q. Mm-hmm.
A. -- so I felt that my talents would be better suited outside of aircraft.
Q. Okay. So this was a purely voluntary choice on your part?
A. Yes, sir.
Q. Okay. Had you completed all of the requirements of flight and pilot training to that point?
A. Yes, sir.
Q. Okay. So where did you go next for -- within the Air Force to further your developmental engineering career track within the Air Force?
A. Sir, I PCSed, which is basically changing bases, to Hanscom Field in Massachusetts.
Q. Okay. And when did you arrive at

19

Hanscom?
A. Sir, my best-faith estimate is late spring and early summer of 2001.
Q. And at the time you arrived, what was your rank within the Air Force?
A. Sir, I was a second lieutenant.
Q. Is that the rank that you -- that an Air Force Academy graduate graduates with, if you will?
A. Yes, sir.
Q. So you arrived at Hanscom Air Force Base.
A. (Witness nods head).
Q. And what -- what did you do there? What was your -- what was your job there?
A. Sir, my job there, as stated, was a developmental engineer for the Air Force.
Q. Okay. And specifically what did you do on a daily basis as a developmental engineer at Hanscom?
A. Sir, I worked on a program for the Air Force that I'm not quite sure -- the details are allowed to be discussed.
Q. Give me -- okay. Give me the

20

broad parameters of it, what -- what it -- what aspect of Air Force function it pertained to.
A. Sir, we were developing programs for the Air Force for our development of the department of defense.
Q. Let me help you out. Are these computer programs you were developing?
A. Yes, sir.
Q. Okay. I mean, I'm not looking to ask you questions that effect the security of our country, you know. I just want to have a general idea of the kind of work you were doing.
A. Yes, sir.
Q. So you were doing -- developing computer programs related to national defense; is that fair to say?
A. Yes, sir.
Q. Okay. And -- and was there a group of you involved in that kind of work while you were at Hanscom?
A. Yes, sir.
Q. Okay. And how many people were

Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

21

within your group?
A. Sir, there were roughly ten military personnel --
Q. Mm-hmm.
A. -- and roughly ten civilian personnel.
Q. Okay. And were -- were there servicemen or women who reported to you on the -- at Hanscom in the work you were doing?
A. No, sir.
Q. And -- and to whom did you report?
A. Sir, I reported to Captain -- now Major -- Brian Peters.
Q. Okay. And -- and to whom did Major Peters report?
A. Sir, he reported to then Colonel Bremer, George Bremer.
Q. Can you spell Bremer's last name, B-R-E-M-E-R?
A. Sir, that sounds right.
Q. All right. And was Colonel Bremer present at Hanscom?
A. Yes, sir.

22

Q. Okay. And was -- was there any servicemen or service women senior to Colonel Bremer within the chain of command at Hanscom?
A. Yes, sir.
Q. And can you identify who was senior to Bremer?
A. No, sir.
Q. Okay. But there was someone senior to Bremer at Hanscom?
A. Yes, sir.
Q. And this was part of this team?
A. Yes, sir.
Q. Okay. Now, where did you live when you served at Hanscom?
A. Sir, I lived at Independence Court --
Q. All right.
A. -- Minuteman Village.
Q. Is there an address, or is Independence Court the address?
A. Sir, it was 159 Independence Court.
Q. All right. What -- physically, what kind of housing is 159 Independence

23

Court?
A. Sir, it is a temporary home or a mobile home.
Q. Okay. Did anyone live there with you?
A. Yes, sir.
Q. Who lived there with you?
A. Sir, my girlfriend --
Q. Mm-hmm.
A. -- at the time.
Q. And what's her name?
A. Sir, it was Jennifer Gagne, G-A-G-N-E.
Q. Okay. And you said your girlfriend at the time. Is -- are you no longer involved with Miss Gagne?
A. Correct.
Q. Okay. And when did you first become romantically involved with Miss Gagne?
A. Sir, at school, at the Air Force Academy --
Q. Okay.
A. -- in 1999.

24

Q. And is -- is Miss Gagne a member of the Air Force?
A. Yes, sir.
Q. Is she still?
A. No, sir.
Q. Okay. Do you know when she left the service?
A. No, sir.
Q. Did -- do you know whether she completed her five-year commitment to postgraduate service?
A. No, sir.
Q. You don't know, or she did not?
A. Sir, I do not know.
Q. Okay. Do you know where she lives now?
A. No, sir.
Q. Okay. When's the last time you had any communication with her?
A. This morning.
Q. Okay.
A. Correction. Last night.
Q. Are you still on a friendly basis with her?

Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

149

A. Yes, sir.
MR. WORTH: Okay. This is Joshua Lewin who's just arrived this morning?
THE WITNSES: Hello.
MR. WORTH: Everyone knows him but you.
MR. CHARNAS: Josh, Ian Brown.
THE WITNESS: Nice to meet you.
MR. CALLAHAN: This is Cheryl Genereux from my office.
MS. GENEREUX: We met once before.
MR. WORTH: The expectation is that we're gonna transition at some point. I think I'm going to finish out certain of these questions and then we'll take a short break and then -- if that's okay with everybody.
MR. CHARNAS: Sure.
MR. WORTH: In fact, you know what? If you gave us ten minutes,

150

we could probably do it now if you're -- can you give us ten minutes?
MR. CHARNAS: Absolutely.
MR. LEWIN: Yeah, that's fine.
(Off the record at 1:11 p.m.)
(Recess taken).
(Back on the record at 1:21 p.m.)
(Mr. Worth no longer present at deposition).
EXAMINATION
BY-MR.LEWIN:
Q. All right. Mr. Brown, we've been introduced. My name is Josh Lewin. I am gonna take over for Mr. Worth. I represent Verizon, the phone company. And forgive me if I ask any questions that have been asked this morning. As you know, I wasn't here, so I'll try to have a sense of what was covered this morning and I'll try and stay off those -- those areas.

