UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
IAN J. BROWN, JAMES BROWN and       )
BARBARA BROWN                       )
            Plaintiffs              )
                                    )
v.                                  )
                                    )        CIVIL ACTION
                                    )        NO. 04-11924-RGS
                                    )
UNITED STATES OF AMERICA,           )
VERIZON NEW ENGLAND INC. and        )
BOSTON EDISON COMPANY d/b/a         )
NSTAR ELECTRIC                      )
            Defendants              )
_____)

**CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT BY VERIZON NEW ENGLAND INC.**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Verizon New England Inc,

("Verizon") hereby submits this concise statement of material facts as to which Verizon contends

there is no dispute and upon which Verizon is entitled to summary judgment on all claims

brought against it by Plaintiff, Ian J. Brown ("Plaintiff").

**Statement of Facts[1]**

**Hartwell Road**

1.  Hartwell Road is a two lane rural country road which passes through a mixture of civilian

    residential and commercial buildings, with a speed limit of 25 miles per hour.  Exhibit B -

    *Deposition of Adrienne St. John* ("*St. John Dep.*") pp. 43-51; Exhibit C -*Deposition of*

    *Murray Burnstine (* "*Burnstine Dep.*"), p. 147.

---

[1] Several of the facts set forth herein are disputed by Verizon, but those disputes are not material for purposes of
summary judgment.  Accordingly, any disputed facts are set forth in the light most favorable to the Plaintiff.

2.  The eastern and western portions of Hartwell Rd. pass through residential neighborhoods and by a small farm known as the "egg farm."  The middle portion  provides access to two Raytheon facilities, a Naval groundwater treatment plant, a hangar which was abandoned in approximately 2003, and the Air Force trailer park.  Exhibit B -  *St. John Dep*., at pp. 43-51, 119-120 & Ex. 12A.

3.  In the area where Plaintiff lost control of his motorcycle, Hartwell Rd. curves to the left. Exhibit D - *Deposition of Ian Brown*, (*"I. Brown Dep."*) pp. 320-21, 371, 437-443, ex. 1-4; Exhibit E  - *Deposition of Gordon Johnston* (*"Johnston Dep."*), ex. 1A.

## Pole 16/37

4.  In 1916, predecessors of the Utilities, The Edison Electric Company of Boston and The New England Tel. & Tel. Co. of Massachusetts, designed and proposed a line of jointly owned utility poles to be installed along Hartwell Rd. in Bedford.  See Exhibit F - *Minutes from Bedford Board of Selectmen, February 16, 1916*.[2]

5.  On February 16, 1916, the Town of Bedford, through its Board of Selectmen (the "Town"), granted the Utilities the authority to erect and maintain the line of poles.  The Town ordered that the line of poles meet specific engineering specifications and be placed in specific locations alongside Hartwell Rd.  Id.

6.  In 1916, pursuant to the order of the Town, the Utilities installed the line of utility poles, including the utility pole involved in Plaintiff's accident ("Pole 16/37").  Exhibit G - *Deposition of Peter Dion*, (*"Dion Dep."*) pp. 34-35.  Exhibit H  - *Verizon's Supplemental Answers to Plaintiff's Interrogatories* (*"Verizon's Supp. Ans. to Ints."*), No. 5.

---

[2] See Exhibit A, ¶2(a), *Affidavit of Joshua A. Lewin, Esq.,* attesting to the authenticity of the copy of these records obtained pursuant to a public records request.

7.  Pole 16/37 was replaced by the utilities in 1929, 1954 and 1962 in the normal course.[3]

    Exhibit G - *Dion Dep.*, at pp. 34-35; Exhibit H - *Verizon's Supp. Ans. to Ints.*, No. 4 .

8.  Verizon jointly designed and engineered the original placement of Pole 16/37 in 1929 and the

    replacement of the pole in 1962.  Exhibit I – *Affidavit of Richard M. Horan* ("*Horan Aff.*"),

    ¶¶8-17; Exhibit J – *Verizon's Response to Plaintiff's Request for Admissions* ("*Verizon's*

    *Resp. to Req. for Admissions*"), No. 21 & 22

9.  Pole 16/37 is located on the right side of the road approximately 102 feet beyond the location

    where Plaintiff lost control.  Exhibit C - *Burnstine Dep.*, at p. 248, ex. 2 p.1.

10. At the time of Plaintiff's accident, the distance between Pole 16/37 and the edge of the

    pavement was thirteen inches which complied with 220 C.M.R. § 125.23 (requiring that

    utility poles be placed a distance greater than six inches from the edge of the pavement).

    Exhibit C - *Burnstine Dep.*, at pp. 165-167, & ex. 2, p.1.  Plaintiff has adduced no evidence

    that the distance between Pole 16/37 and the edge of the pavement violated any published

    rules, regulation or other industry standard.  See id.

