# EXHIBIT 7

**Condensed Transcript**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IAN J. BROWN, JAMES BROWN
AND BARBARA BROWN,

    Plaintiffs,

VS                    CIVIL ACTION NUMBER 04-11924-RGS

UNITED STATES OF AMERICA,
VERIZON NEW ENGLAND, INC. AND
BOSTON EDISON COMPANY
D/B/A NSTAR ELECTRIC,

    Defendants.

DEPOSITION OF

IAN JAMES BROWN

July 7, 2006
9:40 a.m.

Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street, Suite 2200
Boston, Massachusetts

Laurie J. Driggers, Notary Public, Certified Shorthand Reporter,
Realtime Professional Reporter and Certified Realtime Reporter,
within and for the Commonwealth of Massachusetts.



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

Ian James Brown                                              July 7, 2006

### 5

1    comfortable.
2    Q.  All right.  That would be fine with
3    me.
4        Ian, my name is Bill Worth and I
5    represent Verizon New England in the
6    lawsuit you've -- you've brought against
7    Verizon and the United States of America
8    and -- and NSTAR.
9        Before I begin asking you
10   questions, I just want to say for the
11   record that Mr. Wilmot, who represents the
12   United States of America, will be
13   attending this deposition and has given us
14   the go-ahead to start without him; he'll
15   be delayed slightly in arriving this
16   morning.
17       And in addition, at some point in
18   this deposition Joshua Lewin, who is also
19   counsel of record for Verizon, will take
20   over as Verizon's attorney, probably in
21   the middle of this session where Verizon
22   is asking questions of -- of the witness.
23   And I understand there's no objection to
24   that on the part of other counsel.

### 6

1        Now, Ian, we spoke a little bit
2    before we started the deposition about
3    deposition practice in terms of how to
4    answer questions when a court reporter is
5    transcribing the events of this morning or
6    taking down our testimony rather than
7    transcribing.  In addition, I want you to
8    answer questions that I pose to you only
9    from your best memory.  I don't want you
10   to guess.  And I want you only to answer
11   those questions that you understand.  I
12   will assume if you've answered a question,
13   that you understood it.
14       If you don't understand the
15   question, please let me know, and I will
16   attempt to rephrase it.  You understand
17   everything I've said so far?
18   A.  Yes, sir.
19   Q.  Okay.  Now, are you taking any
20   medications that might impair your ability
21   to understand questions?
22   A.  No, sir.
23   Q.  Why don't you give me your full
24   name and residential address?

### 7

1    A.  Sir, my name is Ian James Brown,
2    and I live at 223 Cotter, C-O-T-T-E-R,
3    Avenue in Neptune, New Jersey.  The zip
4    code there, 07753.
5    Q.  Do you have a social security
6    number?
7    A.  Yes, sir.
8    Q.  And what is that?
9    A.  Sir, it's 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.
10   Q.  How long have you resided at 223
11   Cotter Avenue, Neptune, New Jersey?
12   A.  Sir, I've lived there since I was
13   released from the hospital following my
14   rehabilitation in 2002.
15   Q.  And did you live there at any time
16   prior to your hospitalization?
17   A.  No, sir.
18   Q.  Who lives there with you?
19   A.  Sir, my parents.
20   Q.  Okay.  And what are their names?
21   A.  My father's name is James E. Brown.
22   Q.  Mm-hmm.
23   A.  And my mother's name is Barbara B.
24   Brown.

### 8

1    Q.  What's your dad's age?
2    A.  Sir, he's 56.
3    Q.  Okay.  And your mom's age?
4    A.  Fifty-two.
5    Q.  And what's your age?
6    A.  Sir, I'm 29.
7    Q.  What's your date of birth?
8    A.  Sir, I was born March 22nd, 1977.
9    Q.  You have brothers and sisters?
10   A.  Yes, sir.
11   Q.  And who are they and where do they
12   live?
13   A.  Sir, I have one sister, and she
14   lives 15 miles south of me in Brick, New
15   Jersey.
16   Q.  How -- and what is her name and
17   age?
18   A.  Sir, she is 30 years old, and her
19   name is Jill Edwards, E-D-W-A-R-D-S.
20   Q.  Okay.  Now, you're letting me call
21   you Ian, and I appreciate the courtesy of
22   your calling me sir, but I'm -- you don't
23   have to call me sir, especially before
24   every -- question or after every question,



Jack Daniel
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                                              July 7, 2006

**153**

1   Q. Okay. Do you remember being in the
2   hospital on January 4th?
3   A. No, sir.
4   Q. Okay. And do you remember being
5   transported to the hospital from Bedford?
6   A. No, sir.
7   Q. What is the last event you recall
8   on the day of January 4th, 2002?
9   A. Hitting the telephone pole, sir.
10  Q. Okay. Now, when you say "hitting
11  the telephone pole," can you describe for
12  me what you remember?
13  A. Sir, it's a broad question. I
14  don't know exactly what aspect that you're
15  looking at.
16  Q. Well, you said the last thing you
17  remember is hitting the telephone pole.
18  Can you describe for me what you remember
19  about hitting the telephone pole?
20  A. Sir, I remember heading toward the
21  telephone pole. My field of vision wasn't
22  on it. And I just remember contacting
23  what would've been the pole, based on my
24  position.

**154**

1   Q. What part of your body hit the
2   telephone pole?
3   A. My head.
4   Q. And do you remember feeling your
5   head hit the telephone pole?
6   A. No, sir. And also you didn't let
7   me finish the -- what I felt I hit the
8   telephone pole. I -- I -- there may have
9   been other parts of my body that hit it.
10  I just remember stopping and I remember
11  impacting the pole, but I don't know
12  exactly what orientation my body was
13  immediately after and immediately at the
14  point of impact.
15  Q. Okay. Well, let's step back a
16  little. Do you remember events of the day
17  of January 4th before you got on your
18  motorcycle leaving your house to return to
19  Hanscom Air Force Base?
20  A. Yes, sir.
21  Q. Okay. Can you tell me what you
22  did on the day of January 4th?
23  A. Sir, I went to work.
24  Q. At what time?

