# EXHIBIT 3

**Condensed Transcript**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IAN J. BROWN, JAMES BROWN AND
BARBARA BROWN,

    Plaintiffs,

VS

UNITED STATES OF AMERICA,
VERIZON NEW ENGLAND, INC.,
AND BOSTON EDISON COMPANY
D/B/A NSTAR ELECTRIC,

    Defendants.

CIVIL ACTION NUMBER
04-11924-RGS

DEPOSITION OF

MURRAY BURNSTINE, P.E.

February 20, 2007
10:50 a.m.

Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street
Boston, Massachusetts

Laurie J. Driggers, Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter, Certified LiveNote Reporter and Notary Public within and for the Commonwealth of Massachusetts.



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust
100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

Murray Burnstine, P.E.                                    February 20, 2007

### 113

1  control. You can take your hand off and
2  it'll keep going.
3     Q. Do you know if that was added to
4  this bike?
5     A. When I inspected it, it -- it
6  returned to idle by itself when you let go
7  of it.
8     Q. So your opinion is that after
9  losing directional control in the area of
10 the manhole cover, the motorcycle then
11 proceeded towards the guardrail on the
12 right side of the road?
13    A. Correct.
14    Q. And is it your opinion that Brown
15 was astride the motorcycle as it proceeded
16 towards the right side of the road?
17    A. Yes.
18    Q. Okay. And you then indicated that
19 his right hip and right shoulder made
20 contact with the guardrail?
21    A. Correct.
22    Q. And is it your opinion that this
23 occurred before Brown reached the area of
24 the utility pole?

### 114

1     A. Yes.
2     Q. And by before, I guess that would
3  be west of the utility pole; is that
4  right?
5        MS. JOHNSON:
6  South-southwest.
7     A. It would be south.
8  South-southwest.
9     Q. And when -- is it your opinion that
10 when Brown made contact with the
11 guardrail, he was astride the motorcycle
12 at that time?
13    A. For the hip, he probably -- he
14 might have been, but for the shoulder he
15 had to be horizontal. He had to be
16 preparing to push the motorcycle away to
17 get his shoulder involved.
18    Q. So it's your opinion that he could
19 not have been on the motorcycle when his
20 shoulder made contact with the guardrail?
21    A. He'd be on the motorcycle, but he
22 would be leaning forward so that his
23 shoulder was down --
24       (Witness indicating)

### 115

1     Q. Okay.
2     A. -- about even with his hip.
3     Q. And when you say "leaning forward,"
4  would he be leaning so his chest was on
5  the top of the gas tank or slightly off
6  to the side of the motorcycle, to the
7  right side of the motorcycle?
8     A. I don't know. I can't give you
9  that precision. I just assumed he was
10 just leaning forward.
11    Q. Do you have an opinion as to where
12 along the guardrail Brown made contact?
13    A. You mean where --
14    Q. I'm sorry. It's a bad question.
15    Is it your opinion that he made
16 contact with the guardrail somewhere
17 between Pole 37 and -- is this 38 or 39
18 -- between Pole 37 and the pole with the
19 25 mile an hour speed limit sign?
20    A. Yes.
21    Q. And do you have an opinion as to
22 where along that stretch he made contact?
23    A. No. I -- probably in the last 13
24 feet, because there was none of his --

### 116

1  none of his clothing caught in the seams
2  of the guardrail. And I believe that each
3  section is 13 feet long.
4     Q. Do you have an opinion as to how
5  long his body was in contact with the
6  guardrail?
7     A. No. Well, what do you mean "how
8  long?" You mean for the distance or the
9  seconds?
10    Q. No, I'm sorry. It's a fair
11 question.
12    Time, in terms of time.
13    A. I would say it would be less than
14 13 feet.
15    Q. How about time?
16    A. I can't tell. It just says, less
17 than 13 feet.
18    Q. Did you see any evidence in the
19 last 13 feet of the guardrail before Pole
20 16/37 that he was actually in contact with
21 the guardrail?
22    A. No. The evidence is on the
23 clothing. I didn't see anything on the
24 guardrail that -- that indicated anything



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:   617.557.0039
Toll Free:     866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

