UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11924-RGS

IAN J. BROWN, JAMES BROWN, and
BARBARA BROWN,

v.

UNITED STATES OF AMERICA,
VERIZON NEW ENGLAND, INC., and
BOSTON EDISON COMPANY d/b/a/
NSTAR ELECTRIC

MEMORANDUM AND ORDER ON
THE MOTIONS OF THE UNITED STATES
AND BOSTON EDISON FOR SUMMARY JUDGMENT

September 26, 2007

STEARNS, D.J.

BACKGROUND

On January 4, 2002, First Lieutenant Ian Brown left Hanscom Air Force Base (Hanscom) on his motorcycle to take his lunch break at home. While returning to his duty station, Lt. Brown lost control of the bike on Hartwell Road in Bedford, Massachusetts. Hartwell Road is a semi-rural, two-lane public highway. The shoulders of Hartwell Road are not paved. At the stretch where the accident occurred, Hartwell Road curves gently to the left. A guardrail is situated approximately two feet to the right of the edge of the pavement. A stone wall backed by a chain link fence lies immediately behind the guardrail. The posted speed limit is 25 miles per hour. According to Lt. Brown, he was traveling at "about 25 m.p.h. at the time of the accident."

Brown was thrown from the bike into the guardrail. He was propelled headfirst along the guardrail into a utility pole. The pole was located on the inside of the guardrail approximately thirteen inches from the edge of the road. The accident left Lt. Brown permanently paralyzed from the waist down.[1] Lt. Brown was honorably discharged from the Air Force as a result of his injuries. He now lives in Neptune, New Jersey with his parents, Barbara and James Brown, who have renovated their home to accommodate their wheelchair-bound son.

On September 2, 2004, Lt. Brown, joined by his parents, brought suit against the United States, Verizon New England, Inc. (Verizon), and NStar (formerly Boston Edison Company).[2] The Browns alleged negligence on the part of the United States, Verizon, and Boston Edison in the siting and maintenance of the utility pole and the guardrail. After discovery, the United States and Boston Edison moved separately for summary judgment.[3] The United States argues that it owed no duty to Lt. Brown because it never owned or maintained Hartwell Road. Boston Edison maintains that Lt. Brown's accident was not reasonably foreseeable, and that in any event, the claims brought by the Browns are

---

[1] The underlying facts are more fully set out in the court's decision denying the motion of the United States to dismiss Lt. Brown's claims under the doctrine of Feres v. United States, 340 U.S. 135 (1950). See Brown v. United States, 410 F. Supp. 2d 3 (D. Mass. 2006).

[2] As the parties refer to NStar throughout the pleadings by the name of its predecessor, Boston Edison Company, the court will do the same.

[3] On May 15, 2007, all parties stipulated to the dismissal with prejudice of the claims and cross-claims brought by and against Verizon.

barred by the Massachusetts Statute of Repose. For reasons to be stated, judgment will enter for the United States and Boston Edison.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "'[G]enuine' means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Buchanan v. Maine, 469 F.3d 158, 166 (1st Cir. 2006), quoting Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 218-219 (1st Cir. 2004).

### The Motion of the United States

The Browns' negligence claim against the United States is premised on the belief that the United States owns Hartwell Road and is therefore responsible for maintaining the Road and its appurtenances in a safe condition. The suit against the United States is brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b). The FTCA waives sovereign immunity and grants federal district courts jurisdiction over tort claims where the United States, "if a private person, would be liable to the claimant in accordance

with the law of the place where the act or omission occurred."[4]  28 U.S.C. § 1346(b)(1).

See FDIC v. Meyer, 510 U.S. 471, 477 (1994).  Under Massachusetts law, "[a] landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk."  Mounsey v. Ellard, 363 Mass. 693, 708 (1973), quoting Smith v. Arbaugh's Restaurant, Inc., 469 F.2d 97, 100 (D.C. Cir. 1972).

The relevant material facts viewed in the light most favorable to the Browns are as follows.  Utility pole 16/37 (the pole that figured in Lt. Brown's accident) was installed by Boston Edison in 1916, and replaced with new but otherwise identical poles in 1929, 1954, and 1964.  The guardrail was installed in 1990.  While the evidence does not identify with certainty the person or persons responsible for installing the guardrail, the parties agree that the United States had no role in its construction or placement.