151

I want to start asking you some questions about the accident itself. And I guess my first question to you is: Do you have a memory of anything concerning the accident?
A. Yes, sir.
Q. Okay. And have you -- since the time of the accident, have you always remembered what happened?
A. Yes, sir.
Q. All right. Do you remember when the police officers arrived on the scene?
A. No, sir.
Q. So you have no memory of speaking with any police officers at the scene?
A. No, sir.
Q. Okay. So is it fair to say that your memory isn't complete about the accident?
A. Yes, sir.
MR. CHARNAS: Objection.
Q. All right. You don't remember speaking to the police officer at the scene; is that right?

152

A. No, sir.
Q. What's the last thing about the accident that you remember?
MR. CHARNAS: Let's go off the record.
(Off the record at 1:24 p.m.)
(Discussion off the record).
(Back on the record at 1:24 p.m.)
BY MR. LEWIN:
Q. Well, I guess my question to you is --
MR. CHARNAS: We should go back on.
(Reporter interruption).
BY MR. LEWIN:
Q. -- on January 4th, 2002, you were involved in a motorcycle accident?
A. Yes, sir.
Q. And you remember some events on the days of January -- on the day of the 4th; is that right?
A. Yes, sir.

Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

153

Q. Okay. Do you remember being in the hospital on January 4th?
A. No, sir.
Q. Okay. And do you remember being transported to the hospital from Bedford?
A. No, sir.
Q. What is the last event you recall on the day of January 4th, 2002?
A. Hitting the telephone pole, sir.
Q. Okay. Now, when you say "hitting the telephone pole," can you describe for me what you remember?
A. Sir, it's a broad question. I don't know exactly what aspect that you're looking at.
Q. Well, you said the last thing you remember is hitting the telephone pole. Can you describe for me what you remember about hitting the telephone pole?
A. Sir, I remember heading toward the telephone pole. My field of vision wasn't on it. And I just remember contacting what would've been the pole, based on my position.

154

Q. What part of your body hit the telephone pole?
A. My head.
Q. And do you remember feeling your head hit the telephone pole?
A. No, sir. And also you didn't let me finish the -- what I felt I hit the telephone pole. I -- I -- there may have been other parts of my body that hit it. I just remember stopping and I remember impacting the pole, but I don't know exactly what orientation my body was immediately after and immediately at the point of impact.
Q. Okay. Well, let's step back a little. Do you remember events of the day of January 4th before you got on your motorcycle leaving your house to return to Hanscom Air Force Base?
A. Yes, sir.
Q. Okay. Can you tell me what you did on the day of January 4th?
A. Sir, I went to work.
Q. At what time?

155

A. Sir, normal work time in the morning.
Q. Which is about?
A. Sir, it's about 8:00 --
Q. Okay.
A. -- is when work starts, but I normally go in early.
Q. About how early?
A. Sir, I would go and work out for an hour or two before work.
Q. And do you recall doing that on January 4th?
A. Yes, sir.
Q. And at some point did you leave work -- by the way, when you say work, where was your work at Hanscom?
A. Sir, it was on base at the ESC building.
Q. And about how long would it take you to get from your home to work at the ESC building?
A. Sir, only a couple of minutes.
Q. Can you clarify "a couple"?
A. Yes, sir. Maybe ten.

156

Q. Around ten minutes?
A. Sir, it could be more or less.
Q. Okay. Would you say more than five?
A. Sir, it could be more than five.
Q. What's your best guess about how long it took you to get to work?
MR. CHARNAS: Objection.
Q. From your residence?
A. Sir, I could only give a best-faith estimate.
Q. What's your best-faith estimate?
A. My best-faith estimate would be about five to ten minutes.
Q. All right. And on the day of January 4th, did you ride your motorcycle to work that morning?
A. No, sir.
Q. Okay. How did you get to work?
A. Sir, I drove my pickup truck.
Q. And at some point did you return from work to your residence?
A. Yes, sir.
Q. Okay. And about what time was

Jack Daniel
Court Reporting & Video Services
Inc

Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

157

that?
A. Sir, it was early afternoon, shortly after -- after the normal lunch hour. I had a late lunch that day.
Q. Okay. And what time was your late lunch?
A. Sir, I do not remember an exact time.
Q. Can you give me an estimate of what time?
A. I -- I could give you a best-faith estimate of leaving the office around 1:00 or so.
Q. And when you left the office, did you go directly to your home?
A. Yes, sir.
Q. Okay. And where was your home located at the time?
A. Sir, 129 Independence Court in Bedford, Massachusetts.
Q. And is that located off of Hartwell Road in Bedford?
A. Yes, sir.
Q. Okay. When you left work and

158

rushed home, what mode of transportation did you use to return to your home?
A. Sir, I drove my pickup truck.
Q. And what did you do when you were at your home on January 4th at around 1:00?
A. Sir, I had lunch.
Q. And about how long did you spend at home having lunch?
A. Not long, sir.
Q. Can you give me -- more than a half an hour?
A. Sir, it would be unlikely that I spent much longer than a half hour there.
Q. Would you say about a half hour?
A. Yes, sir.
Q. And at some point at approximately around 1:30 would you say you left your house to return to work?
A. Sir, it could've been -- because I estimated the first time, I left my house when I was done eating and I got to my house in the early afternoon. And to the best of my knowledge, that's the best

159

estimate I can give you.
Q. Okay. Now, when you went to return to work in the afternoon of January 4th, you decided to drive your motorcycle?
A. Yes, sir.
Q. And can you tell me why you decided to drive your motorcycle that day?
A. Sir, I think that I chose to drive my motorcycle back to work primarily because the weather was -- was good and I preferred riding my motorcycle in good weather than my pickup truck.
Q. What was the weather that day?
A. Sir, it was unseasonably warm. It was nice.
Q. Clear?
A. Yes, sir.
Q. And were the roads dry?
A. Yes, sir.
Q. Okay. When you say "unseasonably warm," can you give me kind of a range of the temperature you think it may have been?
A. No, sir. I cannot.