11. Under the Utilities' Joint Pole Agreement, NStar assumed sole responsibility for inspecting

    and maintaining all jointly owned poles in Bedford, including Pole 16/37.  Exhibit K -

    *Verizon's Answers to Interrogatories* ("*Verizon's Ans. to Ints.*"), No. 7; Exhibit L - *Joint*

    *Pole Agreement,* pp. 00048-49, 0072, 0074 0079).[4]  NStar conducted inspections in Bedford

    pursuant to that agreement.  Exhibit M – *Deposition of Donald E. Horrigan* ("*Horrigan*

    *Dep."),* pp. 17-21; 35-39.

---

[3] Verizon's records indicate that the pole was last replaced in 1962 while NStar's records indicate that the replacement occurred in 1964.  This discrepancy is not material for purposes of summary judgment.
[4] A true copy of the Joint Pole Agreement is attached hereto as Exhibit L.  See Exhibit A *Lewin Aff.*, ¶2(b).

12. There is no evidence that Pole 16/37 was ever struck prior to Plaintiff's accident on January 4, 2002.  Exhibit I - *Horan Aff.*, ¶20.

## The Guardrail

13.  A guardrail was installed behind Pole 16/37 in approximately 1990 to protect a fence located on the side of the roadway.  Exhibit N – *Deposition Armand L.C. Ouellette* (*"Ouellette Dep."*), p. 34, 51.

14. Verizon had no knowledge of the existence of the guardrail or its installation prior to Plaintiff's accident.  Exhibit I - *Horan Aff.*, ¶ 19-20; Exhibit  K - *Verizon's Ans. to Ints*., No. 10; Exhibit H - *Verizon's Supp. Ans. to Ints*., No. 4.

## The Accident

15. After a lunch break at his home on January 4, 2002, Plaintiff was riding his Kawasaki Ninja ZX-12R sport motorbike on Hartwell Road in Bedford to his office at Hanscom Air Force Base.  Exhibit O - *Affidavit of Ian J. Brown* (*"Brown Aff."*), ¶¶ 1-3, 6; Exhibit E - *Johnston Dep.* 61-62, 69, ex. 21 & 22d.

16. As Plaintiff came around the curve, he lost control of his motorcycle and hit the guardrail.  Exhibit P – *Plaintiff Ian J. Brown Answers to Defendant Verizon New England, Inc.'s First Set of Interrogatories ("I. Brown's Ans. to Ints."),* No. 6(c); Exhibit D - *I. Brown Dep*, pp.177-182, 374-79.

17. The guardrail redirected the Plaintiff, who then slid along the guardrail causing him to collide with Pole 16/37.[5]  Exhibit P – *I. Brown's Ans. to Ints.,* ¶ 6(c); Exhibit D - *I. Brown Dep*, pp.374-79.

---

[5] The parties' experts dispute whether Plaintiff's paraplegia was caused by contact with the guardrail or the Pole 16/37.  There is also a dispute as the speed Plaintiff was traveling when he lost control of his motorbike.

18. Plaintiff would not have hit Pole 16/37 had the guardrail not been present.  Exhibit  P -. *Brown's Ans. to Ints*., No. 6(c); Exhibit D - *I. Brown Dep*, pp. 177-182, 374-79; Exhibit E - *Johnston Dep*., p. 61.

**Plaintiff's Expert, Murray Burnstine**

19. In the Complaint, Plaintiff claims negligent placement of Pole 16/37.  See Exhibit Q - *Plaintiff's Complaint*, ¶6.  In support of this allegation, Plaintiff has designated Murray. Burnstine, a mechanical engineer, as its liability expert.  See Exhibit R - *Plaintiff's Expert Disclosure*; Exhibit S – *Report and Curriculum Vitae of Murray Burnstine* ("*Burnstine Report*").

20. Burnstine opines in his report that: "[Pole 16/37] is on the wrong side of the road", "the guardrail is on the wrong side of [Pole 16/37]" and that "Pole [16/37] is too close to the pavement.  Exhibit  S - *Burnstine Report*, p. 3.  The report reveals no underlying basis for these conclusions.  Id.

21. Mr. Burnstine is a *mechanical engineer* whose professional career since 1964 has been limited to providing testimony and litigation consulting services "in -- in the field of accident reconstruction [and] automotive design.  Exhibit C - *Burnstine Dep*., pp. 6-8, 13-16, 20-21; Exhibit S – *Burnstine Report* (Curriculum Vitae).