**155**

1   A. Sir, normal work time in the
2   morning.
3   Q. Which is about?
4   A. Sir, it's about 8:00 --
5   Q. Okay.
6   A. -- is when work starts, but I
7   normally go in early.
8   Q. About how early?
9   A. Sir, I would go and work out for
10  an hour or two before work.
11  Q. And do you recall doing that on
12  January 4th?
13  A. Yes, sir.
14  Q. And at some point did you leave
15  work -- by the way, when you say work,
16  where was your work at Hanscom?
17  A. Sir, it was on base at the ESC
18  building.
19  Q. And about how long would it take
20  you to get from your home to work at the
21  ESC building?
22  A. Sir, only a couple of minutes.
23  Q. Can you clarify "a couple"?
24  A. Yes, sir. Maybe ten.

**156**

1   Q. Around ten minutes?
2   A. Sir, it could be more or less.
3   Q. Okay. Would you say more than
4   five?
5   A. Sir, it could be more than five.
6   Q. What's your best guess about how
7   long it took you to get to work?
8        MR. CHARNAS: Objection.
9   Q. From your residence?
10  A. Sir, I could only give a best-faith
11  estimate.
12  Q. What's your best-faith estimate?
13  A. My best-faith estimate would be
14  about five to ten minutes.
15  Q. All right. And on the day of
16  January 4th, did you ride your motorcycle
17  to work that morning?
18  A. No, sir.
19  Q. Okay. How did you get to work?
20  A. Sir, I drove my pickup truck.
21  Q. And at some point did you return
22  from work to your residence?
23  A. Yes, sir.
24  Q. Okay. And about what time was



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                                July 7, 2006

**161**

1  Q. Can you approximate how often you
2  drove your motorcycle to work in the
3  wintertime of 2002?
4       MR. CHARNAS: You mean
5  2001/2002?
6       MR. LEWIN: Yes.
7  A. Sir, can you repeat the question?
8  Q. Sure. Could you tell me how
9  frequently you drove your motorcycle to
10 work versus your pickup truck?
11 A. During the winter months?
12 Q. Yes. Of 2001 and 2002.
13 A. I could give you an estimate. At
14 best, once a week.
15 Q. Okay. And would that be one day
16 per week or --
17 A. Sir, one day per week. Sir, the
18 winter of 2001 started in the late
19 December and we had a break and I -- my
20 accident was in -- on January 4th, so time
21 wise there was not much time in there, so.
22 Q. And I apologize if Mr. Worth has
23 asked you this question already. But how
24 long had you been stationed at Hanscom Air

**162**

1  Force Base prior to January of 2002?
2  A. Sir, I had been there since the
3  summer of 2002, several months at best.
4  Q. Summer of 2001?
5  A. Correction. Sorry.
6  Q. And did you live at 129
7  Independence Court the entire time?
8  A. No, sir.
9  Q. Okay. Where else did you live?
10 A. Sir, I lived in Nashua, New
11 Hampshire.
12 Q. And is that where you moved first
13 when you were stationed at Hanscom Air
14 Force Base?
15 A. Yes, sir.
16 Q. Okay. And when did you move from
17 Nashua -- Nashua to 129 Independence
18 Court?
19      MR. CHARNAS: We did cover
20 this.
21      MR. LEWIN: You did? Okay.
22 I apologize.
23      MR. CHARNAS: That's okay.
24      MR. LEWIN: I apologize.

**163**

1       BY MR. LEWIN:
2  Q. All right. When you left your
3  house at 129 Independence Court to return
4  to work on January 4th, can you tell me
5  the course of travel that you took to get
6  to work?
7  A. Sir, I took the main roadway from
8  my house to work.
9  Q. Okay. And is that Hartwell Road?
10 A. Sir, it includes Hartwell Road.
11 Q. Okay. And again, I'm referring to
12 when you left after lunch right before
13 your accident, did you take a right onto
14 Hartwell Road from Independence Court; is
15 that correct?
16 A. Sir, the intersection it's -- it's
17 roughly -- going back, yes.
18 Q. Okay. And about how far from
19 Independence Court to the place at which
20 you lost control of the motorcycle would
21 you say it was?
22 A. Can you repeat that? I missed
23 the --
24 Q. About how far from the intersection

**164**

1  of Independence Court and Hartwell Road to
2  the point at which you lost control of
3  your motorcycle, what was that distance?
4  A. Sir, I could only give an estimate.
5  Q. Okay.
6  A. I would estimate that it was less
7  than a mile.
8  Q. Okay. And sitting here today, do
9  you have a memory of driving the
10 motorcycle at that period from the corner
11 of Independence Court and Hartwell Road to
12 the spot at which you lost control of the
13 motorcycle?
14 A. Yes.
15 Q. Okay. And did you have any trouble
16 with the motorcycle during that period?
17 A. Sir, the context of the question,
18 can you clarify?
19 Q. Sure.
20     Did the motorcycle appear to you to
21 be operating properly at the time?
22 A. Yes, sir.
23 Q. Okay. There were no trouble that
24 you noticed with the tires of the



Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                                                July 7, 2006