Murray Burnstine, P.E.                                    February 20, 2007

### 117

1  to do with this accident.
2  Q. When you went to the scene in April
3  to perform your survey of the scene, did
4  you have photographs from the Bedford
5  Police Department at that time?
6  A. No.
7  Q. Would making contact with the
8  guardrail reduce Mr. Brown's speed at
9  which he was traveling?
10 A. Yeah, of course.
11 Q. Okay. Do you have an opinion as
12 to how much his speed was reduced by way
13 of his contact with the guardrail?
14 A. It would be insignificant.
15 Q. And why would it be insignificant?
16 A. Well, you got a -- a 700-pound
17 object. I mean, you -- trying to slow it
18 down by the guy's sleeves -- sleeve
19 rubbing against a metal guardrail is not
20 going to slow you down much. I don't
21 think you could measure it if you had, you
22 know, instruments.
23 Q. So you couldn't calculate?
24 A. No. Well, you'd have to know the

### 118

1  distance and the coefficient of friction.
2  Then you can calculate it. Whether he's
3  going uphill or downhill, but, I mean,
4  you're going to end up with a, you know,
5  a tenth of a mile per hour or something
6  like that.
7  Q. Is it possible to find out what the
8  coefficient of friction is between Mr.
9  Brown's riding clothing and the steel
10 guardrail?
11 A. Yeah, you can run tests.
12 Q. Okay. So you could calculate it if
13 you needed to?
14 A. Well, you'd have to know -- you'd
15 have to know the contact force, how many
16 pounds were bearing down and exactly what
17 part of his uniform was involved. Because
18 I think it's different type of material.
19 Q. And would contact force be
20 determined by the speed, the weight and
21 the angle of impact at the guard --
22 between Brown, the motorcycle and the
23 guardrail?
24 A. Well, it doesn't have to do with

### 119

1  speed. It just has to do with -- with
2  the contact force. You know, if his --
3  if the motorcycle is leaning over, then
4  you'd have to know the angle and what the
5  -- and then can you calculate the force.
6  Q. Do you know the formula to
7  determine the force -- the contact force
8  to which you're referring? Is there a
9  formula used in physics?
10 A. Well, you have to draw what's
11 called, a free body diagram. Take into
12 account the weight of the rider, what
13 portion of his body is -- is involved, the
14 weight of the motorcycle, the angle it's
15 at.
16    You know, I'd be surprised if you
17 -- for a person going 20 miles an hour,
18 if it would slow him down even one mile
19 an hour.
20 Q. And is it your opinion that the
21 contact force bears no relationship to the
22 speed of travel?
23 A. No. They're two different things.
24 Q. So the contact force of a person on

### 120

1  a motorcycle that hits a guardrail at 80
2  miles an hour is the same as one who hits
3  at 20 miles an hour?
4  A. Yeah. The force would be the same.
5  Q. Okay. Now, after striking the
6  guardrail, do you have an opinion as to
7  the direction of travel of the --
8  A. Wait.
9  Q. -- of the motorcycle?
10 A. Who struck the guardrail? I didn't
11 say --
12 Q. After making contact with the
13 guardrail --
14 A. Yes.
15 Q. -- do you have an opinion as to
16 the direction of travel of the motorcycle?
17    MR. CHARNAS: I'm sorry.
18 After Mr. Brown struck the guardrail --
19    MR. LEWIN: Yes.
20    MR. CHARNAS: -- or after
21 -- okay.
22 A. Well, Brown and the motorcycle were
23 traveling parallel to the guardrail. When
24 he hit his head on the pole, the



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

Murray Burnstine, P.E.                                                February 20, 2007

**121**

1  motorcycle continued ahead and down toward
2  its left where the police found it 89 feet
3  away.
4      Q.  Now, when you say, Brown and the
5  motorcycle were traveling parallel to the
6  guardrail, at what point did they begin to
7  travel parallel to the guardrail?
8      A.  Well, according to the police, they
9  have located a mark.
10     Q.  Well, what's your opinion about --
11         MR. CHARNAS: Can he just
12  finish his answer, please?
13         THE WITNESS: What?
14         MR. LEWIN: Well, it's a
15  non-responsive.
16         MR. CHARNAS: Then you have
17  the right to strike it later on, but he
18  has the right to finish his answer.
19     A.  Well, I know he was parallel to the
20  guardrail, because his clothing was melted
21  by contacting the guardrail in two -- two
22  areas.
23     Q.  All right. Well, you've told us
24  that after he left -- after he lost