In 1987, Raytheon Corporation leased the land immediately to the south of the site of Lt. Brown's accident from the United States Navy.[5]  Raytheon vacated the parcel in 1998

---

[4]The waiver of sovereign immunity is construed strictly in favor of the United States. Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003).  There is no subject matter jurisdiction under the FTCA over claims based on the exercise of a discretionary function. See 28 U.S.C. § 2680(a).  "The discretionary nature of government conduct depends on whether the conduct involved an element of judgment or choice . . . [as opposed to conduct directed] by statute, regulation or policy). . . . The exception . . . "protects only governmental actions and decisions based on considerations of public policy." Magee v. United States, 121 F.3d 1, 4-5 (1st Cir. 1997).  Cf. Patrazza v. Commonwealth, 398 Mass. 464, 469-470 & n.3 (1986) (the siting of highway guardrails is a discretionary function immune from suit under the Massachusetts Tort Claims Act).

[5]Under the terms of its lease with the Navy, Raytheon was required to obtain written approval before undertaking any capital maintenance projects on the property (which would include the installation of guardrails). Joseph Broderick, who worked as Raytheon's property manager for thirty-eight years, and whose responsibilities included the upkeep

4

and returned the land to the possession of the Navy.  The Navy at all times considered Hartwell Road to be a public way under the jurisdiction of the Town of Bedford (Town).  A search of Navy records conducted by Jerry Peterson, a civilian Navy employee and Rule 30(b)(6) witness, failed to find any mention of the pole or guardrail.  Dennis Cronin, an Air Force employee who was also designated as a Rule 30(b)(6) witness, testified that the Air Force never claimed ownership of Hartwell Road and never took responsibility for its upkeep.[6]

The overwhelming evidence points to the Town as the owner and custodian of Hartwell Road.  Armand Ouellette, the Superintendent of Grounds at Hanscom testified that during his many years at the base, the Town had maintained and made improvements on Hartwell Road.  "We've never had the road, we've never maintained it, and we've never done anything to it." Ouellette Dep., at 32.  Adrienne St. John, who worked as an engineer for the Town for eighteen years, agreed that the maintenance of Hartwell Road was the Town's responsibility.[7]  Charles Genetti, who worked for the Town's Department of Public Works from 1948 until 1983 as a foreman in the highway and grounds division, oversaw

---

of the property, does not recall having ever approved or undertaken a project involving the guardrail or the utility poles along Hartwell Road.  Broderick reviewed Raytheon records and found no mention of Pole 16/37.  The guardrail also does not appear on Raytheon's drawings of the site.

[6]Cronin searched Air Force records at Hanscom and found no reference to the guardrail, its construction, installation, maintenance, or financing.  Cronin, a civilian employee of the Air Force, has been responsible for the oversight of real property at Hanscom since 1980.

[7]St. John did not, however, believe that the Town owned Hartwell Road in fee simple because the Road is not listed on the Town's Accepted Street Register. St. John Dep., at 55-56.

the Town's maintenance of Hartwell Road. Genetti Dep., at 9-10. Genetti testified that the Town kept Hartwell Road "clean, cut the brush on the side of the road, put down liquid asphalt and hot top," applied cold asphalt to repair frost heaves and fill in "dangerous" (more than 2 inches below the asphalt surface) manhole covers, and handled all snow removal. Id. at 21-24.

Daniel Bremser, a land surveyor hired by the government, testified that his search of the historical records established that the Town took title to Hartwell Road in 1734 or 1735.[8] (The authenticity of the historical records on which Bremser relied in rendering his expert report is not disputed). Bremser noted that Hartwell Road is largely bounded by ancient stone walls, including the segment of the Road where Lt. Brown's accident occurred. Stone walls were traditionally erected as boundary markers in colonial New England. See Ryan v. Stavros, 348 Mass. 251, 265 (1964) (walls and fences are reliable indicators of property lines). As a result, Massachusetts law recognizes ancient fences and walls as decisive proof of the boundary between private property and a public way.[9]

---

[8] A description of the process by which colonial roads became established as "public ways" is set out by Justice Kass in Martin v. Building Inspector of Freetown, 38 Mass. App. Ct. 509 (1995).

[9] "If buildings or fences have been erected and continued for more than twenty years, fronting upon or against a highway, town way, private way, training field, burying place, landing place, street, lane or alley, or other land appropriated for the general use or convenience of the inhabitants of the commonwealth, or of a county, city, town, or parish, and from the length of time or otherwise the boundaries thereof are not known and cannot be made certain by the records or by monuments, such buildings or fences shall be taken to be the true boundaries thereof." Mass. Gen. Laws c. 86, § 2.