160

Q. Can you say it was warmer than 40 degrees?
A. Yes, sir.
Q. Warmer than 50 degrees?
A. Sir, it could have been.
Q. Somewhere in the vicinity of 50 degrees?
A. Sir, we would have to check records to find out. I don't recall off the top of my head.
Q. Okay. Why was it that you drove your pickup in the morning versus driving your motorcycle in the afternoon?
A. Sir, I answered that question that you just asked.
Q. Well, let me ask you this: Why did you drive your pickup truck in the morning versus your motorcycle in the morning?
A. Sir, the weather was worse in the morning than it was in the afternoon. It was colder.
Q. Did you drive your motorcycle frequently in the winter?
A. No, sir.

Jack Daniel
Court Reporting & Video Services
inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

165

motorcycle?
A. Sir, that I noticed? No.
Q. Okay. Well, have you learned since then that there were any problems with the tires on the motorcycle?
A. Sir, I have not.
Q. Okay. Were you aware of any other technical problems with the motorcycle at that time?
A. Sir, I was not aware of any.
Q. Okay. Have you become aware since that time of any problems with the motorcycle?
A. No, sir.
Q. Now, at some point you lost control of the motorcycle; is that right?
A. Yes, sir.
Q. And do you remember that?
A. Yes, sir.
Q. And since the time of the accident, have you always remembered losing control of the motorcycle?
A. Yes, sir.
Q. Okay. Has your memory changed at

166

all over time? Well, let me rephrase the question. Has your ability to remember what happened in the accident changed at all over time?
A. No, sir. My ability is fine.
Q. Do you -- do you recall talking to a police officer and telling them that you had no idea what happened after the accident?
A. Sir, I do not remember that.
Q. Do you remember speaking to any paramedics or emergency personnel and telling them that you don't remember what happened at the accident?
A. No, sir. I do not remember telling any personnel at the accident.
Q. Do you remember speaking with any doctors and telling them that you had no recollection of the accident?
A. No, sir.
Q. What do you remember about losing control of the motorcycle?
A. Sir, specific -- I'm asking, in a specific context, what are you asking

167

about my memory of losing control?
Q. I just want to know everything you can remember about the time at which you lost control of the motorcycle.
A. Sir, when the motorcycle was no longer in my control, I remember feeling the bike falling out of control and pushing off with my feet from the bike to turn my back to the approaching guardrail.
Q. Prior to you feeling that you were losing -- you were no longer in control of the bike, what caused you to lose control of the -- of the motorcycle?
A. Sir, the motorcycle lost control after exiting the depression that was in the road.
Q. Okay. Did you see the depression in the road before the motorcycle hit the depression in the road?
A. Yes, sir.
Q. Okay. And did you slow down when you saw the depression in the road?
A. Yes, sir.
Q. Okay. And about how fast were you

168

going before you saw the depression in the road?
A. Sir, about the speed limit of 25.
Q. All right. Do you remember looking at your speedometer at the time?
A. No, sir.
Q. So it's fair to say that your memory that you were going -- when you say about 25 -- is just your best estimate at this point?
A. No, sir.
Q. Okay. Well, what's the basis of your statement that you know you were going 25 miles an hour?
MR. CHARNAS: I think he said about 25, didn't he? Okay.
A. Sir, I know that I was going about 25 based on visual cues. You know roughly how fast you're going on a motorcycle by look. But if you take your eyes off of the road and look at the speedometer it's not safe sometimes.
Q. All right. Do you have any training in estimating how fast you're

Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

of the bike?
A. Yes, sir.
Q. All right. And can you describe that for me?
A. Yes, sir. The bike -- front tire of the bike slid out from underneath me. The bike began to topple over toward its right side. I felt the bike losing control, and I exited the bike in a way to make myself safe from getting trapped underneath it.
Q. All right. Now you said the bike fell in such a way as to fall on its right side. Do you recall when the handle bar -- sorry -- do you recall the handle bars moving at all on the bike as you lost control of it?
A. No, sir.
Q. Okay. They remained straight?
A. Sir, that's an assumption that you are making. I don't recall the movement of the handle bars in the process.
Q. Okay. Now, when you say the bike fell so that it was landing on its right

side, would -- was the back tire coming around to your right or around to your left side?
MR. CHARNAS: Objection.
A. Sir, the back tire was not coming around in a direction --
Q. Okay.
A. -- that I remember.
Q. So the bike just fell towards your right side; is that correct?
A. Yes, sir.
Q. Okay. And as that happened, you've explained how you tried to position your body, but I'm not sure I understood it. If you could explain it to me again.
A. Sir, I saw the encroaching guardrail, and I pushed off with my feet and turned my back to the guardrail for safety --
Q. Okay.
A. -- and used the guardrail to guide me.
Q. And as you came off the bike, you were coming head first --

A. Yes, sir.
Q. -- is that right?
Okay. And so you positioned your body as you're in the air; is that right?
A. That's right.
Q. By the way, did you ever hit the ground between the point where you lost control of the bike and the time that you impacted the guardrail?
A. Sir, I do not remember hitting the ground.
Q. Okay. Do you have a recollection of being in the air the entire time?
A. Sir, I have a recollection of being in the air at the time of the accident.
Q. Well, when you say "at the time of the accident," what do you mean by that?
A. I remember leaving the motorcycle, turning my back to the guardrail and being in the air during that process.
Q. Okay. And at some point did you hit the guardrail?
A. Yes, sir.
Q. And do you recall hitting the

guardrail?
A. Sir, my eyes were in the opposite plane from hitting the guardrail, but the path that I was on and the aim point that I had picked as a best-faith estimate, I can say that I hit the guardrail that was in my line of path -- in my line of travel. But --
Q. And what was -- go ahead.
A. I answered already.
Q. Okay.
A. Sorry.
Q. What was the first part of your body that hit the guardrail?
A. Sir, the first part of the guardrail that I hit -- my body, that I remember, there might've been a minor change, maybe the back of my heel hit, I have no idea what the first point is -- what the first point that I remember hitting was my back.
Q. Okay. About where on your back?
A. Sir, I do not recall.
Q. Okay. Go ahead.