22. Mr. Burnstine has no education, training or experience in the field of roadside design—a discipline of civil engineering which involves completely different educational training and professional experience than that of Mr. Burnstine.  See Exhibit T - *Affidavit of Malcolm H. Ray, ("Ray Aff.),* ¶¶ 1-10; Exhibit S - *Burnstine Report* (Curriculum Vitae); Exhibit C - *Burnstine Dep*., pp. 43-49, 52-59, 284-285.

23.  At his deposition, Mr. Burnstine admitted that he conducted no research, analysis or testing with respect to the placement of the pole and that his opinions are based merely on "common sense" and "common knowledge." See Exhibit C - *Burnstine Dep*., pp. 34, 161-179.

24. Mr. Burnstine testified that he went online and found an article ("Design Considerations For Existing Utility Poles In Urban Areas"[6]) to support his opinion and to cite at the end of his report because "lawyers like to see something in writing to back you up." Exhibit C - *Burnstine Dep*., p.34.  He did not rely on the article in rendering his opinion.  Id.

25. The article cited in Mr. Burnstine's report applies relates to existing utility poles in "urban areas."  The introduction to that article states: does not support Mr. Burnstine's opinion but rather further exposes his failure to conduct any analysis whatsoever.  See Exhibit U - *Design Considerations for Existing Utility Poles in Urban Areas*, p. F-3/1 (when determining how to proper locate and protect utility poles in connection with highway and street projects, a proper analysis "should reflect sound engineering principles and economic data, and should be based upon minimum offset and clear zone distances, crash experience, and available countermeasures.")

26. When conducting a roadside design analysis, roadside design professionals conduct a "thorough analysis employing accepted methods in the industry and relies on published data, the publications listed above, other scholarly and peer-reviewed articles from reputable publications in the industry, and generally accepted civil engineering and economic principles." Exhibit T - *Ray Aff.,* ¶11 -14.

---

[6] A true copy of this article, which was contained in Mr. Burnstine's file, is attached hereto as Exhibit U.  See Lewin Aff., ¶2.

**The Browns' Consortium Claim**

27. At the time of the accident, James and Barbara Brown, Plaintiff's parents, lived in New Jersey and provided him with no financial support.  Exhibit V – *Deposition of James Brown, "J. Brown Dep."),*  p. 83; Exhibit W – *Deposition of Barbara Brown ("B. Brown Dep.),* p. 53.

28. Plaintiff's medical care and medical supplies have been paid for by the United States of America because of his status as a military veteran.  Exhibit D - *I. Brown Dep*., p. 251.

29. To the extent he has incurred expense beyond that paid by the United States, Mr. Brown has met those expenses on his own.  Exhibit D - *I. Brown Dep*., pp. 252-255.

30. James and Barbara Brown have not paid for any of Plaintiff's medical treatment since the accident and Plaintiff is not financially dependent on them for his medical care. Exhibit V - *J. Brown Dep,.* pp.106-107, 109; Exhibit W - *B. Brown Dep*., pp. 61-63; Exhibit D - *I. Brown Dep*., pp. 252-255.

31. After leaving inpatient treatment after the accident, Mr. Brown moved home with his parents. Exhibit D - *I. Brown Dep*., p. 243.

32.  Mr. Brown receives a monthly tax-free stipend from the United States government of more than $5,000.  Exhibit D - *I. Brown Dep.*, pp. 70, 264.

33. The Brown's monthly mortgage payment is $1,000 per month.  While the Browns do not charge Mr. Brown rent, Mr. Brown pays the gas and electric bills and purchases the food for the household.  Exhibit V - *J. Brown Dep*., pp. 105-106; Exhibit W - *B. Brown Dep*., pp. 61-63, 114; Exhibit D - *I. Brown Dep*., p. 264.

34. Aside from occasional gifts from his parents, Mr. Brown purchases all of his own clothing and supplies and pays for his continuing education courses.  Exhibit D  - *I. Brown Dep.*, p. 264.

35. While not having to pay rent, Mr. Brown is saving his money to purchase a residence of his own—which the government will pay to have modified so that it is fully accessible.  Exhibit D - *I. Brown Dep.*, pp. 259-260; 266-267.

36. According to Mrs. Brown, Ian is "financially independent" from his parents. Exhibit W - *B. Brown Dep.*, pp. 115-117.  Likewise, Mr. Brown testified that the Browns have not provided Ian with any financial support since the accident. Exhibit V - *J. Brown Dep.*, p. 109.


Respectfully submitted,

VERIZON NEW ENGLAND, INC.

By its attorneys,


   /s/ William A. Worth
   /s/ Joshua A. Lewin
William A. Worth, BBO #544086
Joshua A. Lewin, BBO# 658299
PRINCE, LOBEL, GLOVSKY & TYE LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Date:  March 14, 2007


### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed  through  the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 14, 2007.

        /s/ Joshua A. Lewin