### 165

1  motorcycle?
2  A. Sir, that I noticed? No.
3  Q. Okay. Well, have you learned since
4  then that there were any problems with the
5  tires on the motorcycle?
6  A. Sir, I have not.
7  Q. Okay. Were you aware of any other
8  technical problems with the motorcycle at
9  that time?
10 A. Sir, I was not aware of any.
11 Q. Okay. Have you become aware since
12 that time of any problems with the
13 motorcycle?
14 A. No, sir.
15 Q. Now, at some point you lost control
16 of the motorcycle; is that right?
17 A. Yes, sir.
18 Q. And do you remember that?
19 A. Yes, sir.
20 Q. And since the time of the accident,
21 have you always remembered losing control
22 of the motorcycle?
23 A. Yes, sir.
24 Q. Okay. Has your memory changed at

### 166

1  all over time? Well, let me rephrase the
2  question. Has your ability to remember
3  what happened in the accident changed at
4  all over time?
5  A. No, sir. My ability is fine.
6  Q. Do you -- do you recall talking to
7  a police officer and telling them that you
8  had no idea what happened after the
9  accident?
10 A. Sir, I do not remember that.
11 Q. Do you remember speaking to any
12 paramedics or emergency personnel and
13 telling them that you don't remember what
14 happened at the accident?
15 A. No, sir. I do not remember telling
16 any personnel at the accident.
17 Q. Do you remember speaking with any
18 doctors and telling them that you had no
19 recollection of the accident?
20 A. No, sir.
21 Q. What do you remember about losing
22 control of the motorcycle?
23 A. Sir, specific -- I'm asking, in a
24 specific context, what are you asking

### 167

1  about my memory of losing control?
2  Q. I just want to know everything you
3  can remember about the time at which you
4  lost control of the motorcycle.
5  A. Sir, when the motorcycle was no
6  longer in my control, I remember feeling
7  the bike falling out of control and
8  pushing off with my feet from the bike to
9  turn my back to the approaching guardrail.
10 Q. Prior to you feeling that you were
11 losing -- you were no longer in control of
12 the bike, what caused you to lose control
13 of the -- of the motorcycle?
14 A. Sir, the motorcycle lost control
15 after exiting the depression that was in
16 the road.
17 Q. Okay. Did you see the depression
18 in the road before the motorcycle hit the
19 depression in the road?
20 A. Yes, sir.
21 Q. Okay. And did you slow down when
22 you saw the depression in the road?
23 A. Yes, sir.
24 Q. Okay. And about how fast were you

### 168

1  going before you saw the depression in the
2  road?
3  A. Sir, about the speed limit of 25.
4  Q. All right. Do you remember looking
5  at your speedometer at the time?
6  A. No, sir.
7  Q. So it's fair to say that your
8  memory that you were going -- when you say
9  about 25 -- is just your best estimate at
10 this point?
11 A. No, sir.
12 Q. Okay. Well, what's the basis of
13 your statement that you know you were
14 going 25 miles an hour?
15         MR. CHARNAS: I think he
16 said about 25, didn't he? Okay.
17 A. Sir, I know that I was going about
18 25 based on visual cues. You know roughly
19 how fast you're going on a motorcycle by
20 look. But if you take your eyes off of
21 the road and look at the speedometer it's
22 not safe sometimes.
23 Q. All right. Do you have any
24 training in estimating how fast you're



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                             July 7, 2006

### 177

1   of the bike?
2   A. Yes, sir.
3   Q. All right. And can you describe
4   that for me?
5   A. Yes, sir. The bike -- front tire
6   of the bike slid out from underneath me.
7   The bike began to topple over toward its
8   right side. I felt the bike losing
9   control, and I exited the bike in a way
10  to make myself safe from getting trapped
11  underneath it.
12  Q. All right. Now you said the bike
13  fell in such a way as to fall on its
14  right side. Do you recall when the handle
15  bar -- sorry -- do you recall the handle
16  bars moving at all on the bike as you
17  lost control of it?
18  A. No, sir.
19  Q. Okay. They remained straight?
20  A. Sir, that's an assumption that you
21  are making. I don't recall the movement
22  of the handle bars in the process.
23  Q. Okay. Now, when you say the bike
24  fell so that it was landing on its right

### 178

1   side, would -- was the back tire coming
2   around to your right or around to your
3   left side?
4       MR. CHARNAS: Objection.
5   A. Sir, the back tire was not coming
6   around in a direction --
7   Q. Okay.
8   A. -- that I remember.
9   Q. So the bike just fell towards your
10  right side; is that correct?
11  A. Yes, sir.
12  Q. Okay. And as that happened, you've
13  explained how you tried to position your
14  body, but I'm not sure I understood it.
15  If you could explain it to me again.
16  A. Sir, I saw the encroaching
17  guardrail, and I pushed off with my feet
18  and turned my back to the guardrail for
19  safety --
20  Q. Okay.
21  A. -- and used the guardrail to guide
22  me.
23  Q. And as you came off the bike, you
24  were coming head first --

### 179

1   A. Yes, sir.
2   Q. -- is that right?
3       Okay. And so you positioned your
4   body as you're in the air; is that right?
5   A. That's right.
6   Q. By the way, did you ever hit the
7   ground between the point where you lost
8   control of the bike and the time that you
9   impacted the guardrail?
10  A. Sir, I do not remember hitting the
11  ground.
12  Q. Okay. Do you have a recollection
13  of being in the air the entire time?
14  A. Sir, I have a recollection of being
15  in the air at the time of the accident.
16  Q. Well, when you say "at the time of
17  the accident," what do you mean by that?
18  A. I remember leaving the motorcycle,
19  turning my back to the guardrail and being
20  in the air during that process.
21  Q. Okay. And at some point did you
22  hit the guardrail?
23  A. Yes, sir.
24  Q. And do you recall hitting the

### 180

1   guardrail?
2   A. Sir, my eyes were in the opposite
3   plane from hitting the guardrail, but the
4   path that I was on and the aim point that
5   I had picked as a best-faith estimate, I
6   can say that I hit the guardrail that was
7   in my line of path -- in my line of
8   travel. But --
9   Q. And what was -- go ahead.
10  A. I answered already.
11  Q. Okay.
12  A. Sorry.
13  Q. What was the first part of your
14  body that hit the guardrail?
15  A. Sir, the first part of the
16  guardrail that I hit -- my body, that I
17  remember, there might've been a minor
18  change, maybe the back of my heel hit, I
19  have no idea what the first point is --
20  what the first point that I remember
21  hitting was my back.
22  Q. Okay. About where on your back?
23  A. Sir, I do not recall.
24  Q. Okay. Go ahead.