**122**

1  directional control of the motorcycle, that
2  he then traveled towards the right towards
3  the guardrail. Do you remember that
4  testimony?
5      A.  Yes.
6      Q.  And while he was traveling towards
7  the right towards the guardrail --
8  guardrail, was he traveling parallel to
9  the guardrail?
10     A.  That question doesn't make sense.
11  He has to go travel to the right to get
12  to the guardrail.
13     Q.  Okay. And then you testified at
14  some later point he was traveling parallel
15  to the guardrail; is that right?
16     A.  Yes.
17     Q.  Now my question to you is, when did
18  he -- when did his direction of travel
19  change towards being in a direction
20  towards the guardrail, to then being
21  parallel with the guardrail?
22     A.  I guess where the police have what
23  they call, first skid. They have a mark
24  that looks like it's heading for the

**123**

1  guardrail on the police diagram.
2      Q.  Do you have an opinion, independent
3  of what's in the police report, about the
4  location where Brown's direction of travel
5  changed to being towards the right towards
6  the guardrail, and then parallel to the
7  guardrail?
8      A.  No.
9      Q.  Do you believe that --
10     A.  It's just that it had to be before
11  Pole 37.
12     Q.  Do you believe that Brown's
13  direction of travel was constantly towards
14  the right after he lost directional
15  control of the motorcycle to the point
16  that he made contact with the guardrail?
17     A.  That I don't know. It could've
18  been wobbling all over the road. There's
19  no -- you know, without any tire marks in
20  the road, I just -- it's just speculation
21  what happened next.
22     Q.  If he was wobbling, would you
23  expect there to be tire marks in the road?
24     A.  Not necessarily.

**124**

1      Q.  If he were wobbling on the shoulder
2  of the road, would you expect there to be
3  marks on the dirt shoulder of the road?
4      A.  Yes. There would be S-shaped
5  marks, showing the motorcycle going back
6  and forth.
7      Q.  And did you see any of those marks
8  when you were at the scene?
9      A.  No.
10     Q.  Have you ever seen any photographs
11  of any such marks?
12     A.  No.
13     Q.  Do you have any idea how much force
14  it would take to cause the marks that you
15  observed on Brown's clothing that you
16  believe were caused by the guardrail?
17     A.  No.
18     Q.  How -- do you have an opinion as
19  to how those marks were caused?
20     A.  Just the heat of friction --
21     Q.  Okay.
22     A.  -- rubbing against an unpainted
23  surface. Unpainted, untarred, no sand --
24  and it could only be the beam and the


Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:   617.557.0039
Toll Free:     866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

Murray Burnstine, P.E.            February 20, 2007

**165**

1    people in my field that the safest
2    location for a pole, if you got to have
3    them, is on the inside of a curve.
4      Q. Understanding that it would be
5    safer to have the pole, in your opinion,
6    on the inside of the curve, what is the
7    basis of your opinion that the pole was
8    located on the wrong side of the road?
9      A. Because it's on the outside of the
10   curve.
11     Q. So is it your opinion that all
12   utility poles must be located on the
13   inside of a curve?
14     A. No. They can be on the outside of
15   the curve if they're 20 feet from the
16   road, you know, where nobody's going to
17   hit them. But this thing's on the wrong
18   side of the road and it's nine inches from
19   the edge of the road.
20     Q. Well, when you -- when you -- I
21   think your report says the pole's 13
22   inches from the side of the road.
23     A. It's what?
24     Q. Thirteen inches?

**166**

1     A. Oh -- you're correct.
2     Q. When you say, wrong side of the
3   road, are you aware of any literature that
4   states poles cannot be located within 13
5   inches on the outside of a curve?
6     A. Just a rule of common sense.
7        MR. CALLAHAN: Is that a
8   no?
9     A. Pardon?
10       MR. CALLAHAN: Is that a
11   yes or a no? Can we get an answer to the
12   question?
13     A. I don't know of any written
14   standard that tells you 13 inches is no
15   good, but 14 inches is all right.
16     Q. Are you aware of any Massachusetts
17   regulations in that respect?
18     A. No. I'm not -- I don't know
19   either way.
20     Q. In fact, are you aware whether this
21   pole, in terms of its distance from the
22   edge of the pavement, was in violation of
23   any law or regulation in the State of
24   Massachusetts?