A 1938 map located by Bremser clearly indicates the ancient stone wall at the accident site behind the guardrail and Pole 16/37. The Town long ago recognized the stone walls as setting the outer boundaries of Hartwell Road by widening the Road from the stone walls inward, and installing sewer lines on the adjacent shoulders without seeking easements from the owners of the adjoining property. The Town also prior to the accident made a specific grant of permission to Boston Edison to install Pole 16/37 on the shoulder of Hartwell Road.

The only evidence offered by plaintiffs to rebut the government's disclaimer of ownership is a plan recorded by the United States at the Middlesex South Registry of Deeds in 1993 (Plan # 809) that references the Navy parcel as "Total U.S. Navy Jurisdiction: Area = 44.6334 acres including Hartwell Road," and an assertion made by Arthur Hayes, a Navy cartographer, during a Rule 30(b)(6) deposition that the Navy "owns" the land on which Pole 16/37 is sited.[10]

Even assuming that a dispute of material fact exists as to whether the United States held formal title to Hartwell Road in some capacity prior to Lt. Brown's accident, it is undisputed that the United States never exercised a right of dominion. Instead, the Town at all times was in possession and control of Hartwell Road. See McIntyre v. Boston

---

[10]Hayes is a 25-year employee of the Department of Defense, who currently works out of a Navy real estate department located in Philadelphia, Pennsylvania. Hayes oversees Navy acquisitions, transfers, easements, and permitting in a ten-state area. Hayes based his opinion that the Navy owns Hartwell Road solely on the absence of references to a grant of an easement to the Town permitting the construction of Hartwell Road in the 1952 and 1977 deeds of the adjoining property to the Navy. Hayes did not know if Hartwell Road was in fact a public way. Nor was he aware that the Road dates from at least the eighteenth century.

Redevelopment Auth., 33 Mass. App. Ct. 901, 901-902 (1992) ("The critical test [for a plaintiff attempting to recover damages from a landowner for an injury occurring on the property] is who had the right to control the property."). Under Massachusetts law, a party vested with exclusive control of property, whether by easement or prescriptive use, is responsible for maintaining it in a reasonably safe condition (regardless of who holds title). See Archambault v. Williams, 359 Mass. 742, 743 (1971) ("[N]o obligation is imposed on the grantor of an easement to maintain or repair the land placed in servitude."); Williams v. Ferris, 355 Mass. 288, 293-294 (1969) (whether the responsibility for maintaining property in a safe condition falls on the fee owner or the easement owner depends on possession and control); Shapiro v. Burton, 23 Mass. App. Ct. 327, 333 (1987) (same).[11]

In sum, no properly instructed jury could conclude that the United States was at any relevant time responsible for the condition of Hartwell Road. See Richards v. Relentless, Inc., 341 F.3d 35, 41 (1st Cir. 2003) (judgment as a matter of law under Rule 50(a) is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party."); Guilloty Perez v. Pierluisi, 339 F.3d 43, 59-60 (1st Cir. 2003) (affirming a judgment as a matter of law where no reasonable jury could have found that an employee's protected activity led to an adverse employment action). Cf. Lockhart-

---

[11]The United States also argues that it cannot be liable to plaintiffs in light of the Lioni doctrine, which holds that the owner of land abutting a public way does not owe a duty of care to travelers who inadvertently stray from the road. See Lioni v. Marr, 320 Mass. 17, 19-20 (1946). It is doubtful that the holding of Lioni, which was decided on common-law distinctions involving a plaintiff's status as an invitee or licensee, survives Mounsey v. Ellard, which redirects the focus to a defendant's duty of care with regard to those who willfully or inadvertently find themselves on his property.

Bembery v. Sauro, 2007 WL 2265647, *1 (1st Cir. Aug. 9, 2007) ("No properly instructed jury could have found a violation of constitutional rights on the evidence."). Consequently, judgment will enter for the United States on the Browns' FTCA claim.