Ian James Brown July 7, 2006

185

that it was in contact for a few seconds, but that's the best I can give you.
Q. Okay. You've testified that the first part of -- that your head hit the telephone pole; is that right?
A. Yes, sir.
Q. Okay. And was that the first part of your body that hit telephone pole?
A. Sir, I do not know.
Q. Do you recall -- do you recall hitting the telephone pole?
A. Yes, sir, though my eyes were not on the pole when it hit. I was looking in the opposite direction.
Q. Okay. Well, how do you know you actually hit the pole?
A. It was directly in the line of path that I was traveling, and my motion abruptly stopped at the pole.
Q. Okay. By the way, were you conscious after you hit the pole?
A. Sir, I do not recall --
Q. Okay.
A. -- immediately after or -- I -- I

186

do not know.
Q. Okay. What's the next memory you have after hitting the pole?
A. Sir, after -- after I hit the telephone pole, the next memory I have is waking up in the hospital.
Q. And when was -- when did you wake up, that day or --
A. Sir, that's the part that gets vague when my memory is -- I don't know what day it was that I initially regained consciousness. I don't know that I was unconscious. I was put into a medically-induced coma, and I remember recovering after that.
Q. Do you remember anything prior to -- do you remember anything after the accident, but prior to the medically-induced coma?
A. No, sir.
Q. All right. At the time of the accident, what were you wearing?
A. Sir, at the time of the accident I was wearing my battle dress uniform, which

187

is what the Air Force calls for our camouflage clothes. I was wearing a pair of slacks, a BDU blouse, what we call -- our winter-weight camouflage jacket. I was wearing a t-shirt underneath that. I was wearing a pair of combat boots, standard issue. And on top of all of my uniform I was wearing a full suit of riding gear for protective clothing, including a helmet, kevlar suit and riding -- protective gloves.
Q. And how long had you had your full suit of riding gear?
A. Sir, I bought the suit with my motorcycle.
Q. And when was that?
A. Sir, the exact date would be on the bill of re -- bill of sale, which we can get, if needed.
Q. Do you remember the month and year?
A. It's -- sir, it was late -- sir, it was 2001, and I do not remember the month of purchase.
Q. How about the season?

188

A. Sir, it was summer.
Q. And had you owned a motorcycle prior to this?
A. Yes, sir.
Q. Okay. What was the first motorcycle that you owned?
A. Sir, it was a Kawasaki Zx6.
Q. And when did you purchase that?
A. Sir, I would have to check the bill of sale.
Q. How about month and year?
A. 1999 is the year. Month -- could have been in springtime.
Q. And did you own any other motorcycles?
A. No, sir. Only those two.
Q. And when did you cease to own the Kawasaki Zx6?
A. Sir, I traded that for my Kawasaki Zx12R.
Q. And the Zx12 was the bike you were riding at the time of the accident?
A. Yes, sir.
Q. You said you took some courses on

Jack Daniel Court Reporting & Video Services Inc
Experience you can Trust
Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com
141 Portland Street, Suite 200
Boston, Massachusetts 02114

Q. Do you recall?
A. I do not recall.
Q. Okay. You said you hit a depression in the roadway on Hartwell Road.
A. Yes, sir.
Q. Okay. Can you describe what that depression -- what you recall about that depression?
A. Yes, sir. The depression that was in the roadway was surrounding a manhole cover, and it was in the lane leaving Independence Court along Hartwell Road. And I have driven past that very pothole, ran past it while jogging and ridden my bicycle fast many times, and from what I recall of that pothole, I remember always consciously and subconsciously thinking that it was a dangerous situation. And it went down several inches into the roadway, unlike many of the other manhole covers that I had encountered anywhere else in the country.
Q. And do you remember, from what you

had seen, about how many inches it went down?
A. Sir, I can only give a best-faith estimate of about three inches.
Q. So on the day of January 4th, 2002, you were aware that there was an unusually-dangerous manhole on Hartwell Road?
A. Yes, sir.
Q. And you had seen it many times before?
A. Yes, sir.
Q. Okay. Had you ever driven over it on your motorcycle before?
A. No, sir.
Q. How about with your pickup truck? Let me ask you a different question. Do you ever recall driving in your pickup truck and hitting the depression with one of the tires of the pickup truck?
A. No, sir.
Q. Okay. Do you remember consciously avoiding the manhole cover with your pickup truck?

A. Yes, sir.
Q. And do you remember consciously avoiding the manhole with your motorcycle?
A. Yes, sir.
Q. By the way, what's the speed limit on Hartwell Road?
A. Sir, it's 25.
Q. After you hit the telephone pole -- well, you said the first part of your body was your head that hit the telephone pole. What's the next thing you remember?
A. Sir, that question was asked in a different context and the same answer --
Q. Okay.
A. -- is that the next thing I remember after contacting the telephone pole was waking up in the hospital.
Q. Okay. So you don't remember any time -- you don't remember landing on the ground after you hit the telephone pole?
A. Correct.
Q. Okay. Okay. Do you remember having any pain when you hit the telephone pole?