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                                July 7, 2006

### 193

1  Q. Do you recall?
2  A. I do not recall.
3  Q. Okay. You said you hit a
4  depression in the roadway on Hartwell
5  Road.
6  A. Yes, sir.
7  Q. Okay. Can you describe what that
8  depression -- what you recall about that
9  depression?
10 A. Yes, sir. The depression that was
11 in the roadway was surrounding a manhole
12 cover, and it was in the lane leaving
13 Independence Court along Hartwell Road.
14 And I have driven past that very pothole,
15 ran past it while jogging and ridden my
16 bicycle fast many times, and from what I
17 recall of that pothole, I remember always
18 consciously and subconsciously thinking
19 that it was a dangerous situation. And it
20 went down several inches into the roadway,
21 unlike many of the other manhole covers
22 that I had encountered anywhere else in
23 the country.
24 Q. And do you remember, from what you

### 194

1  had seen, about how many inches it went
2  down?
3  A. Sir, I can only give a best-faith
4  estimate of about three inches.
5  Q. So on the day of January 4th, 2002,
6  you were aware that there was an
7  unusually-dangerous manhole on Hartwell
8  Road?
9  A. Yes, sir.
10 Q. And you had seen it many times
11 before?
12 A. Yes, sir.
13 Q. Okay. Had you ever driven over it
14 on your motorcycle before?
15 A. No, sir.
16 Q. How about with your pickup truck?
17 Let me ask you a different question. Do
18 you ever recall driving in your pickup
19 truck and hitting the depression with one
20 of the tires of the pickup truck?
21 A. No, sir.
22 Q. Okay. Do you remember consciously
23 avoiding the manhole cover with your
24 pickup truck?

### 195

1  A. Yes, sir.
2  Q. And do you remember consciously
3  avoiding the manhole with your motorcycle?
4  A. Yes, sir.
5  Q. By the way, what's the speed limit
6  on Hartwell Road?
7  A. Sir, it's 25.
8  Q. After you hit the telephone pole --
9  well, you said the first part of your body
10 was your head that hit the telephone pole.
11 What's the next thing you remember?
12 A. Sir, that question was asked in a
13 different context and the same answer --
14 Q. Okay.
15 A. -- is that the next thing I
16 remember after contacting the telephone
17 pole was waking up in the hospital.
18 Q. Okay. So you don't remember any
19 time -- you don't remember landing on the
20 ground after you hit the telephone pole?
21 A. Correct.
22 Q. Okay. Okay. Do you remember
23 having any pain when you hit the telephone
24 pole?

### 196

1  A. Sir, I do not remember.
2  Q. Okay.
3       MR. CHARNAS: Off the
4  record.
5       (Off the record at 2:08
6  p.m.)
7       (Discussion off the record).
8       (Back on the record at 2:09
9  p.m.)
10      BY MR. LEWIN:
11 Q. What's the first thing you remember
12 when you woke up in the hospital?
13 A. Looking at the ceiling tiles.
14 Q. Did you know where you were?
15 A. No, sir. I had no clue.
16 Q. Did you know what had happened?
17 A. No, sir.
18 Q. Did you have any idea what was
19 going on?
20 A. No, sir.
21 Q. Okay. Who was the first person
22 that you saw?
23 A. Sir, looking back, I actually don't
24 remember now --



Jack Daniel Court Reporting & Video Services, Inc.
Technologies you can use • Experience you can Trust
Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com
141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                           July 7, 2006

**297**

1   started, when I started recognizing people
2   and engaging in conversation, I -- I think
3   my memory was okay at that point. It was
4   better than, you know, when I was of
5   heavily, heavily medicated.
6     Q.  I want to go back to the day of
7   the accident.
8     A.  Yes, sir.
9     Q.  Actually, let me go back to your
10  motorcycle.
11      You purchased the motorcycle in New
12  Jersey?
13    A.  Yes, sir.
14    Q.  It was new when you purchased it?
15    A.  Brand new, sir.
16    Q.  Do you recall what you paid for it?
17    A.  No, sir. The bill of sale shows,
18  which we have record of.
19    Q.  Okay. Now, when you -- in your
20  answers to interrogatories, you indicated
21  that certain work was done to it. For
22  example, date of purchase in your answers
23  to interrogatories is July 6th of 2001?
24        MR. CHARNAS: Excuse me,

**298**

1   Mike, which set are you referring to?
2         MR. CALLAHAN: I'm sorry.
3   I'm looking at Plaintiff Ian Brown's
4   Answers to Boston Edison's First Set of
5   Interrogatories.
6         MR. CHARNAS: Which number?
7         MR. CALLAHAN: Number 6.
8         MR. CHARNAS: Go ahead.
9   I'm sorry.
10    A.  (Witness viewing document).
11    Q.  And if you look at Answer 6 F, it
12  indicates that you purchased the motorcycle
13  on July 6th of 2001?
14    A.  (Witness viewing document). Yes,
15  sir.
16    Q.  Does that refresh your recollection
17  as to when you purchased the motorcycle?
18    A.  Sir, I would have to check the bill
19  of sale.
20    Q.  Okay that --
21    A.  Sounds --
22    Q.  It sounds about right?
23    A.  It could -- yeah. It could be
24  pretty close.