**167**

1     A. I don't know either way.
2     Q. What's the speed limit on that
3   curve?
4     A. The sign says, 25.
5       MR. CHARNAS: Off the
6   record.
7       (Off the record)
8       BY MR. LEWIN:
9     Q. Other than your reference to common
10   knowledge, as you've stated it, did you
11   review any other materials indicating or
12   supporting your opinion that the pole was
13   on the wrong side of the road, other than
14   the article entitled "Design
15   Considerations...," that we've been
16   speaking about?
17     A. I don't know either way.
18     Q. My question is, did you review any
19   other materials?
20     A. I don't remember.
21     Q. But you've brought here today all
22   the articles you reviewed in reaching your
23   opinion; isn't that right?
24     A. For this case, correct.

**168**

1     Q. Are you aware of any publication
2   that states that it is impermissible to
3   locate a utility pole on the outside of a
4   curve of a road which has a speed limit
5   of 25 miles an hour?
6     A. I can't imagine that kind of --
7   that kind of specification.
8     Q. So is your answer no?
9     A. I'm not aware of any.
10     Q. Did you conduct any other analysis
11   upon which you based your opinion that the
12   pole was on the wrong side of the road,
13   other than reference to common sense -- or
14   common knowledge? I'm sorry.
15     A. No. Well, I talked to a traffic
16   engineer about it.
17     Q. Well, I just asked you a minute ago
18   if you had spoken to any person about the
19   location of the utility pole --
20     A. Oh, I --
21     Q. -- and you said, no.
22     A. -- I discussed this case with a
23   friend of mine who's a -- a highway
24   designer.

Jack Daniel Court Reporting & Video Services
Technologies you can use • Experience you can Trust
Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com
100 Franklin Street
Boston, Massachusetts 02110

Murray Burnstine, P.E.                                February 20, 2007

**169**

1  Q. Who's that?
2  A. Murray Segal, S-E-G-A-L.
3  Q. And what was your discussion with
4  him?
5  A. I just explained it, told him about
6  the case: pole 13 inches from the end of
7  the pavement and on the wrong side of a
8  guardrail. And he said it sounded like a
9  real defect.
10 Q. What sounded like a real defect?
11 A. What's that?
12 Q. What sounded like a real defect?
13 A. The pole location and the guardrail
14 orientation.
15 Q. So he said that the location of the
16 guardrail behind the pole sounded like a
17 real defect?
18 A. Correct.
19 Q. Did he specifically say to you that
20 the location of the pole on the outside of
21 a curve was a defect?
22 A. I don't think he said it was a
23 defect. He said it sounds like a
24 dangerous scene.

**170**

1  Q. Did he specifically say to you that
2  the pole was improperly located on the
3  outside of the curve?
4  A. I don't think so. I mean, there's
5  just some things, you know, like, one and
6  one is two. You don't have to get an
7  answer out of somebody.
8  Q. Did you tell him the speed limit of
9  the road?
10 A. I don't remember.
11 Q. Did you tell him the radius of the
12 curve --
13 A. Yes.
14 Q. -- on the road?
15 A. Yes.
16 Q. Now you also opine in your report
17 that the guardrail is on the wrong side of
18 the pole; is that -- is that your opinion?
19 A. Yes.
20 Q. What's the basis for that opinion?
21 A. The purpose of the guardrail is to
22 deflect vehicles away -- away from the
23 pole, not into it.
24 Q. How do you know that the purpose of

**171**

1  this guardrail was to deflect vehicles
2  away from the pole?
3  A. Well, that should've been its
4  purpose.
5  Q. What if the guardrail was installed
6  to protect the fence, would that change
7  your opinion about the purpose of the
8  guardrail?
9  A. Well, it could -- it should've been
10 on the other side of the pole.
11 Q. Do you know when the guardrail was
12 placed?
13 A. I was told that there -- there's no
14 record of who installed the guardrail is
15 what Mr. Charnas told me.
16 Q. Do you know when it was installed?
17 A. No.
18 Q. Do you know when the pole was
19 originally installed?
20 A. Yeah. 1916.
21 Q. Do you know which was installed
22 first?
23 A. What?
24 Q. Do you know which was installed