The Motion of Boston Edison

The Browns contend that Boston Edison is liable for negligently allowing the utility pole to remain on the "wrong" side of the guardrail once it was installed. Boston Edison makes two arguments in support of its motion for summary judgment. First, Boston Edison contends that it owed no duty to Lt. Brown as his accident was not foreseeable. Second, Boston Edison maintains that Lt. Brown's claim is barred by the Statute of Repose, Mass. Gen. Laws c. 266, § 2B. Boston Edison is entitled to judgment on both theories.

Foreseeablity

Whether Boston Edison owed Lt. Brown a duty of care is a question of law for the court. See Jupin v. Kask, 447 Mass. 141, 146 (2006). While dispositive motions are disfavored in negligence actions, where a defendant is determined to owe no duty of care, summary judgment must be granted. See Westerback v. Harold F. LeClair Co., Inc., 50 Mass. App. Ct. 144, 146 (2000) ("Questions of reasonable forseeability are ordinarily left to the jury, but the judge may properly decide them as a question of law where the harm suffered, although within the range of human experience, is sufficiently remote in everyday life as not to require special precautions for the protection of patrons."). The duty of care derives from the foreseeability of the harm caused to others by a defendant's acts or omissions. See Restatement (Second) of Torts § 302, comment "a" (1965). In Whittaker v. Saraceno, 418 Mass. 196 (1994), a jury's verdict holding a commercial landlord liable

9

for failing to provide adequate building security was reversed by the Supreme Judicial Court. It held that the rape of a female office worker by an intruder was not foreseeable by the landlord as a matter of law because "there was no evidence of previous crimes in the office portion of the building in which the plaintiff was attacked." Id. at 200. In Glick v. Prince Italian Foods of Saugus, Inc., 25 Mass. App. Ct. 901 (1987), patrons sought to hold a restaurant liable for personal injuries caused when an automobile crashed through its exterior wall. The Appeals Court, citing the rule of Mounsey, held that no duty is owed when the risk is one that no reasonable defendant could have anticipated. Id. at 902.

The more recent and contextually analogous case of Afarian v. Massachusetts Elec. Co., 449 Mass. 257 (2007), involved an intoxicated driver's collision with a utility pole. The Supreme Judicial Court, adopting Restatement (Second) of Torts § 368 (1965), held that

> [a] possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who (a) are traveling on the highway, or (b) foreseeably deviate from it in the ordinary course of travel.

Afarian, 449 Mass. at 264. The Court specifically cited comment "e" to section 368, which explains that "[t]he public right to use the highway carries with it the right to protection by reasonable care against harm suffered in the course of deviations which may be regarded as the normal incidents of travel." Driving while intoxicated, the Afarian Court concluded, poses an extraordinary risk against which a landowner cannot reasonably be expected to take precautions. The Court cited favorably the approach taken by the Maryland Court of

Appeals in Coates v. S. Md. Elec. Coop., Inc., 354 Md. 499 (1999), with respect to utility pole collisions. Coates identified a series of factors to be considered:

> driver conduct as well as the proximity of the pole to the road; the nature and condition of the road in the vicinity of the pole; whether the pole was to the right or left of the vehicle in the direction the vehicle should have been traveling; the extent to which the vehicle veered off the road; whether the pole had been struck on previous occasions; whether the location of the pole was mandated by some governmental authority or left largely to the discretion of the utility; whether the utility could feasibly have located the pole elsewhere; and the cost and feasibility of relocating the pole to a different location.

Id. at 514. See also McMillan v. State Highway Comm'n, 393 N.W.2d 332 (1986).[12] The Afarian Court also stressed the need to take into account public policy considerations

---

[12]As examples of cases where a utility owed no duty of care to a plaintiff because an accident was not reasonably foreseeable, the Afarian court cited the following: Speigel v. S. Bell Tel. & Tel. Co., 341 So. 2d 832, 833 (Fla. Dist. Ct. App.1977) (affirming summary judgment for utility company, noting that a utility company has no obligation to guard against extraordinary exigencies created when an out-of-control vehicle leaves the travel portion of a road); Bush v. N. Ind. Pub. Serv. Co., 685 N.E.2d 174, 178 (Ind. App.1997) (utility company is not required to anticipate "the illegal and reckless conduct of motorists"); Oram v. New Jersey Bell Tel. Co., 132 N.J. Super. 491, 493-495, (1975) (summary judgment in favor of utility company appropriate where driver hit pole two feet from the road after being forced off the road by another driver – a utility company "need only anticipate ordinary travel"); Gorrell v. Texas Utils. Elec. Co., 915 S.W.2d 55, 60 (Tex. App.1995) (summary judgment in favor of utility affirmed where the driver was not traveling with reasonable care and her deviation was not in the ordinary course of travel); McAllen v. De La Garza, 898 S.W.2d 809, 810, 812 (Tex. 1995) (intoxicated driver who fell asleep at the wheel did not deviate from the road in the ordinary course of travel); Florida Power & Light Co. v. Macias, 507 So. 2d 1113, 1115-1116 (Fla. Dist. Ct. App.1987) (adopting the rule that "the chance that a vehicle in the ordinary course of travel will deviate from the roadway and collide with a pole is only a remote possibility," thus to recover, a plaintiff "must present some evidence which indicates a particularly dangerous condition which would make it likely, and thus foreseeable, that vehicles would deviate from the roadway and collide with the particular pole alleged to have been negligently maintained").