A. Sir, I do not remember.
Q. Okay.
MR. CHARNAS: Off the record.
(Off the record at 2:08 p.m.)
(Discussion off the record).
(Back on the record at 2:09 p.m.)
BY MR. LEWIN:
Q. What's the first thing you remember when you woke up in the hospital?
A. Looking at the ceiling tiles.
Q. Did you know where you were?
A. No, sir. I had no clue.
Q. Did you know what had happened?
A. No, sir.
Q. Did you have any idea what was going on?
A. No, sir.
Q. Okay. Who was the first person that you saw?
A. Sir, looking back, I actually don't remember now --

249

appetite so I didn't really eat much. They'd come home at night and I'd try to get up for a little bit, and you know, talk to them. And every once in a while they would cook but they're both so busy that it was like three ships passing in the night. More than often than not we ended up ordering in food and there's not much around me. So I got kind of tired of Italian and Chinese every day.
Q. Did you have any company during the day?
A. No. At that point my -- so much of my time -- my free time was spent coordinating with financial institutions and dealing with insurance issues and medical equipment issues and those kinds of things.
I mean, it was almost a full-time job just trying to situate all the paperwork to adjust to my new life and change of address and change of income and change of pretty much everything you can imagine goes with it.

250

Q. And once again, if it's been covered, just let me know.
But how about recreational activities?
A. I had -- we covered it.
Q. It's covered?
A. Yeah.
Q. And covered now as well through the current time?
MR. CHARNAS: (Nods head).
BY MR. LEWIN:
Q. Okay. All right. You mentioned that you dealt within financial institutions.
A. (Witness nods head).
Q. Can you explain to me the benefits you're receiving?
A. Sir, we went over all that.
Q. It was covered?
MR. CHARNAS: (Nods head).
BY MR. LEWIN:
Q. I'm gonna just -- I'm going to ask a few questions -- it's my understanding that there was some stuff that Bill didn't

251

cover there. So let me just probe a little bit. If it's all been covered, just let me know.
All your medical treatment is covered by the -- by the military?
A. No, sir.
Q. All right. Whose it covered by?
A. Sir, the majority of it is covered by the Department of Veteran Affairs.
Q. Okay. And do you expect those benefits to continue in the future?
A. I do, sir.
Q. All right. And do they ever terminate?
A. Sir, they may.
Q. Do you know?
A. I do not know for sure.
Q. Okay. Is it your expectation that they'll continue as long as you are alive?
A. No, sir.
Q. Okay.
A. They -- I would imagine a policy change.
Q. Do you have any knowledge or

252

information that your benefits will cease at any given time?
A. No. But then again, I have no knowledge that it's going to continue. I just don't know much about that topic.
Q. But as far as you know, everything is covered at this point.
A. Yes, sir. The -- there are things that are not covered by the military and that's why I replied no to one of the previous questions you asked me.
Q. All right. And what are those things?
A. Sir, chiropractic care, any of the care to help rehabilitate muscles, such as massage, myofascial release, chronic pain issues. Some of your medical equipment is not covered by the Department of Veterans Affairs, so a lot of the things you need to do to adapt, you have to provide for on your own, modifications to clothing and all kinds of things that you would not, I guess, typically think of as a burden to anybody in a situation similar to mine are

Ian James Brown July 7, 2006

253

typically not covered by medical insurance or by the Department of Veteran Affairs.
Q. Are you receiving chiropractic care?
A. Yes, sir.
Q. On a regular basis?
A. Yes, sir. It's in the -- it should be in the notes and if that's not, we can get that to you.
Q. And that's out of pocket?
A. Yes, sir.
Q. And same question with respect -- by the way, who -- who are you treating with on the chiropractic care?
A. Sir, Doctor Madeline Healey, and it's documented.
Q. How about the muscle massage to which you referred?
A. I can no longer afford to do that. It was part of the rehabilitation to help rehabilitate the rhomboids and Latissimus dorsi that I injured from surgery. Part of it was done at Doctor Healey's office and the other part was done by a masseuse,

254

who was a friend of mine, but is no longer practicing here.
Q. And did you pay for that treatment --
A. Yes, sir.
Q. -- out of pocket?
And have the problems for which you sought that treatment, have they resolved themselves?
A. No. I just can't afford them anymore.
Q. Okay. And can you just describe, again for me, what the -- what exactly the treatment was for?
A. Yes, sir. The pain that I have in my shoulders and upper back and pretty much all the pain that I have from postural sitting and the rods in and all this stuff that I covered earlier, it was to help on a muscular sense for the body to better process some of the fluid and to help keep me more flexible and hopefully get me back to a point where I have full range of motion in some of the muscles in

255

my back.
Q. And the next thing you mentioned was myofascial release.
A. Right.
Q. What's --
A. That I discussed some of that earlier. It's a technical term. But basically the surrounding that covers the muscle is binding up, making the muscles cramp. There's techniques you can do to help relieve that cramping and it's part of what they did in massage and the same with the chronic pain. They were just techniques to release some of the muscle tension and pain that were there.
Q. And was that treatment from the same people, the Healey chiropractic --
A. Yes.
Q. -- and your friend who was a masseuse?
A. Yes.
Q. Same with the chronic pain --
A. Yes.
Q. -- that you mentioned?