**299**

1     Q.  Now, it says on July -- above that
2   on Section E it says "on July 6th, 2001
3   the fender kit and blinker kit were
4   installed."
5     A.  (Witness viewing document). Yes,
6   sir.
7     Q.  That was like some additional
8   optional equipment that you had put out
9   there?
10    A.  Sir, I think that was just
11  something from the dealership that they
12  installed.
13    Q.  And on September 24th, 2001 you had
14  a fuel tank, tail cover and seat cover and
15  fuel tank cap installed for. Do you see
16  that?
17    A.  (Witness viewing document). Yes,
18  sir.
19    Q.  What was the reason for having that
20  done?
21    A.  Sir, the motorcycle had scratches
22  on the tank, my brand new tank, and I do
23  not recall at the exact reasoning that it
24  was done, but I think there was an

**300**

1   insurance issue. I think insurance had
2   paid for them to replace that.
3     Q.  Do you know how those scratches
4   came to be on the fuel tank?
5     A.  Sir, I do not know. I think that
6   it was an insurance thing and maybe
7   vandalism or wind or something. I would
8   have to check with insurance why they --
9   why they put that claim through.
10    Q.  Well, when you purchased the
11  motorcycle on July 6th or July of 2001,
12  did -- were those scratches it?
13    A.  No, sir.
14    Q.  So something happened while you
15  owned the vehicle?
16    A.  No, sir.
17    Q.  While you opened the motorcycle?
18    A.  No, sir. I would have to check.
19  But I think that something happened while
20  I was -- actually had the motorcycle
21  actually stationary or parked.
22    Q.  Well, after you had purchased it?
23    A.  Correct.
24    Q.  Okay. And so did you -- you



Jack Daniel Court Reporting & Video Services, Inc.
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                                        July 7, 2006

**329**

1  see the clearance. I'm sorry. I don't
2  mean to be rude in any means, I just
3  don't -- I don't know.
4     Q. You're an experienced motorcycle
5  rider. You've ridden for a while --
6     A. Yes, sir.
7     Q. -- you have to tell me -- you have
8  to have some idea what your position was
9  as you rode over the depression?
10    A. Sir, a few inches, but I've never
11 looked at myself while riding a
12 motorcycle.
13    Q. Okay.
14    A. As a best-faith estimate, my hips
15 were a couple of inches off.
16    Q. Fair enough, you weren't standing
17 straight up --
18    A. No, sir.
19    Q. -- on the motorcycle?
20    A. No, sir.
21    Q. Okay. As you went over the road
22 depression and you were -- I don't know
23 how to describe your position -- but kind
24 of --

**330**

1     A. Standing on the pegs.
2     Q. -- standing on the pegs, what
3  happened next in terms of your physical
4  position on the motorcycle or to the
5  motorcycle itself?
6     A. Can you repeat the question, I
7  wanted to find out at what point you're
8  referring to? The --
9     Q. As you're going over -- as your
10 rear tire was going over the --
11    A. Yes.
12    Q. -- road depression, what happened
13 next to either you, in terms of your
14 physical positioning on the motorcycle, or
15 to the motorcycle itself?
16    A. I felt the motorcycle lose control
17 and began to react because I know that
18 there was no easy correction I could've
19 made to rectify it.
20    Q. Okay. Now, you've used that phrase
21 several times in terms of the motorcycle
22 losing control. What do you mean by that?
23    A. Sir, when you walk, you feel a
24 point at which you're about to fall if you

**331**

1  lose your balance, per se. And the way I
2  am explaining it, I'm trying to draw a
3  parallel in saying that you can feel when
4  you're no longer on your -- the right
5  center like. You can feel when you're
6  about to lose your balance and slip, just
7  as when you're walking. If you're sitting
8  up and you're about to fall over, you feel
9  that center of gravity shift. And I felt
10 the bike was losing control by a
11 gravitational feel and a positional feel.
12 I felt that the bike was about to fall.
13    Q. Okay. Would you equate that with
14 saying that you were losing control of the
15 -- of the motorcycle?
16    A. Sir, I'm not quite sure I
17 understand the manner in your asking.
18    Q. Okay. Well, you were riding the
19 motorcycle, and as the operator you have
20 full control over where the motorcycle
21 goes --
22    A. Right.
23    Q. -- what you do with it. Now, as
24 you hit the depression, at some point in

**332**

1  time you lost control of your ability to
2  maneuver and operate the motorcycle; is
3  that correct?
4     A. Yes, sir. I no longer control.
5     Q. All right. And what part of your
6  body either came off the motorcycle first
7  or -- what did you do? Did you lose your
8  grip on the handle bars?
9     A. No, sir.
10    Q. Did you lose your feet?
11    A. What I did was I pushed off with
12 my feet first. I used my hands on the
13 bike as balance as the bike was going down
14 and used the bike as a reference -- as a
15 center of gravity to push off of as it
16 was tucking.
17    Q. Okay.
18    A. And --
19       MR. CHARNAS: Did you finish
20 your answer?
21       BY MR. CALLAHAN:
22    Q. I'm sorry. Go ahead.
23    A. No, sir.
24    -- and I began to use my feet to



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:   617.557.0039
Toll Free:     866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown                                                                    July 7, 2006

**333**

push off to get those clear so that my legs were not trapped underneath. And I began to turn my shoulders in a manner to start protecting myself from the encroaching guardrail.

Q. How far had the motorcycle traveled past the road depression when you made the decision to push off the motorcycle?

A. Sir, that I have no idea, because I was not looking behind from where the manhole cover was to where I was when I pushed off. I simply felt that the bike was going down and knew I had only a few split seconds to keep myself safe. I didn't look to see how far that was.

Q. Where were you looking?

A. I was looking for an aim point. Basically, something that -- any time you have a parachute accident or any accident, you look for, you know, your safest option, and I was looking for a place to turn so that I could slide in a safe manner as possible.