**172**

1  first?
2  A. Oh, I think the -- the pole would
3  be installed first. Because that type of
4  guardrail has only been around for 40
5  years.
6  Q. What materials did you review in
7  reaching your opinion that the guardrail
8  is on the wrong side of the pole?
9  A. Again, one of those papers.
10 Q. And just to speed things along, is
11 it this paper, "Effects of Presence of
12 Light Poles on Vehicle Impact of Roadside
13 Barriers?"
14     MR. CHARNAS: What page are
15 you on, Josh?
16     MR. LEWIN: Page .4 of
17 his --
18     (Witness viewing)
19 A. It might have been. I'm not sure.
20 It could've been the U.S. Federal Highway
21 paper.
22 Q. Did you review any other materials,
23 other than those listed in this report,
24 with respect to your opinion regarding the



Jack Daniel Court Reporting & Video Services
Technologies you can use • Experience you can Trust
Direct Dial: 617.557.0039
Toll Free: 866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com
100 Franklin Street
Boston, Massachusetts 02110

Murray Burnstine, P.E.                                February 20, 2007

### 173

1  relative locations of the guardrail and
2  the utility pole?
3  A. No.
4  Q. And, again, this article, "Effects
5  of Presence of Light Poles on Vehicle
6  Impact of Roadside Barriers," was that
7  something you already had in your files?
8  Or did you obtain that to find support for
9  your opinion?
10 A. I -- I -- I obtained it.
11 Q. To support your opinion in this
12 case?
13 A. I guess so.
14 Q. And where did you get it?
15 A. Internet search engine.
16 Q. And did you read this entire
17 article prior to reaching your conclusions,
18 or did you read it after you had reached
19 your conclusions?
20 A. Prior.
21 Q. And did you consider its
22 methodology and conclusions to be sound?
23 A. Yes.
24 Q. And how is it that you say this

### 174

1  article supports your conclusion that the
2  guardrail's on the wrong side of the pole?
3  A. I believe the article says the
4  purpose of the guardrail is to deflect
5  vehicles away from poles or other
6  obstacles.
7  Q. Do you consider Hartwell Road, in
8  the area of the accident, to be a
9  low-volume road?
10 A. Well, compared to what? It's not
11 -- it's not Route 128.
12 Q. It's a small, rural road; is that
13 right?
14 A. Yeah.
15 Q. With one lane in each direction?
16 A. Yeah, I mean, they have -- when
17 they have a traffic jam in the morning
18 when that -- people in the trailer park go
19 to work. You know, but I wouldn't
20 consider it a major road. It is just a
21 country road.
22 Q. It's not an urban road?
23 A. No.
24 Q. It's not a highway?

### 175

1  A. No.
2  Q. Are you aware of any state laws or
3  regulations with respect to the placement
4  of guardrails in juxtaposition to a
5  utility pole?
6  A. I -- I don't know of any written
7  regulation, but, again, it's just common
8  sense.
9  Q. And are you aware of whether that
10 matter of common sense is published in any
11 peer-reviewed journals or articles?
12 A. I believe these articles that I've
13 cited say that, what the purpose of the
14 guardrail is. It's not to make sure you
15 slide into a pole.
16 Q. Now you have also provided an
17 opinion in your report that Pole 37 was
18 too close to the pavement; is that your
19 opinion?
20 A. Correct.
21 Q. On Hartwell Road, what distance
22 would not be too close to the pavement?
23 A. Well, I just have to say, as far
24 as possible.