arising from "our society's dependence on the services supplied by utility companies, and the public benefit of receiving those services." Id. at 265-266.[13]

In arguing that Boston Edison should have recognized the foreseeability of a risk of an accident involving Lt. Brown, the Browns point to Town police logs that list "the vicinity of 180 Hartwell Road" as the site of twenty-eight reported motor vehicle accidents between 1994 and 2002.  However, none of these accidents involved Pole 16/37 or, as best the court can determine, a motorcycle.  Nor have the Browns pointed to any accident in the experience of Boston Edison, involving Hartwell Road or any other public way, that resembles Lt. Brown's in the sense that a guardrail exacerbated the injuries of a motorist who collided with a utility pole.[14]  Under the circumstances, the court finds that no duty of

---

[13] There is no evidence in the record that Boston Edison had the legal right either to dismantle and reposition the guardrail or to relocate Pole 16/37 on the adjacent property, which it neither owned nor had access to by way of an easement.

[14] According to Murray Burnstine, a mechanical engineer with no civil engineering experience (who was offered as an expert witness by the Browns), the primary purpose of a guardrail is to prevent vehicles that veer from a roadway from striking a fixed object that is more likely to cause injury or damage than the guardrail itself.  Burnstine also offered the seemingly counterintuitive opinion that had the guardrail not been present Lt. Brown would not have collided with the utility pole (as opposed to the stone wall).

In its reply brief, Boston Edison argues that the court should not consider the testimony or opinion of Burnstine as he has "no training, education, or experience that qualifies him to render an opinion in the field of civil engineering."  Moreover, Burnstine conceded in his deposition that he had "rendered his opinion without conducting any analysis with respect to the placement of the pole," but had reached his opinion through the application of 'common sense.'" Boston Edison Reply Brief, at 8.  Under Fed. R. Civ. P. 56(e), affidavits supporting or opposing summary judgment must set forth facts that would be admissible in evidence.  A district court may exclude an expert affidavit that expresses opinions that have no foundation or rest on obviously incorrect assumptions or speculative evidence. See Casas Office Machines, Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 681 (1st Cir. 1994).  The court agrees with Boston Edison that Burnstine's affidavit fails to satisfy either Fed. R. Evid. 702 or 104(a).  Consequently, the Burnstine affidavit will be stricken and

care existed as Boston Edison could not have reasonably anticipated Lt. Brown's accident.[15]

Statute of Repose

As a second ground for summary judgment, Boston Edison argues that the Massachusetts Statute of Repose bars Lt. Brown's claims insofar as they involve Pole 16/37. The statute, Mass. Gen. Laws c. 260, § 2B, bars any claim for negligence arising out of the design, construction, or administration of improvements to real property that is not asserted within six years following the opening of the improvement or its substantial completion. See Klein v. Catalano, 386 Mass. 701, 702 (1982). A statute of repose does not incorporate the concepts of accrual and discovery. See McGuinness v. Cotter, 412 Mass. 617, 622-623 (1992). "[T]he determination of when a cause of action accrues, causing the statute of limitations to run, has long been the product of judicial interpretation in this Commonwealth." Franklin v. Albert, 381 Mass. 611, 617 (1980). "A

---

Burnstine's opinion disregarded.

The Browns have also offered the section of the Massachusetts Highway Design Manual that sets out specifications for the siting of guardrails. Boston Edison argues persuasively that the court should not consider the Manual as Burnstine did not consult it in forming his opinion; the Browns have made no showing that the Manual is applicable to the guardrail installed on Hartwell Road or that the Manual was in effect when the guardrail was installed; and finally, the Browns never produced the Manual to Boston Edison during discovery.