256

Now, you talked about the V -- the Department of Veteran Affairs not covering some of the equipment -- adaptive equipment that you need.
A. Yes, sir.
Q. What sorts of things don't they cover?
A. Sir, if you have difficulty doing something but there's no letter of medical justification for it, such as you go to class and they don't have a desk that's suited for you and you want to get like a little lap table desk, it's a medical device that sometimes you need to have a doctor prescribe to you, and if not, then you have to pay out of pocket and they elevate the price out of pocket because they know it's not covered by insurance. But things that you need in everyday life that may not be covered, you're expected to pay for.
Q. You mentioned like a desk. What -- what other sorts of things?
A. Reaching devices. I can't even

Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

261

your vehicle.
A. Sir, the modifications I have to the vehicle are a guard that comes down and covers the gas plate so that -- or gas pedal so that I don't, in a leg spasm, hit the gas pedal. And there's a hand lever with the left hand that attaches to the steering column, which runs down to control both the brake and the gas.
Q. And can you tell me how you control the brake and the gas with this lever?
A. Yes, sir. There are two types. Mine, I pull down toward my lap to depress the accelerator and I push in toward the dash in order to apply the brake. They call that model a "push right angle."
(Reporter interruption).
THE WITNESS: They call that model a "push right angle."
BY MR. LEWIN:
Q. And is there a gear shifter of any sort?
A. Sir, it's an automatic

262

transmission.
Q. In terms of what the automatic transmission is, is it the standard pull down shift with your right -- right hand to go from park to reverse to neutral?
A. Sir, you can have a column shift. But mine happens to be in the center console of my car.
Q. And is that the standard -- is that a modification, or is that a standard?
A. No, sir. I have no other modifications to the car.
Q. Okay. And is that all that's necessary for you to operate the vehicle?
A. For me, yes.
Q. Okay. And if this has been covered, let me know.
How do you get in and out of your vehicle?
A. The same way I get in and out of the bed. I explained earlier how I do what they call a transfer.
Q. Okay.
A. And it's the same thing that I do

263

to get from my wheelchair to the car seat.
Q. Okay. And there are no modifications necessary to enable you to transfer from the wheelchair into the vehicle?
A. At this point, no. I can make that transfer safely on my own.
Q. Okay. And then how do you -- what do you do with your wheelchair once you're inside the vehicle?
A. My wheelchair folds up. The sides come off. The back folds forward. The wheels pop off so I'm left with an L-shaped bracket for the wheelchair which I bring across my chest and put in a rear passenger seat and fold the front passenger seat back and put the tires behind me.
Q. How long does it take you to get from your wheelchair ready to drive away?
A. Best-faith estimate, several minutes. Less than ten maybe. It's not a quick process when it's raining, but it's not an -- entirely too long either.

264

Q. It's my understanding that you were asked some questions about what kind of wage compensation you're receiving --
A. Yes, sir.
Q. -- earlier today. And it's my understanding that you testified you receive $5,000 a month from -- I assume it's the Department of Veterans Affairs?
A. Yes, sir.
Q. What expenses do you have on a monthly basis?
A. I help pay for home expenses. I pay for food. Currently I'm paying for school, clothing. I go through slacks and underwear a little quicker than most, chiropractic care. There are many others that I can't think of right now.
Q. How much is your school -- how much is your school expenses?
A. Classes this semester were 3,300 I think for the class and the lab and the books were less than a thousand.
Q. And that's for this semester?
A. Yes, sir. That was for one of the

Jack Daniel
Court Reporting & Video Services Inc

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200

Ian James Brown July 7, 2006

317

is that on?
A. Hartwell Avenue.
Q. And that's over in -- that's in Lexington, I think, or a different town?
A. Sir, I'm not sure where the town borders lie.
Q. Okay. What was the route that you typically followed when you left Independence Court to get to the main gate?
A. Sir, I -- I took the shortest path and followed the base -- keeping the base to my right the entire time. I think I may get the road names wrong.
Q. So you would get onto Hartwell Road, follow the base along Hartwell Road and then do you recall any of the streets that you would then connect to in order to get to the main gate?
A. Sir, the names of them I may have wrong. I think that at the end of Hartwell Road I typically made a right, and I think the name of that was Summer Road. And I think it winds around to the

318

left and that goes straight to Hartwell Avenue, which I, again, made another right and go straight to the main gate.
Q. And you had been stationed at the base sometime in the summer of 2001?
A. Yes, sir.
Q. And did you work -- not knowing how it works, it was a typical five days a week that you worked at the base?
A. Yes, sir.
Q. And you had weekends off?
A. Yes, sir.
Q. And it would be fair to-- how frequently did you go home for lunch?
A. Sir, roughly every day.
Q. Okay. So that -- so on a typical workday you would drive to the base in the morning, track back home for lunch, back to the base after lunch and then back home again --
A. Yes, sir.
Q. -- to Independence Court.
So it would be four times a day that you would drive along Hartwell Road?

319

A. At a very minimum.
Q. So there may be days when you make -- take that trip more than four times?
A. Most times I would take the trip more than that because the main artery I used to go that direction when I would go food shopping and such.
Q. And fair to say that you drove by this location -- the location of your accident on many occasions prior to January 4th, 2002?
A. Yes, sir, many.
Q. And I think you had indicated that you had made observations of this road depression prior to January 4th, 2002?
A. Yes, sir.
Q. And you made a habit of trying to avoid the road depression when you were driving both your pickup truck and your motorcycle; is that right?
A. Yes, sir. Also on my bicycle.
Q. Why did you try to avoid that road depression?
A. It just looks like a dangerous

320

situation, sir.
Q. Would it be fair to say that you were concerned that it may cause an accident if you rode over it?
A. Yes, sir.
Q. Had you ever noticed the guardrail prior to January 4th, 2002?
A. Yes, sir.
Q. And had you ever noticed the telephone pole prior to January 4th, 2002?
A. Yes, sir. The utility pole.
Q. And do you recall how many telephone poles or utility poles are on the roadway there?
A. No, sir. You see them out of the periphery of your vision when you travel, but I never bothered to count them.
Q. Okay. Could you describe the topography as you approach the area of your accident?
A. Sir, at that time -- and I understand now that the road had been reconditioned. The asphalt was kinda old, and it -- the depression was -- looked

Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown July 7, 2006

321

almost as though the manhole cover was too heavy and kind of pulled the roadway into it. Approaching that, you are coming upon a road that is slightly going uphill. It's actually quite a -- kind of a steep hill. And then it's a left-hand turn toward the top of the hill. That's my best guess of the topography.
Q. Okay.
A. There are trees and obstructions off to the right side of the guardrail and toward the inside you had adjoining traffic and a fence and such.
Q. Okay. Do you recall that there was a facility right -- about that curve there's a facility on the left on the hill?
A. Yes, sir.
Q. Okay. And there's a -- there's a road by which people can egress and -- enter into and exit that facility?
A. Yes, sir.
Q. In relation to that roadway, the egress and ingress into that facility,

322

where was the road depression on the manhole?
A. Sir, at this time, I think it's after. But I haven't been up in this area in quite sometime.
Q. Do you recall there being any type of road signs along Hartwell Road in the hundred to 200 yards prior to the location of your accident?
A. Sir, there's a speed limit sign on the right.
Q. And had you observed that speed limit sign prior to January 4th, 2002?
A. Oh, I always observe the sign.
Q. Where was the road depression in relation to the -- what I'll call the right side of the road, where the pavement ended on the right side of Hartwell Road?
A. Sir, the manhole and depression in the road is toward the center line from the area that you are referring to.
Q. Okay. And when you say "center line," you're talking about the double -- or there's a yellow line that runs down

323

Hartwell Road?
A. Yes, sir.
Q. And was the manhole and the road depression in the right travel lane or the westbound travel lane of Hartwell Road?
A. Sir, I'm not sure of the direction.
Q. Okay.
A. East-west, however, it is on the -- if you are driving with the guardrail to your right, it is in your lane.
Q. Okay. Do you recall if it's in the middle of that lane or more toward the center of the roadway, if you recall?
A. Sir, I -- I think it was toward the center compared to the location of the entire road.
Q. I'm talking about in terms of the right travel lane?
A. In the lane?
Q. Yes.
A. It was closer to the center line than it was closer to the middle of the road.
Q. Okay. Now, you testified that --

324

Strike that. Do you recall how far that road depression was from the telephone pole or utility pole which you've testified you struck?
A. Do I recall now off the top of my head how far that distance is?
Q. Do you know how far that distance is, yeah, that's my -- yeah?
A. No, sir. I don't know the exact distance.
Q. Do you have an approximate idea of the distance?
A. Yes, sir. I can give a best-faith estimate of less than a hundred yards, as a rough guess.
Q. Do you know if it's less -- less than 50 yards from the pole?
A. Sir, it's been a while since I've been up here. I don't remember right now the best -- the best I could give you is what I gave you.
Q. Have you ever been back to that location since the accident?
A. Sir, I think once.

Jack Daniel
Court Reporting & Video Services
Inc

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

push off to get those clear so that my legs were not trapped underneath. And I began to turn my shoulders in a manner to start protecting myself from the encroaching guardrail.
Q. How far had the motorcycle traveled past the road depression when you made the decision to push off the motorcycle?
A. Sir, that I have no idea, because I was not looking behind from where the manhole cover was to where I was when I pushed off. I simply felt that the bike was going down and knew I had only a few split seconds to keep myself safe. I didn't look to see how far that was.
Q. Where were you looking?
A. I was looking for an aim point. Basically, something that -- any time you have a parachute accident or any accident, you look for, you know, your safest option, and I was looking for a place to turn so that I could slide in a safe manner as possible.
Q. When you say -- I'm sorry. When

you say an "aim point," what do you mean by that?
A. If you eject out of an aircraft, you don't want it to just crash over a neighborhood, so you try to aim the aircraft at something it's going to do the least impact. I tried to aim my body at something that does the least damage to me.
Q. And what did you aim your body at?
A. At the guardrail.
Q. You had a full kevlar suit on, correct?
A. Yes, sir.
Q. Okay. Did you make a choice not to go down with the bike and slide along the ground?
A. Yes, sir.
Q. Okay. And why is that?
A. It looked much safer to avoid the bike, to get away from it. There are many things that could happen potentially, but I wanted to make some distance and change my path of travel from the bike's

path of travel so that the bike didn't come over top of my, per se, or the gas tank opening up.
But I wanted to pick a point where I was gonna be safe from the roadway and from all the other conditions. So I picked a shallow angle at something that I would just glide along.
Q. Did all those thoughts go through your mind during this incident in terms of picking an aim point, wanting to make sure that the bike didn't roll over you, concern about the gas tank, did all of those thoughts go through your mind during the accident?
A. Sir, I would not say all of the specifics are things I focused on. But in all my time in training in parachuting and such, you know so much of what's going on around you in such a short amount of time, it's what you train -- you spend your entire life focusing on maximizing those seconds that you're in free fall, your body position and these things, so that's

-- reverting back to my training after 805 parachute jumps and orienting my body in space and doing these things and avoiding injury by picking aim points and stuff, these were all things that are just instinct to me. So they're thoughts that are going through my head as I'm performing them in a quick and efficient manner.
Q. So the aim point that you're referring to, is an aim point that you're going to aim your body at in order to try to minimize risk to you?
A. Yes, sir.
Q. It's not an aim point that you would direct the motorcycle towards?
A. Oh, no, sir.
Q. When you were picking that aim point, I take it you saw the guardrail?
A. Yes, sir.
Q. Did you see the telephone or utility pole?
A. No, sir.
Q. How far were you from the guardrail

# Condensed Transcript

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IAN J. BROWN, JAMES BROWN
AND BARBARA BROWN,

Plaintiffs,

VS.

CIVIL ACTION NUMBER:
04-11924-RGS

UNITED STATES OF AMERICA,
VERIZON NEW ENGLAND, INC., and
BOSTON EDISON COMPANY
d/b/a NSTAR ELECTRIC,

Defendants.