Q. When you say -- I'm sorry. When

**334**

you say an "aim point," what do you mean by that?

A. If you eject out of an aircraft, you don't want it to just crash over a neighborhood, so you try to aim the aircraft at something it's going to do the least impact. I tried to aim my body at something that does the least damage to me.

Q. And what did you aim your body at?

A. At the guardrail.

Q. You had a full kevlar suit on, correct?

A. Yes, sir.

Q. Okay. Did you make a choice not to go down with the bike and slide along the ground?

A. Yes, sir.

Q. Okay. And why is that?

A. It looked much safer to avoid the bike, to get away from it. There are many things that could happen potentially, but I wanted to make some distance and change my path of travel from the bike's

**335**

path of travel so that the bike didn't come over top of my, per se, or the gas tank opening up.

But I wanted to pick a point where I was gonna be safe from the roadway and from all the other conditions. So I picked a shallow angle at something that I would just glide along.

Q. Did all those thoughts go through your mind during this incident in terms of picking an aim point, wanting to make sure that the bike didn't roll over you, concern about the gas tank, did all of those thoughts go through your mind during the accident?

A. Sir, I would not say all of the specifics are things I focused on. But in all my time in training in parachuting and such, you know so much of what's going on around you in such a short amount of time, it's what you train -- you spend your entire life focusing on maximizing those seconds that you're in free fall, your body position and these things, so that's

**336**

-- reverting back to my training after 805 parachute jumps and orienting my body in space and doing these things and avoiding injury by picking aim points and stuff, these were all things that are just instinct to me. So they're thoughts that are going through my head as I'm performing them in a quick and efficient manner.

Q. So the aim point that you're referring to, is an aim point that you're going to aim your body at in order to try to minimize risk to you?

A. Yes, sir.

Q. It's not an aim point that you would direct the motorcycle towards?

A. Oh, no, sir.

Q. When you were picking that aim point, I take it you saw the guardrail?

A. Yes, sir.

Q. Did you see the telephone or utility pole?

A. No, sir.

Q. How far were you from the guardrail



Jack Daniel Court Reporting & Video Services, Inc.
Technologies you can use • Experience you can Trust
Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com
141 Portland Street, Suite 200
Boston, Massachusetts 02114

**Condensed Transcript**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IAN J. BROWN, JAMES BROWN
AND BARBARA BROWN,

    Plaintiffs,

VS.

UNITED STATES OF AMERICA,
VERIZON NEW ENGLAND, INC., and
BOSTON EDISON COMPANY
d/b/a NSTAR ELECTRIC,

    Defendants.

CIVIL ACTION NUMBER:
04-11924-RGS

DEPOSITION OF

IAN JAMES BROWN

VOLUME II

July 14, 2006
9:14 a.m.

Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street, Suite 2200
Boston, Massachusetts

Ayako Odanaka, Notary Public, Certified Shorthand Reporter and Registered Professional Reporter within and for the Commonwealth of Massachusetts



**Jack Daniel**
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

Ian James Brown - Volume II                                              July 14, 2006

**371**

1  I -- My body and my head were pointed and
2  oriented in the direction of travel. So if
3  I were going down the roadway on the
4  motorcycle, when I pushed off, my head --
5  I was traveling down the road head first
6  in the direction that the motorcycle was
7  traveling, in a general sense. But
8  whether or not whether the motorcycle went
9  one direction and I went another, you
10 know, would not be the exact same
11 direction, but I was going head first down
12 the roadway.
13     Q.  And the road, after the manhole
14 where the depression was, does Hartwell
15 Road kind of incline and curve to the
16 left?
17     A.  Yes, sir.
18     Q.  Do you have a -- You testified that
19 you were not heading at the guardrail on
20 what I would kind of call a 90-degree
21 angle, straight toward the guardrail. Do
22 you have a memory as to what angle you
23 were traveling toward the guardrail?
24     A.  Sir, the best faith estimate, as I

**372**

1  stated earlier, it was a shallow angle. I
2  mean, it was certainly not orthogonal as
3  you mentioned. I don't know what that
4  angle was. But I know that it was it was
5  shallow enough that it did not seem to be
6  -- That I would anticipate a very strong
7  impact. It looked like I was going to
8  glance along the side of it.
9         MR. CALLAHAN: Off the
10 record for a minute.
11        (Discussion off the record).
12        BY MR. CALLAHAN:
13    Q.  You testified it was a shallow
14 angle and can you give me any better
15 understanding as to what angle you were
16 heading toward the guardrail?
17    A.  Sir, as a best faith estimate, I
18 can only say that it was less than 45
19 from my perception. But again, my eyes
20 were averted away from the guardrail at
21 the time of impact. I would anticipate
22 that it was decreasing but I cannot say
23 for sure.
24    Q.  When you say "less than 45," do I

**373**

1  understand that to mean the angle between
2  the guardrail and your body as it
3  approached the guardrail?
4     A.  Correct, sir.
5     Q.  Do you recall what was on the other
6  side of the guardrail?
7     A.  Sir, can I have the question
8  clarified?
9     Q.  Sure. Let me re-ask it. Do you
10 have a memory of whether or not there was
11 anything in the ten to fifteen feet area
12 beyond the guardrail?
13    A.  Sir, I used to drive by that every
14 day, walk by it, bicycle passed it, as I
15 mentioned earlier. And knowing that I
16 knew there were trees there at the time.
17 But at the time of the accident my eyes
18 were averted away from the guardrail. So
19 I did not see what exact obstructions were
20 on the ten to fifteen feet on the side of
21 the guardrail in the stretch of roadway
22 that I was on.
23    Q.  Do you recall how many feet --
24 Strike that. At the location where you --

**374**

1  Your body came into contact with the
2  guardrail, do you recall how many feet
3  that was from the utility pole along
4  Hartwell Road that you believe you struck?
5     A.  No, sir, I do not recall.
6     Q.  Do you know if it was -- Do you
7  recall whether it was more than ten feet
8  from the utility pole?
9     A.  No, sir, I do not recall.
10    Q.  Do you know if it was more than 20
11 feet from the utility pole?
12    A.  Sir, I do not recall.
13    Q.  I believe you testified earlier
14 that when you picked the aim point you did
15 not see the utility pole; is that right?
16    A.  Yes, sir.
17    Q.  Do you have a memory as to --
18 Strike that. When you came into contact
19 with the guardrail, did the direction in
20 which your body was traveling change or
21 was it affected by the guardrail?
22        MR. CHARNAS: I'm sorry,
23 could we have that question read back,
24 please?