### 176

1  Q. Did you consult with anyone
2  regarding the proximity of the pole to the
3  edge of the pavement in reaching your
4  opinion?
5  A. I don't recall.
6  Q. What materials did you review with
7  respect to your opinion that the pole was
8  too close to the edge of the roadway?
9  A. Just my common sense.
10 Q. And again, you didn't review any
11 state rules or regulations or laws
12 regarding the distance that is required to
13 be maintained between the edge of the
14 pavement and the utility pole, did you?
15 A. Well, during the Harvard Study
16 there were -- we found a big oak tree in
17 Danvers that had been involved in about
18 ten fatal accidents of cars running into
19 it. It was -- it was half in the street,
20 this tree.
21    And we put a recommendation that
22 the tree be removed. And we had to go to
23 a hearing with the tree warden in front of
24 the tree so that the tree could hear what



Jack Daniel Court Reporting & Video Services
Technologies you can use • Experience you can Trust
Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com
100 Franklin Street
Boston, Massachusetts 02110

Murray Burnstine, P.E.                                      February 20, 2007

### 245

1  own if the -- if the front wheel gets
2  knocked out of alignment. So it's not
3  like an automobile at all.
4      If it starts leaning from right to
5  left, that's called a roll. The
6  motorcycle just goes where you don't want
7  it to go. And it's -- it takes a really
8  skilled rider to get it back on.
9  Sometimes you have to speed up, sometimes
10 you have to let go of the handlebars and
11 let the -- and -- and jerk the throttle.
12 But it can take you by surprise, you know.
13 You're suddenly going where you don't want
14 to go.
15     Q. With reference to your report in
16 this case, did you form an opinion as to
17 when Mr. -- at what distance past the
18 manhole cover Mr. Brown lost directional
19 control of the motorcycle?
20     A. No. I don't have a distance,
21 except it was before Pole 37.
22     Q. So sometime between the manhole
23 cover and Pole 37, Mr. Brown lost
24 directional control of the motorcycle; is

### 246

1  that --
2     A. Correct.
3     Q. -- your opinion?
4     A. Yes.
5     Q. And I think you indicated that it
6  was your opinion that the motorcycle
7  started to roll to the right; is that
8  correct?
9     A. No. I said that at the -- at the
10 time of his head hitting the pole, if the
11 motorcycle was rolled to the right, it
12 would explain how his head got hit and not
13 his shoulder or his legs or the
14 motorcycle. Because a motorcycle in that
15 lean-to-the-right position, the operator's
16 head is the farthest object to the right.
17     I can show you with this toy
18 motorcycle.
19         (Witness indicating).
20     If you lean to the right, your
21 head's going to get hit and nothing else.
22     Q. So at some point in time, it is
23 your -- your opinion that Mr. Brown's
24 motorcycle leaned to the right or is it

### 247

1  not that -- your opinion?
2     A. I think it was at the moment of
3  impact.
4     Q. Okay. And at what point in time
5  after the -- after he passed the manhole
6  cover did the motorcycle start to lean to
7  the right?
8     A. That I don't know.
9     Q. Okay. When Mr. Brown and the
10 motorcycle were riding parallel to the
11 guardrail, what position, in your opinion,
12 was the motorcycle in in terms of angle to
13 the street?
14     A. When was that?
15     Q. When Mr. Brown and the motorcycle
16 were riding parallel to the guardrail
17 along the -- the shoulder of the road,
18 what position was the motorcycle in in
19 relation to the angle to the street?
20         MR. CHARNAS: Objection.
21     A. I think it was upright, if that's
22 what you mean --
23     Q. Okay.
24     A. -- by angle. I don't think it was

### 248

1  leaning at that point.
2     Q. So it's your -- I'm sorry. I
3  didn't mean to cut you off.
4     A. There's no need for it to lean
5  there. He's just traveling, you know,
6  with the handlebars straight ahead. He's
7  going parallel to the -- to the guardrail.
8     Q. Okay. So it's your opinion that
9  Mr. Brown was astride the motorcycle
10 riding parallel to the guardrail along the
11 dirt shoulder of the road in an upright
12 position on the motorcycle; is that
13 correct?
14     A. Correct.
15     Q. And for how long a distance is it
16 -- is it -- strike that.
17     Did you form an opinion as to what
18 distance Mr. Brown traveled in that
19 position?
20     A. I have some calculations that may
21 refine what I testified to before. It's
22 104 feet 2 inches from the center line of
23 the manhole to Pole 37. That's a hundred
24 or something before. Going at 24 miles an


Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:   617.557.0039
Toll Free:     866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110