[15] Even if the argument were to be recast in an attempt to impose a general duty on Boston Edison to undertake the safest placement possible of its utility poles, the public policy considerations identified in Afarian would cause the court to hesitate to impose such a duty. It would be tantamount to making a utility company the absolute insurer of every driver who veered from a public highway into a utility pole whatever the cause of the accident. See Roderick v. Brandy Hill Co., 36 Mass. App. Ct. 948, 950 (1994).

statute of repose, on the other hand, itself identifies the event that commences the running of the statutory period, leaving nothing to judicial determination." Rudenauer v. Zafiropoulos, 445 Mass. 353, 358 (2005). Once a defendant establishes that a complaint is putatively covered by the statute, the burden shifts to the plaintiff to show facts to the contrary. McGuinness, 412 Mass. at 620. "Whether a defendant's activities fall within the statute [of repose] is a question of law." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1160 (1st Cir.1993); see also McDonough v. Marr Scaffolding Co., 412 Mass. 636, 640 (1992).

The statute "grants immunity only to architects, engineers, contractors and others involved in the design, planning, construction, or general administration of improvements to real property and denies the same protection to materialmen, owners, tenants and others in possession or control." Klein, 386 Mass. at 717. However, there is no specified "class of protected actors. . . . [I]ts terms extend protection to persons allegedly responsible for acts, i.e., those who commit 'any deficiency or neglect in the design, planning, construction, or general administration of an improvement to real property.'" Dighton v. Fed. Pac. Elec. Co., 399 Mass. 687, 694 (1987).

Lt. Brown makes a two-fold argument: (1) that his claims do not involve allegations of "design, planning, construction or general administration" of the pole; and (2) that the utility pole does not constitute an "improvement to real property." Brown asserts that his claims are not based on an improper placement of the pole, but on the dangerous condition that was created when the guardrail was installed in 1990. Brown contends that Boston Edison's negligence arises from its failure to "remedy the dangerous and ongoing condition caused by the erection of the guardrail alongside, and on the 'wrong side,' of

the pole." Opposition Memorandum, at 14. Relying on <u>Coca-Cola Bottling Co. of Cape Cod v. Weston & Sampson Eng'g, Inc.</u>, 45 Mass. App. Ct. 120 (1998), Brown argues that the erection of the guardrail created a "defect" in Pole 16/37, "analogous to the development of a dangerous crack." Opposition Memorandum, at 14. Because this "defect" arose after the design, planning, and installation of the pole, Brown contends that the Statute of Repose does not apply.[16]

The failure of the argument begins with the word "defect" itself. A defect is an imperfection or fault inherent to an object – as was the case with the plugged soil line referenced in the <u>Coca-Cola</u> case. Nothing in that opinion, or any other that the court can locate, suggests that a defect can be created by the mere juxtaposition of two objects that are totally unrelated to one another.

Whether Brown's argument has any secondary force depends on whether a utility pole qualifies as an "improvement" under the Statute of Repose. "The statute does not define 'improvement,' and [t]he legislative history of G.L. c. 260, § 2B does not indicate precisely what the Legislature meant the term to encompass." <u>Dighton</u>, 399 Mass. at 697. <u>Webster's Third New Int'l Dictionary</u> (1971) defines an "improvement" as "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." Several Massachusetts cases have

---

[16]The Massachusetts Appeals Court in the <u>Coca-Cola</u> case defined "general administration" as the "uninterrupted, post-construction professional activities which defendant performed in an effort to remedy unsatisfactory conditions that were revealed post-construction." <u>Id.</u> at 127.

15

relied on the Webster's definition in determining what constitutes an "improvement" for purposes of the statute. See Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 396 Mass. 818, 823 n.8 (1986); Milligan v. Tibbetts Eng'g Corp., 391 Mass. 364, 368 (1984); Raffel v. Perley, 14 Mass. App. Ct. 242, 245 (1982).