**DEPOSITION OF**

**IAN JAMES BROWN**

**VOLUME II**

July 14, 2006
9:14 a.m.

Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street, Suite 2200
Boston, Massachusetts

Ayako Odanaka, Notary Public, Certified Shorthand Reporter and Registered Professional Reporter within and for the Commonwealth of Massachusetts

Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

Ian James Brown - Volume II July 14, 2006

387

guided to the depression that day, or if I had chosen to do that why I had chosen to do that.
Q. Were you, as you -- You're driving down Hartwell Road and you came upon this -- The area where the depression was located, can you tell me where you were looking? What you were doing at the time?
A. No, sir, I cannot.
Q. Do you know if you were distracted by -- For any reason, by any cause as you were driving down Hartwell Road and approaching the depression?
A. No, sir, I do not know.
Q. Were there any other vehicles either behind you or in front of you traveling on Hartwell Road at the time of the accident?
A. Sir, I do not know.
Q. Do you recall any vehicles traveling on the other side of the road towards you at the time of the accident?
A. Sir, I do not know.
Q. Do you recall whether or not there

388

were any vehicles entering Hartwell Road from that naval research facility on the left?
A. Sir, I do not know that.
Q. Do you have any memory or understanding as to why, in this particular, day you your motorcycle drove over that depression?
A. Sir, again, no. The last things that I remember were contacting that in the last few seconds of reaction time that I did have. And that's why it's difficult for me to estimate how long it was because it was a reaction.
Q. And is it your testimony that subsequent to the accident either in the hospital -- Strike that. Is it your testimony that subsequent to the accident, when you were asked if you knew what happened you responded that you did not know, that that relates solely to not knowing why you drove over the depression on that particular day?
A. Sir, the can you repeat the

389

question? Can we have that read back?
Q. Do you recall on Friday I asked you several questions in response to my review of some of the records, including the police report and some of the medical records in which indicate that you were asked what had happened, and you were -- the response on the records from you was that you did not know what happened; do you recall that?
A. Correct, sir, I recall.
Q. Okay. And what I'm just trying to understand today is, is it your testimony that your response, as indicated on those records, was based on the fact that you did not know why you drove over that depression on that particular day as opposed to not knowing what hap -- Generally what had happened to you that day?
A. Correct, sir, I did not know what had caused the accident.
Q. And when you use the word "cause," you're talking about why you drove over

390

that depression that day?
A. Correct, sir. My last vivid memory was, like, the vibrant details of how my body was oriented and such. My reaction was the only -- Was the last memory I had until I woke up after my coma.
Q. And is it your understanding that it was the -- The manhole and the road depression on Hartwell Road that caused you to lose control of the motorcycle?
A. Yes, sir.
Q. Do you have any memory of the half hour after the accident either lying at the scene, being at the scene or talking to anyone?
A. Sir, going back to my previous answer my last memory was being in the air. So, no.
Q. Okay.
A. Sorry.
MR. CHARNAS: Try to just answer the question.
A. Sorry.
MR. CHARNAS: It'll go

Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown - Volume II July 14, 2006

571

was prior to my injury.
Q. Have you -- I know you've talked about going on to further schooling. Do you -- What do you see as any limitations in that regard?
A. Sir, I think prejudices in people's mindsets, I think that that's going to be the major roadblock that I see. I'm very good at learning to adapt and overcome any situation thrown at me, whether it be something like trying to figure out how to work out again on new equipment or, you know, the like. I see the biggest challenge is getting people to understand to give me a chance.
Q. And do you anticipate, if you're given that chance, you'll be able to succeed in your attempts?
A. I would like to try and I never think of negative thing. So I hope to -- I hope to succeed in medicine given the opportunity.
Q. I have no further questions, thank you.

572

////

FURTHER EXAMINATION
BY-MR.WILMOT:
Q. Mr. Brown, in your best estimation, would your body have made contact with the guardrail in the manner in which you described it to us, if you did not push off your motorcycle, aimed yourself towards it?
A. Yes, sir, I was definitely going to hit that guardrail, regardless. It was a matter of whether I was going to get crushed by my bike possibly or -- So, yes.
Q. My question isn't whether you would have made contact with the guardrail. My question is: Would your body had made contact with the guardrail in the manner that you described it to us had you not pushed off your motorcycle and aimed yourself toward it?
A. No, sir. Not in the manner that I described.
Q. Okay. And would you agree with me that you intentionally pushed off of your

573

motorcycle?
A. Yes, sir.
Q. And you intentionally aimed your body towards the guardrail?
A. No, sir. That's where I disagree.
Q. You do not, okay. Didn't you testify that you picked the guardrail as an aim point?
A. Yes, sir.
Q. That was a conscious decision on your part?
A. Yes, sir.
Q. So when you pushed off your guardrail, you intended to make some contact with the guardrail; is that correct?
MR. CHARNAS: You said pushed off the guardrail.
BY MR. WILMOT:
Q. I'm sorry, pushed off the motorcycle, you intended to make some -- Strike the question. Would you agree that when you pushed off your -- Off the motorcycle that you intentionally aimed

574

your body towards the guardrail?
A. No, sir.
Q. You did not? However, you did testify that you did aim yourself towards the guardrail, correct?
A. No, sir.
Q. You did not pick the guardrail as an aim point?
A. Yes, sir, I did. But I did not intend to hit it and I did not push myself off toward it. I was going toward it anyway, and I pushed off my motorcycle to change the orientation of my body as it hit the guardrail. It was inevitable that I was going to hit it.
Q. Mm-hmm.
A. So all I did was pick a point at which I wanted to use as a safe spot and try to turn my body in the best way possible going into that area because I knew I was going to hit it anyway. It's not as though I could have jumped 70 feet and gone over the trees and been safe.
Q. But, now I didn't have an expedite

Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114