Jack Daniel Court Reporting & Video Services, Inc.
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown - Volume II                                July 14, 2006

**375**

1  (Question read).
2  BY MR. CALLAHAN:
3  Q. Let me rephrase that, it's not a
4  real good question. You testified that you
5  believe your body was traveling at a less,
6  you know, less than 45-degree angle toward
7  the guardrail. What I'm trying to find
8  out is was the direction of your the --
9  Was the direction of the your body
10 redirected in any manner by the guardrail?
11 A. Yes, sir. I did not go through
12 the steel of the guardrail. I was averted
13 because of the guardrail.
14 Q. Do you have an understanding as to
15 whether or not -- Strike that. If the
16 guardrail had not been at that location,
17 would your body have then continued into
18 the area on the other side of the
19 guardrail where the woods and trees are?
20      MR. CHARNAS: Are you
21 assuming that he made the same maneuver
22 he's described to try to aim for the
23 guardrail?
24      MR. CALLAHAN: Yes.

**376**

1  A. Sir, trying to estimate what would
2  happen in a -- In potentially different
3  scenarios with different circumstances
4  would be a vague estimate at best. I
5  would think that given that situation I
6  may have reacted differently. And I'm not
7  quite sure, given the loose parameters of
8  the scenario; it's difficult to say.
9  Q. I don't want to you speculate at
10 all. What I'm asking you to do is:
11 Taking the same conditions and the day of
12 your accident that you pushed off the your
13 motorcycle in the same direction, if the
14 guardrail was not in that location, would
15 your body have then continued on to the
16 side of the road and into that wooded
17 area?
18      MR. CHARNAS: I'm sorry, I
19 have to ask to read that back. (Question
20 read).
21      MR. CHARNAS: I have to
22 object on the ground that he's testified
23 that he did what he did because he aimed
24 for the guardrail. So you're asking to

**377**

1  say what would have happened if he'd aimed
2  for the guardrail but the guardrail wasn't
3  there. On that ground I object. You can
4  answer if you can.
5  A. Sir, going back to my previous
6  statement, it's difficult to say on those
7  -- Given those circumstances mainly for
8  part of the reason that Scott mentioned.
9  And what I can say is if my body had been
10 traveling in the direction it was because
11 of the choice that I had made, if the
12 guardrail was not there, it is possible
13 that I would have just passed into the --
14 What we're calling as the brush in your
15 scenario on the side of the road.
16 Q. Okay. And I think you test -- And
17 just so I understand your testimony, is
18 that you were approaching -- Your body was
19 approaching the guardrail about a less
20 than 45-degree angle, based on your best
21 faith estimate. And is it your testimony
22 that the guardrail redirected the way in
23 which your body was traveling into the
24 utility pole?

**378**

1  A. Yes, sir.
2  Q. Can you tell me how your body was
3  redirected?
4  A. Sir, because I was approaching the
5  guardrail at an angle and now traveled in
6  the direct path of the guardrail, the
7  guardrail decided my path from that point
8  on. Not myself and not the direction of
9  travel, which I left the motorcycle. So
10 what the guardrail did was change the
11 angle of my body movement and beyond that
12 I would only imagine that the experts
13 could best put that together.
14 Q. And, not trying to put words in
15 your mouth, just trying to get
16 understanding of what I think you're
17 saying. Is it fair to say that your body
18 was traveling  (Interruption).
19      BY MR. CALLAHAN:
20 Q. -- At a, as you described, a less
21 than 45-degree angle toward the guardrail,
22 and then when it came in contact with the
23 guardrail its -- Your body was then
24 redirected kind of forward toward the



Jack Daniel
Court Reporting & Video Services inc

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown - Volume II                                July 14, 2006

### 379

1  utility pole?
2       MR. CHARNAS: I'm going to
3  object it was asked and answered. But go
4  ahead and answer it again if you want.
5   A.  Sir, my what I am saying is that
6  the guardrail changed the path along which
7  I was traveling. I contacted the
8  guardrail and was then traveling along the
9  path of the guardrail. The guardrail
10 changed my path, my body's motion, so that
11 the guardrail now dictated how my body was
12 moving and not the general physics of the
13 situation.
14  Q.  I think we're saying the same thing
15 but I'm just --
16  A.  I think so too. I don't mean to
17 get too technical and too vague.
18  Q.  I understand. Would it be fair to
19 say that your body direction was not a
20 straight line from where you exited --
21 Exited the motorcycle directly to the
22 utility pole?
23  A.  Correct, sir.
24       MR. CHARNAS: Wait, when you