The question whether a utility pole constitutes an improvement to real property is not answered in the Massachusetts cases. Consequently, the court has looked for guidance to cases from other jurisdictions.[17] Two helpful decisions are from federal district courts: Pippin v. Potomac Elec. Power Co., 132 F. Supp. 2d 379 (D. Md. 2001), and Montaup Elec. Co. v. Ohio Brass Corp., 561 F. Supp. 740, 748 (D.R.I. 1983). In applying the Maryland Statute of Repose, the district court in Pippin found that "anything that permanently enhances the value of the premises for general uses, . . . including its effect on the value and use of the property" is an improvement. Despite plaintiff's argument that a pole was not a "permanent" fixture, and that a property owner does not "value" the presence of a pole on his property, the court found that the installation of the pole met the Black's Law Dictionary definition of an "improvement."[18]

---

[17]In Afarian, the Supreme Judicial Court did not reach the utility company's argument that the Statute of Repose applied. Afarian, 449 Mass. at 267 n.14.

[18]Black's Law Dictionary (6th ed. 1990), defines an improvement as: "[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally has reference to buildings, but may also include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc. An expenditure to extend the useful life of an asset or to improve its performance over that of the original asset. Such expenditures are capitalized as part of the asset's cost."

16

> [A]lthough a utility pole can be removed from the ground in roughly 15 minutes, that is not the only determination of its relationship with the parcel in question. The pole has been in the same spot for 26 years. This includes all of the weathering that has been inflicted upon the utility pole. Even after the accident, PEPCO, once again erected a pole in the same exact position. This reflects a relationship that the utility pole has with the land. The pole has also survived three different owners, which shows a desire to keep the pole on the property, as well as a sense that the pole runs with the land.

Id. at 390.

In Montaup, the Rhode Island District Court (Selya, J.), applying Massachusetts law, found that claims against the manufacturer of allegedly defective ground wire brackets used in electric transmission lines were barred by the Statute of Repose. Montaup, 561 F. Supp. at 748. Judge Selya also looked to Webster's definition of an "improvement" in finding that the construction of electrical transmission lines amounted to an improvement to real property. Judge Selya observed that

> [i]f the real property at issue is more narrowly defined as Montaup's power line easements, the conclusion becomes even more compelling that the construction of the line represents an improvement to the easements. Montaup uses the line in providing a precious and utilitarian commodity - electricity to its customers. The costs of construction would, from an accounting perspective, have to be capitalized. It cannot, therefore, be contended that the transmission line neither makes the easement more useful nor more valuable.

Id. at 748.[19]

---

[19] In Mora-San Miguel Elec. Coop., Inc. v. Hicks & Ragland Consulting and Eng'g Co., 93 N.M. 175 (1979), the court affirmed a summary judgment holding that the installation of a power line was an improvement to real property within the meaning of a statute of repose. Likewise in Washington Natural Gas Co. v. Tyee Constr. Co., 611 P.2d 1378, 1380-1381 (Wash. Ct. App.1980), the court found that underground electric lines added to the value of the subdivision property *on which they were located and which they served.*) (Emphasis added). The court accordingly held that the lines constituted improvements to real property. There are cases to the contrary. although less persuasive

Boston Edison installed Pole 16/37 in 1916 with the permission of the Town and replaced it in 1929, 1954, and 1964. Pole 16/37 has remained in the same location for nearly a century. The pole adds value to the property in which it sits by facilitating the delivery of electric power to customers on the adjacent land.[20] The court finds that Pole 16/37 is an improvement to real property. Because the last reinstallation occurred over forty years ago, the six-year Statue of Repose applies, and the Browns' claims of negligence against Boston Edison are barred.

## ORDER

For the foregoing reasons, the motion of the United States for summary judgment is <u>ALLOWED</u>. Boston Edison's motion for summary judgment is also <u>ALLOWED</u>. The Clerk may now close the case by entering judgment for the defendants.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

in their reasoning. In <u>Turner v. Marable-Pirkle, Inc.</u>, 233 S.E.2d 773 (Ga. 1977), the court held that the replacement of a transformer with one of greater capacity did not constitute an improvement to real property within the meaning of the Georgia statute of repose because it did not increase the value of the farm property where the transformer was located. In <u>Smith v. Westinghouse Elec. Corp.</u>, 732 P.2d 466 (Okl.1987), the court oddly resorted to state tax laws in determining whether transmission lines were "improvements to real property." "Because *ad valorem* taxes for the electrical equipment in suit are assessed solely against the public utility using it, the transformers in question were not improvements to real property." <u>Id.</u> at 470.

[20]While the pole can be easily replaced, that does not make it "fungible" in the sense of being "impermanent." Over its ninety-year history, Pole 16/37 has outlived many of its neighboring structures.