### 380

1  say, "a straight line" you mean a
2  perpendicular line?
3       MR. LEWIN: Straight line.
4       MR. CALLAHAN: A straight
5  line, perpendicular anticipates another
6  line.
7       MR. CHARNAS: Could we go
8  off the record for a second?
9       (Discussion off the record).
10      BY MR. CALLAHAN:
11  Q.  Just so we're clear, my prior
12 question was -- Was related -- Strike
13 that. Just so we're clear, what I was
14 trying to get at with my prior question
15 was I wanted to -- If you think about a
16 straight line you think about a line
17 directly from one point to another point;
18 do you understand that?
19  A.  Yes, sir.
20  Q.  Okay. And what I was asking you
21 was if you -- If you take the first point
22 A as being the point at which you pushed
23 off the motorcycle and point B being the
24 location of the utility pole, it's my

### 381

1  understanding that the direction of your
2  body did not travel along the straight
3  line from point A to point B as I've just
4  described them; is that correct?
5   A.  Sir, that is 100 percent accurate.
6  My body was not -- The path of my body
7  was not on the line that you have drawn.
8   Q.  Using the same kind of basic math,
9  if we -- If we describe the point on the
10 guardrail as being point A, let's say the
11 point of your motorcycle, where you left
12 the motorcycle is point A, the point where
13 you came into contact with the guardrail
14 as being point B and the utility pole as
15 being point C, your body traveled from
16 point A to point B, and then from point B
17 to point C; is that accurate?
18  A.  Sir, can we get a chalkboard?
19  Q.  I can give you a piece of paper if
20 you --
21  A.  I think I understand the question
22 being that point A is where I left the
23 motorcycle, point C is the guardrail,
24 point B is the telephone pole and you're

### 382

1  asking if --
2   Q.  No, I changed them up a little bit.
3  That's probably what confused you. Point
4  A being your position on the motorcycle at
5  the time you pushed off, B being the point
6  on where your body came into contact with
7  the guardrail, and C being the location of
8  the utility pole. So is it fair to say
9  that your body traveled from point A to B
10 and then from B to C?
11  A.  Sir, are we talking straight lines
12 only?
13  Q.  For the purposes of this question,
14 yes.
15  A.  No, sir.
16  Q.  Okay. Can you describe for me what
17 wouldn't be a straight line along those
18 points?
19  A.  Sir, because of wind friction and
20 the laws of physics that are well beyond
21 me I can only estimate that my body had
22 some sort of, like, deceleration or some
23 external force that may not have been 100
24 percent straight line. I don't think that


Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Ian James Brown - Volume II                                     July 14, 2006

**511**

1  Q. And when is that or how often is
2  that?
3  A. Sir, mornings and nights. It
4  varies based on what my class schedule is.
5  Some nights I have late class, some nights
6  my father works nights, some of the nights
7  my mom's at choir and I'm sure they'll get
8  into all the specifics of that. But the --
9  Basically the times that we're home are
10 the times that, you know, my parents help
11 me out. And to clarify earlier when I
12 say, "ships passing in the night," I don't
13 get to see my parents as much as I would
14 like to and I'm sure we'd all like more
15 time in the day.
16 Q. Could you give me some
17 approximation of about how many hours per
18 day you would say you are home at the
19 same time as one of your parents?
20 A. Sir, including sleeping?
21 Q. No, not including sleeping.
22 A. Okay. Sir, as a best faith
23 estimate I would say five hours. But when
24 all three of us are there at the same

**512**

1  time that gets to be a little less.
2  Q. Mr. Wilmot asked you some questions
3  about how you come up with your best faith
4  estimate of -- Do you need a break?
5  A. No, sir.
6  Q. Okay. Mr. Wilmot asked you some
7  questions about how you came up with your
8  best faith estimate that you were
9  traveling about 25 miles an hour at the
10 time of your accident. And one of your
11 answers was that you base that on the
12 visual cues that you had at the time.
13 And I guess my question is: What visual
14 cues are you basing your estimate that you
15 were going 25 miles an hour? Let me
16 rephrase the question. On what visual cues
17 do you base your best faith estimate that
18 you were going 25 miles an hour at the
19 time of your accident?
20 A. Sir, peripheral vision, objects you
21 see passing and the -- As a rough estimate
22 of objects you see in front of you that
23 are approaching you, closing speeds, I
24 guess, we would call off line is when you

**513**

1  see an object approaching you.
2  Q. Well, let's start with your
3  peripheral vision. What do you remember
4  sitting here today on what you base your
5  25 mile an hour estimate? What do you
6  remember sitting here today that was in
7  your peripheral vision that you base that
8  estimate on?
9  A. Sir, I would imagine same things
10 that you would see driving anywhere on
11 earth. Your visual perception in your
12 peripheral vision is relative which are
13 not focusing on it so you don't see like
14 minor details. You just see movement and
15 the passing of objects. So I could only,
16 as a best faith estimate, say that knowing
17 the road I was on and the area, I more
18 than likely saw in my peripheral vision
19 the houses off to the left, per se, and
20 possibly the shrubs and such on the right
21 side in my peripheral. But again that's
22 only a best faith estimate as what I would
23 likely see in my peripheral vision as
24 driving down that road.

**514**

1  Q. I'm not asking for what you might
2  or likely would see. You've testified
3  that sitting here today your -- Your best
4  faith estimate is that you were traveling
5  25 miles an hour. And you've testified
6  that you didn't look at the speedometer
7  and that you, today, come up with that
8  estimate based on certain visual cues.
9  And now you've told me that one of those
10 visual cues is what you saw through your
11 peripheral vision. And so what, I guess,
12 I'm asking you is: Sitting here today,
13 what was it in your peripheral vision that
14 you remember seeing that on which you
15 arrive at a 25 mile an hour estimate?
16    MR. CHARNAS: Objection.
17 A. Okay. Sir --
18 Q. Do you understand the question?
19 A. I do. The peripheral vision is one
20 of the things you use as visual cues when
21 you're estimating speed. I remember
22 seeing the roadway as I was driving on it
23 in my direct vision and also in my
24 peripheral vision so I could see the


Jack Daniel
Court Reporting & Video Services Inc.
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114